Exhibit F

由此

HCCL 2/2004

**IN THE HIGH COURT OF THE**
**HONG KONG SPECIAL ADMINISTRATIVE REGION**
**COURT OF FIRST INSTANCE**
COMMERCIAL ACTION NO.2 OF 2004

------------------------

BETWEEN

PEREGRINE FIXED INCOME LIMITED (In Liquidation) — Plaintiff

and

JP MORGAN CHASE BANK (formerly known as The Chase Manhattan Bank and having merged with Morgan Guaranty Trust Company of New York) — Defendant

----------------------

Before : Hon Stone J in Chambers

Dates of Hearing : 19 and 20 January 2005

Date of Judgment : 4 February 2005

------------------------

JUDGMENT

------------------------

*The application*

1. By summons dated 27 May 2004 the defendant in these proceedings, JP Morgan Chase Bank ('JPMCB') applies to stay these proceedings to the United States District Court for the Southern District of

由此



New York on the basis that that court is clearly and distinctly the more natural and appropriate forum for trial.

2. This action was commenced by the plaintiff liquidators on 9 January 2004, with a Statement of Claim being filed on 17 March 2004. On 19 May 2004 time was extended for the filing of a Defence, and a week thereafter the present *forum non conveniens* summons was issued.

*The factual background*

3. The plaintiff ('PFIL') was a wholly owned subsidiary of Peregrine Investment Holdings Ltd. Both companies were part of the Peregrine group which collapsed in 1998 and was placed into liquidation.

4. At the time of the matters in question in this action, PFIL was a trader in fixed income financial products, including foreign exchange and interest rate swaps and other derivative products.

5. The defendant herein was formed in or about November 2001 upon the merger of Morgan Guaranty Trust with the Chase Manhattan Bank.

6. The plaintiff's case is that JPMCB assumed the liabilities of Morgan Guaranty Trust by operation of New York law.

7. In the present proceedings, PFIL claims damages in contract against JPMCB arising from the close-out of a number of derivative

transactions, a closure of positions which was necessitated by the collapse of the Peregrine Group in January 1998.

8. The essential dispute between the parties relates to the amount which was paid to PFIL consequent upon the close-out. PFIL says that this settlement was short by some US$14 million.

9. This allegation depends, in turn, upon the construction and application of certain provisions of the 1992 International Swap Dealers Association Master Agreement ('the ISDA Master Agreement') which it is common ground governed the transactions in question pursuant to agreement to this effect between PFIL and Morgan Guaranty Trust dated 8 January 1996.

10. There is no need for present purposes to go into detail of the types of transactions which it was necessary contractually to close-out; suffice it to say that these were non-deliverable forward foreign exchange transactions, foreign exchange options, forward foreign exchange swap transactions, cross-currency swap transactions and interest rate swap transactions. Moreover, these various transactions were denominated in a wide range of currencies.

11. It further appears to be common ground that an 'Event of Default' occurred upon Peregrine Investment Holdings Ltd, which was a 'Credit Support Provider' of PFIL under the ISDA Master Agreement, seeking the appointment of a Provisional Liquidator; once this happened, as it did on 13 January 1998, the parties were obliged to close-out

outstanding derivative transactions in accordance with the provisions of that Agreement.

12. After obtaining market quotations, on 23 January 1998 payment was made to the Provisional Liquidators of PFIL by Morgan Guaranty Trust effective upon closure of the various open positions in respect of the various transactions then extant.

13. Put shortly, it is the plaintiff liquidators' case that the method of obtaining the market quotations necessary to effect the closure of these positions was flawed: it is said that such market quotations were not obtained as at the 'Early Termination Date' specified in the ISDA Master Agreement, as against the defendant's contention that it had duly fulfilled its obligations to request a market quotation at a time as soon as reasonably possible after the Early Termination Date, and that it had selected the date and time at which such quotations had been obtained in good faith.

14. The practical difference between the respective contentions is that if the PFIL liquidators' contention is correct, then Morgan Guaranty Trust was bound to obtain market quotations as at 12 or 13 January 1998, being reference dates which were crystallized by contract, whereas if JPMCB is correct, if in the circumstances prevailing it was only reasonably practical for Morgan Guaranty Trust to obtain market quotations on a later date, for example on 15 January 1998, then for contractual purposes the quotations thus obtained could be those obtained as of that date, provided that that date was chosen in good faith.

15. I intend to delve no further into the considerable amount of detail inherent in this dispute; the foregoing brief summary is sufficient to provide a flavour of the type of case that this is going to be, wherever its ultimate venue.

16. The broad issues which arise for decision are thus :

(a) whether, on a proper construction of section 14 of the ISDA Master Agreement, quotations from Reference Market Makers need to be obtained 'as at' the same date as the Early Termination Date, which implies quotes on an historical basis, or whether quotations need only be on the basis of the 'spot' value at the time when they were actually obtained, which may be as soon as reasonably practical after the Early Termination Date;

(b) if the latter, were such quotations obtained in fact "as soon as reasonably practical"; and

(c) the meaning of the term 'good faith' within the ISDA Master Agreement, and whether Morgan Guaranty Trust so acted in the selection of the day and time on which the quotations were obtained.

*Applicable principle*

17. There is no dispute as to applicable principle in an application on the basis of *forum non conveniens*.

18. These principles are conveniently summarized in the *Hong Kong White Book 2004*, see in particular M/N 1/1/10 at pp.100-102.

Such principles, of course, derive from the judgment of the House of Lords in *Spiliada Maritime Corp. v. Cansulex Ltd*, [1986] AC 460 (HL).

19. In applications of this type, the burden lies upon the applicant to show that the court should exercise its discretion to grant a stay. In instances wherein, as here, the defendant seeks to avoid the exercise of a jurisdiction invoked by the plaintiff against the defendant as of right, that is, to halt otherwise legitimately constituted proceedings, it must be shown not merely that Hong Kong is not the natural forum for the action, but that there is another available forum, having competent jurisdiction, which is "clearly or distinctly more appropriate" than Hong Kong.

20. Should this initial hurdle be satisfied, the concomitant question thus to be answered is whether trial at the other forum will deprive the plaintiff of any legitimate personal or juridical advantage.

*The respective cases*

21. Mr Shieh SC, leading for the applicant, urged the court to order a stay of these proceedings in favour of adjudication by the United States District Court for the Southern District of New York.

22. In the factual matrix of this case, there was no doubt, he said, that the United States District Court not only would have jurisdiction, but that in the circumstances such court clearly was a more appropriate venue than Hong Kong.

23. In this connection Mr Shieh invoked relevant contractual provisions within the ISDA Agreement, including the fact that the governing law was New York law, the availability of witnesses, and the fact that there were no juridical disadvantages to the plaintiff in moving this case to New York: the burden was on the plaintiff to demonstrate this, he said, and this was a burden which the plaintiff had failed to discharge.

24. Mr Shieh also went so far as to suggest that from the viewpoint of promoting certainty and finality in international derivatives trading, a dispute under New York law in relation to the ISDA Master Agreement is of enormous interest to practitioners, in particular in terms of the early termination and close-out netting provisions within that Agreement; in fact Mr Pickel, the CEO of ISDA, had affirmed that a decision on this point by a New York court would be of far greater value to ISDA's members that a decision from any other jurisdiction.

25. This may be so, but it is nothing to the point, and I reject unequivocally this element of the argument. This is a serious commercial dispute between two parties which has been commenced as of right in the Hong Kong court. For the purpose of adjudicating the present application I have no interest in, and accord no weight to, the fact that practitioners of derivative transactions may have greater interest in that which a New York court has to say on the matter. That which is at stake are the rights of the specific parties to this litigation, and whether this court should continue to exercise its undoubted jurisdiction to resolve this dispute. The views of non-parties are of no account.

26. For the plaintiff, Mr Smith SC submitted that this action has a real and substantial connection with Hong Kong, that the defendant in this application had not discharged the burden of proof incumbent upon it in a stay application. In particular it had not shown that the application of New York law would create difficulties for the Hong Kong court, or, for that matter, that there were material differences between the two legal systems in terms of the issues raised, that the defendant's argument in terms of the availability of witnesses was much overstated, and that there was a clear risk that the action would become time-barred if stayed to New York.

27. Looking at the issue in the round, Mr Smith argued, this action should remain in Hong Kong.

*Post-hearing developments: the defendant's undertaking*

28. A substantial part of the debate in this case surrounded the issue of whether, should this action be stayed in favour of the New York court, the action would be time-barred in New York, whether by reason of a six year limitation period under section 213 of the New York Civil Practice Law and Rules for a claim based upon "a contractual obligation or liability", or whether there was in addition a four year time bar under Article 2 of the Uniform Commercial Code.

29. In this regard a letter from Messrs Richards Butler on behalf of the liquidator plaintiffs had invited the defendant to give a 'global' time bar waiver, but this invitation pointedly had been declined.

30. Initially Mr Shieh sought to defuse that which the court made clear it regarded as a significant juridical disadvantage by arguing that a time bar in an alternative forum could only amount to a juridical disadvantage if such otherwise were not applicable in Hong Kong.

31. This line of argument thus stimulated an invitation to the court by Mr Shieh to depart from the recognised common law position that, in terms of Hong Kong conflict of laws characterisation, statutes of limitation are regarded as matters of procedure and are governed by the law of the forum, and to adopt the position — specifically achieved by statute in England and Australia — that defences of limitation are substantive defences and are governed by the proper law of the transaction.

32. This court made it clear that it was *not* going to accept this argument, for the purpose of this interlocutory application at least; thus the proposition that PFIL would face the same time bar argument under New York law, irrespective of whether the action were to be tried in Hong Kong or in New York, and that as a consequence there would be no juridical disadvantage in staying proceedings to New York, was not an argument that was going to succeed. To the contrary, the court made it plain that the virtual certainty of the plaintiff being time-barred in New York, should the action be stayed to that jurisdiction, constituted a tolerably persuasive argument against the order of a stay.

33. In the event, there was, and is, no need further to dwell upon this aspect of the matter.

由此



34. Upon the completion of argument, counsel informed the court that arrangements were in hand to canvass a suitable form of undertaking, to be given by the defendant to the plaintiff, in terms of agreement by the defendant, should the decision otherwise be to stay this action in favour of the United States District Court for the Southern District of New York, not to plead any statutes of limitation as a defence.

35. Subsequent to the hearing of this application, the court received letters form the Hong Kong solicitors for the parties enclosing the form of undertaking which thus had been agreed.

36. In summary, in this undertaking the plaintiff agreed that upon any stay in favour of the New York court all statute of limitation defences would be waived, as also would be waived any defence in law or equity relating to the passage of time between the underlying events in issue and the commencement of proceedings. A further undertaking was given, within the same document, that in the event of a stay, the defendant would not make application for an order for security for costs pursuant to the relevant New York procedural rules.

37. This document speaks for itself, and for present purposes I need say no more about it, save and except to observe that in my view its existence is a matter of significance in terms of the present *forum non conveniens* argument. Absent an undertaking in these terms, the defendant's application certainly would have failed; in light of this undertaking, now accepted by the plaintiff, the issue is less obviously clear cut.

*Connecting factors*

38. In this case there are said to be factors which clearly point in the direction of the New York court being the "natural forum", that is, that with which the action has the most real and substantial connection. I deal with them in turn.

*(i) Contractual provision*

39. There are two elements to be considered under this head, namely issues of choice of law and the existence of a non-exclusive jurisdiction clause.

40. Under section 13(a) of the ISDA Master Agreement, the 'Governing Law' of this Agreement is specified as that stipulated in the Schedule. Part 4(1) of the Schedule provides that :

> "This Agreement will be governed by and construed in accordance with the laws of the State of New York without reference to the choice of law doctrine."

41. Further, in section 13(b), under the heading 'Jurisdiction', the Agreement reads thus :

> "With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably –
>
> (a) submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

由此



> (b) waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have jurisdiction over such party."

A rider to these provisions reads :

> "Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction…nor will the bringing of proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction."

42. The situation, therefore, is that New York law governs the ISDA Master Agreement, and that, in addition, there is expressed to be a non-exclusive jurisdiction clause in terms of proceedings within the US District Court.

43. Against this background, Mr Shieh suggests that if, as here, the correct interpretation of foreign law is central to the Hong Kong proceedings, that this will be a highly relevant factor in staying proceedings to the foreign jurisdiction.

44. He says that the significance of New York law is twofold: first, the adjudication of this dispute between the parties involves construing the provisions of the ISDA Master Agreement, in particular section 14 thereof, that this is an exercise calling for application of New York law on contractual interpretation, and that a New York court naturally is best equipped to perform this exercise; and second, under section 14 of the Agreement JPMCB was obliged to select in good faith the date and time at which the market quotations were obtained, and that,

as the expert evidence before the court indicates, there is within New York law an extensive and well-developed body of jurisprudence on the doctrine of 'good faith'.

45. Accordingly, went the submission, given that, as such, there is no counterpart doctrine in Hong Kong law, it is clear that the US District Court would be in a better position than the Hong Kong court to decide upon the ambit of the 'good faith' obligation, which was a discretionary and somewhat fluid concept under New York law, and whether Morgan Guaranty did, in fact, comply with this obligation in the selection of the dates and times at which the Market Quotations were obtained.

46. Mr Smith's spirited rejoinder to this argument was that the defendant had not shown that on the specific facts of this case that the application of New York law was material to the choice of forum.

47. He argued that whichever court addresses the construction of section 14 of the ISDA Master Agreement, it would have to approach the issue afresh, by interpreting the words actually used in their context and without the benefit of decided New York cases on the point; in fact, the thrust of Professor Thel's evidence, which was put in on behalf of the defendant, is that the meaning of the words 'good faith' under New York law depends on their natural interpretation in the contractual context in which they are used, which is not materially different from the approach under English and Hong Kong law.

48. Hence, Mr Smith submitted, in sum the evidence of the defendant failed to demonstrate that there was any material difference

between English and Hong Kong law, or that this court, which is well capable of grasping concepts of good faith and commercial morality, is likely to construe section 14 of the Agreement any differently than a New York court.

49. I dare say that Mr Smith is correct in his submission that this court could deal with the issues arising in this litigation, and in particular with the application of New York law. Equally, however, I have little doubt that a New York District Court judge is going to be in a better position more surely to deal with the specific arguments that appear likely to be raised in this case.

50. As to the non exclusive jurisdiction clause, Mr Smith cited an earlier decision of this court, in *T&K Electronics Ltd v. Tai Ping Insurance Co Ltd* [1997] 3 HKC 330, in which the court expressed the view that in any discretionary stay argument not involving an exclusive jurisdiction clause, and where jurisdiction has been established as of right, that "such a non-exclusive jurisdiction clause is simply an element within the factual matrix upon which the court is asked to take a view in each case".

51. Mr Shieh did not, I think, take issue with this proposition in itself, but maintained that a non-exclusive jurisdiction clause is nevertheless entitled to be treated with "considerable weight" in support of an *fnc* stay, citing in this regard a number of English cases in area: see for example *Mercury Communications Ltd v. Communication Telesystems International* [1999] 2 All ER (Comm) 33 and *JP Morgan Securities Asia Private Ltd v. Malaysian Newsprint Industries Sdn Bhd v. Malaysian Newsprint Industries Sdn Bhd* [2001] 2 Lloyd's Rep 41.

52. It is clear that, in contrast to the effect of an exclusive jurisdiction clause, a non-exclusive jurisdiction clause does not change the burden, which remains on the defendant, but equally the presence of such a clause is not something to which little weight should be attached in forming a conclusion as to the appropriateness of the foreign forum to which the action is sought to be stayed. The clause in this case represents a contractual agreement by the plaintiff to submit to the jurisdiction of the New York court should an action be brought against it in New York, and to that degree the parties must be taken to have recognised that New York cannot be characterised as other than an appropriate forum. As Mr Shieh emphasized, the fact that PFIL did envisage proceedings being brought in New York and did expressly waive any objection to that forum must be persuasive factors for the court to take into account in considering the discretionary 'mix'.

53. True it is that this submission is in part offset by the rider to this clause, by which neither party was precluded from bringing proceedings in any other jurisdiction, the existence of this express provision in my view serving to neutralize Mr Shieh's further submission that in light of the contractual terms the court had a right to hear from the liquidators as to the reason why, in the circumstances, it had been decided to press on in Hong Kong and not to commence proceedings in New York.

54. Nevertheless, in my view there can be no doubt but that the existence of the non-exclusive jurisdiction clause, coupled with the express choice of law provision as to the applicability of New York law as the governing law of the ISDA Master Agreement, constitute significant connecting factors which point in favour of the US District Court for the

Southern District of New York as the natural and appropriate forum for the resolution of this dispute.

*(ii) Evidential matters: witnesses and documentary evidence*

55. As to witnesses, the defendant submitted that all of the JPMCB witnesses who will provide evidence which is likely to be challenged or disputed at trial are based in New York; in broad terms, their evidence will demonstrate how JPMCB discharged its contractual obligations under the ISDA Master Agreement in obtaining the Market Quotations and in closing out the relevant transactions.

56. Mr Shieh observed that the three main areas involved in the close-out process could be classified as the (i) legal (ii) mechanical and (iii) execution aspects. He outlined the witnesses who would be speaking to these areas, and made the point that as far as the plaintiff liquidators were concerned, since PFIL had not been involved in the close-out process, the plaintiff was not in a position to provide direct evidence of the primary facts. Accordingly, the only relevant witnesses as to the timing and mechanics of the close-out were the defendant's witnesses.

57. In response Mr Smith had two main themes to his argument. First, that the defendant's 'parade of witnesses' was much overstated, and that this could be seen from the fact that a number of persons, be they traders or executives, who were involved in the close-out of the PFIL transactions were not at present in New York, so that, for example, four of the traders named were currently in Singapore, and in fact some were no longer working with the defendant. Moreover, he said, as to those

由此



potential witnesses currently in New York, such as Mr Magnus, Mr Thompson and Mr Murray, whose job responsibilities were said to make it difficult to attend a trial in Hong Kong, these were allegations that "stretched credulity", and that an organization of the size of the defendant would and should have no real difficulty in making arrangements to deal with their physical absence from New York if it was necessary to do so.

58. Second, Mr Smith noted that much of the relevant evidence in this case is likely to be in documentary form, in terms of historical records of the transactions that had taken place, and that the defendant pointedly had not suggested that documents relevant to the action were not in Hong Kong. Nor, for that matter, he said, had the defendant stated that no steps had been taken in Hong Kong to obtain market quotations or to close-out PFIL's positions.

59. In contested applications of this nature, some forensic mileage on each side will always be attempted to be gained in terms of the convenience of witnesses; moreover, the fact remains that at this early stage, until the case settles down and is pleaded out, the important question of whom is to give evidence on which aspect of the case can only be canvassed on an essentially provisional basis.

60. Having said that, however, and looking at the matter broadly, it does seem to me that if there is a bias under this head, it also points in the direction of New York, if only by reason of the prospective witnesses who are currently at the head office of the defendant and the fact that the plaintiff has not identified any material witnesses from Hong Kong that it intends to call. It is fair to say that this is not an aspect of the case which

in any sense can be regarded as conclusive, but in so far as it retains some weight in a commercial world which is becoming increasingly 'global' in outlook, in my view the balance of this aspect of the argument also favours the defendant's contentions.

61. At the end of the day, having reflected upon the 'connecting factors', in my view the defendant has been able successfully to surmount the initial hurdle imposed by *Spiliada, op cit.* I have concluded that in the circumstances of this case – with reference to the choice of law, the non-exclusive jurisdiction clause, and the evidential bias — that the New York District Court is clearly more appropriate than Hong Kong for the trial of this action. Save for the fact that the liquidation of PFIL is being conducted in this jurisdiction — which doubtless explains why this litigation was commenced in Hong Kong — and save for the fact that the defendant was able to be served in this jurisdiction as of right, in my judgment the New York District Court is *prima facie* clearly the more appropriate forum for the trial of this action.

62. If this be correct, I turn now to consider the second limb of the *Spiliada* equation, whereby the burden shifts to PFIL to demonstrate that there are special circumstances by reason of which justice requires that the trial nevertheless should take place in Hong Kong.

*Juridical disadvantage*

63. Mr Smith's initial submission was that the fact that the action would be time-barred in New York consequent upon the grant of a stay, combined with the defendant's refusal to provide the requested

undertaking to address the time bar issue, constituted a juridical disadvantage which in itself was sufficient ground to refuse this application.

64. I agreed with that submission, as no doubt was made clear during the hearing. Absent the undertaking that now has been proffered, and accepted by those acting for the plaintiff, this stay application would have failed on this ground.

65. This highly significant factor has now, of course, been removed from the equation.

66. I note also that within the undertaking that has now been formalized there is the additional undertaking by the defendant that it will not make any application in New York that the plaintiff post security for costs pursuant to the New York District Court Civil Rule 54.2.

67. Somewhat oddly, the result of the undertaking as now exists is that from the standpoint of time bar issues, and further in terms of security for costs demands, the plaintiff appears to be in a better procedural position than would be the case if this action should continue in Hong Kong, given that Mr Shieh made clear in argument that in this latter eventuality all limitation issues will be pleaded and pursued, and given that the plaintiff would no doubt also be asked to provide security for costs.

68. Be that as it may. Against the backdrop of the procedural situation as it currently stands, it remains to consider the other juridical

disadvantages that are prayed in aid by the plaintiff in maintaining its opposition to this application.

69. As I understand the position, there are two matters which are outstanding under this head.

70. First, it is suggested, at least in the evidence, that PFIL will have difficulty in obtaining appropriate legal representation in New York. I take this allegation with a pinch of salt. Nor did it find a place in Mr Smith's armoury of arguments during the hearing. As Mr Shieh observed, there has not been a great deal of specialist derivatives litigation in Hong Kong, and there is no suggestion that PFIL enjoys any advantage in being able to retain specialist derivatives litigation lawyers in Hong Kong rather than New York.

71. I reject this point.

72. Second, and perhaps more substantially, the plaintiff says that the evidence shows that lawyer's fees are not recoverable in New York proceedings, and thus that the difference between Hong Kong and New York in terms of the recoverability of costs is a relevant factor to be taken into account in the weighing process.

73. The situation as to costs is not disputed by the defendant; indeed in his evidence Professor Thel confirms that this is the position. However Mr Shieh submits that there is no rule that such costs' irrecoverability constitutes a juridical disadvantage thereby necessarily precluding a stay, since if this were the case no actions could ever be

stayed in favour of jurisdictions within the United States. His argument is that the true principle is that whilst irrecoverability of costs is capable of being a juridical disadvantage, whether it will have the effect of preventing a stay otherwise *prima facie* warranted depends upon an evaluation of whether or not substantial justice will be done in the competing forum.

74. He drew the attention of the court to *Roneleigh Ltd v. MII Exports Inc.* [1989] 1 WLR 619 (CA), wherein the claim amount was US$250,000, and wherein a refusal by the trial judge to stay proceedings on this ground was upheld by the Court of Appeal, Nourse LJ observing (*op cit.*, at 623H) that :

> "It seems to me that there must be cases where a judge could reasonably and properly come to the conclusion that substantial justice would not be done via proceedings in a foreign forum, if the success of the plaintiff in monetary terms would necessarily and substantially be diminished by costs which he would have to pay there [New Jersey] but would not have to pay here."

Whilst in the same case, Butler-Sloss LJ agreed, adding (*op cit.*, at 624G-H) :

> "I do not consider that the effect of costs can never in any circumstances be relevant in considering juridical disadvantage...The judge in this case, Sir Neil Lawson, took the view that in a case of a relatively small sum likely to be recoverable there was a substantial disadvantageous effect on the plaintiff of the costs situation in the American court in New Jersey, and there is patently no corresponding disadvantage to the defendant in coming to the English court. I would not like to suggest that, where other factors are clearly in favour of the case going to one of the American jurisdictions, the costs factor should be determinative."

75. Upon this element, I agree with the defendant's submission that there can be no question but that the likely legal costs to be incurred

will be very considerably less than the significant amount at stake, which is slightly over $US$14.3 million, and accordingly that, in the words of the learned editors of *Dicey & Morris, The Conflict of Laws, Vol 1 (30th Ed. 2000)* at para.12-027, the position will not be that such costs would "consume the fruits of recovery and render any victory largely pyrrhic".

76. It seems to me, having regard to all the circumstances of this particular case, that the issue of the irrecoverability of legal fees should not be permitted to be elevated into the status of a juridical disadvantage sufficient to preclude the grant of a stay which, in my view, ought otherwise to be granted. I bear in mind, also, that this issue works both ways, and that, in the event of the plaintiff being unsuccessful after trial in New York, unlike the situation in Hong Kong, it would not be ordered to bear the defendant's legal fees.

77. At the end of the day, therefore, and in light of the undertaking that has been given and accepted, in my view no juridical disadvantage is made out by the plaintiff sufficient to preclude the grant of a stay.

*Decision*

78. For the foregoing reasons, in the exercise of my discretion I have concluded that the defendant is to have the relief sought in paragraph 1 of its summons dated 27 May 2004, and that the proceedings herein be stayed in favour of the United States District Court for the Southern District of New York. I so order.

79. As to costs, I presently can see no reason why they should not follow the event, and I make an order *nisi* that the costs of this action, including the costs of this application, be to the defendant, to be taxed if not agreed. In light of the representation on each side, I certify the matter as fit for two counsel.

80. I thank all counsel for their considerable assistance.

(William Stone)
Judge of the Court of First Instance
High Court

Mr Paul Shieh, SC and Mr Jin Pao, instructed by Messrs Allen & Overy, for the defendant

Mr Clifford Smith, SC and Mr David Stokes, instructed by Messrs Richards Butler, for the plaintiff