**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------X

Peregrine Fixed Income Limited (in
liquidation),

               Plaintiff,                        05 CV 4351 (RMB)

    -v-

JP Morgan Chase Bank (formerly known as The
Chase Manhattan Bank and having merged with
Morgan Guaranty Trust Company of New
York),

               Defendant.

-------------------------------------------------------X

 

**MEMORANDUM OF PEREGRINE FIXED INCOME LIMITED**
**IN OPPOSITION TO MOTION TO DISMISS OF JPMORGAN CHASE BANK**

**DORSEY & WHITNEY LLP**
David C. Singer (DS 1358)
Benjamin J. Catalano (BC 9068)
Seth B. Waxman (SW 7409)
Ryan McCarthy (RM 6621)
250 Park Avenue
New York, NY 10177-1500
(212) 415-9200

Attorneys for Plaintiff
Peregrine Fixed Income Limited

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES…………………………………………………………  i

I.      PRELIMINARY STATEMENT ………………………………………………..  1

II.     ARGUMENT ……………………………………………………………………  2

      A.      Standards of Review …………..…………………………………………..  2

      B.      JPMorgan Breached the ISDA Master Agreement by Admittedly
             Failing to Value the Terminated Transactions "as of" the Early
             Termination Date when it was Reasonably Practicable to Do So ………  3

             1.      JPMorgan Failed in its Responsibility to Value the
                   Terminated Transactions as of the Early Termination
                   Date as Required by Section 14 of the ISDA Master
                   Agreement ……………………………………………………  3

             2.      JPMorgan was not Privileged to Value the Terminated
                   Transactions as of Dates Removed from the Early Termination
                   Date under the "Good Faith" Provision of Section 14 …………..  6

      C.      PFIL did not Breach the ISDA Master Agreement ………………………  8

      D.      Discovery May Yield Evidence of Further Wrongful Behavior by
             JPMorgan ……………………………………………………………………  9

      E.      Any Ambiguity in the ISDA Master Agreement Should be Resolved
             by Discovery and Trial …..………………………………………………  9

III.    CONCLUSION …………………………………………………………………  10

## TABLE OF AUTHORITIES

**Page**

<u>**Cases**</u>

<u>Bear, Stearns Funding, Inc. v. Interface Group-Nevada, Inc.</u>,
361 F. Supp.2d 283, 297 (S.D.N.Y. 2005) ……………………………………………… 2

<u>Blue Planet Software, Inc. v. Games Int'l., LLC</u>,
334 F.Supp. 2d 425, 433 (S.D.N.Y. 2004) ………………………………………… 5

<u>Chemical Bank v. Affiliated FM Ins. Co.</u>,
815 F. Supp. 115, 119 (S.D.N.Y. 1993) ………………………………………… 7

<u>In re Financial News Network</u>, 158 B.R. 570, 573 (S.D.N.Y. 1993) ………………… 4

<u>Greater Eastern Transport LLC v. Waste Management of Connecticut, Inc.</u>,
211 F. Supp. 2d 499, 503 (S.D.N.Y. 2002) ………………………………………… 7

<u>Halifax Fund  L.P. v. MRV Communs.</u>,
No 00 Civ. 4878 (HB), 2001 U.S. Dist. LEXIS 20933, 2001 WL 1622261
(S.D.N.Y. Dec. 18, 2001), <u>aff'd</u>, 54 Fed. Appx. 718 (2d Cir. 2003) …………………... 8

<u>Scott-Macon Securities, Inc. v. Zoltek Companies</u>**,**
No. 04 Civ. 2124, 2005 WL 1138476, at * 10 (S.D.N.Y. May 12, 2005 ) ……………   10

<u>SEC v. Brennan</u>, 230 F.3d 65, 75 (2d Cir. 2000) ……………………………………   4

<u>**Statute**</u>

11 U.S.C. § 362(a) …………………………………………………………………..   4

Plaintiff Peregrine Fixed Income Limited ("PFIL") respectfully submits this memorandum of law in opposition to the motion of JPMorgan Chase Bank ("JPMorgan") to dismiss for failure to state a claim upon which relief can be granted.

## I.   PRELIMINARY STATEMENT

JPMorgan moves to dismiss PFIL's Complaint on the mistaken belief that the International Swap Dealers Association Master Agreement that was entered into by PFIL and JPMorgan on January 8, 1996 (the "ISDA Master Agreement") gave it unfettered discretion to select the valuation date, or "as of" date, for the Terminated Transactions.[1]  Read correctly, the ISDA Master Agreement required JPMorgan to freeze the economic condition of the parties upon an event of default by obtaining Market Quotations that put the parties in the same position they would have been in had the default not occurred.  ISDA Master Agreement § 14.  In this case, the Event of Default occurred on January 12, 1998.  See ISDA Master Agreement § 5(a)(vii)(5) and (6).  As the facts elicited at trial will demonstrate, Market Quotations were readily available, and easily could have been obtained by JPMorgan, as of that date.  See Copley Decl. ¶ 3.  However, JPMorgan improperly delayed its valuation of the Terminated Transactions by selecting subsequent dates, effectively speculating on the market for the contracts and causing it to enjoy more than a $14,000,000 windfall at PFIL's expense.

In this lawsuit, JPMorgan seeks to avoid its contractual obligation to preserve the economic status quo upon termination of the ISDA Master Agreement by arguing that it simply had to "request" Market Quotations, as opposed to actually valuing the Terminated Transactions, "on or as soon as reasonably practicable after the relevant Early Termination Date."  JPMorgan's

---

[1] A copy of the ISDA Master Agreement is attached as Exhibit A to the Declaration of Simon Charles Copley in opposition to JPMorgan's motion to dismiss ("Copley Decl. ¶").  See Copley Decl. ¶ 2.

attempt to interpret the ISDA Master Agreement improperly, and to avoid the fact that it was entirely practicable for JPMorgan to value the Market Quotations as of January 12, 1998, should be rejected, and its motion to dismiss should be denied.

## II.   ARGUMENT

### A.   Standards of Review

The standards of review governing a motion to dismiss are well-settled:

> A party moving to dismiss a claim under Rule 12(b)(6) for "failure to state a claim upon which relief can be granted ... faces a difficult (though not insurmountable) hurdle." Harris v. City of New York, 186 F.2d 243, 247 (2d Cir. 1999) (citing Bolt Elec., Inc. v. City of New York, 53 F.3d 465, 469 (2d Cir. 1995). A purported claim "should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957); Gmurzynska v. Hutton, 355 F.3d 206, 210 (2d Cir. 2004). In adjudicating a 12(b)(6) motion, the Court must accept as true the well-pleaded factual allegations in the complaint, and draw all reasonable inferences in favor of the plaintiff. Harris, 186 F.3d at 247. "The issue on a 12(b)(6) motion 'is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims.'" Woodford v. Community Action Agency of Greene County, Inc., 239 F.3d 517, 526 (2d Cir. 2001 (quoting Chance v. Armstrong, 143 F.3d 698, 701 (2d Cir. 1998)).

Bear, Stearns Funding, Inc. v. Interface Group-Nevada, Inc., 361 F. Supp.2d 283, 297 (S.D.N.Y. 2005). Here, JPMorgan has failed to overcome this difficult hurdle and, therefore, its motion to dismiss should be denied.[2]

---

[2]   The parties agreed that New York law would govern the ISDA Master Agreement. See ISDA Master Agreement Schedule Part 4(1).

**B.    JPMorgan Breached the ISDA Master Agreement by Admittedly Failing to Value the Terminated Transactions "as of" the Early Termination Date when It Was Reasonably Practicable to Do So**

JPMorgan's motion to dismiss should be denied because JPMorgan breached the ISDA Master Agreement when it wrongfully instructed the Reference Market-makers to provide Market Quotations for the Terminated Transactions as of dates other than the Early Termination Date of January 12, 1998.  In its motion to dismiss, JPMorgan contends that section 14 of the ISDA Master Agreement required it merely to request Reference Market-makers to provide Market Quotations at a date and time chosen by it in good faith, rather than "as of" a date and time "on or as soon as reasonably practicable after the relevant Early Termination Date." According to JPMorgan, if the "request" was made in "good faith," the valuation date, or "as of" date, of the quotation was unimportant.  Nowhere in the ISDA Master Agreement is JPMorgan given that type of license or control.

**1.    JPMorgan Failed in its Responsibility to Value the Terminated Transactions as of the Early Termination Date as Required by Section 14 of the ISDA Master Agreement**

Upon an Event of Default, the ISDA Master Agreement required that the parties' relationship be frozen immediately:

> Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement.  The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

ISDA Master Agreement § 6(c)(ii).[3]  Then, the ISDA Master Agreement required JPMorgan to

---

[3]    Pursuant to Section 6(e) of the ISDA Master Agreement, the parties agreed to the Second Method and Market Quotation payment method, which required JPMorgan to determine the settlement amount by obtaining Market Quotations.

obtain Market Quotations that would have the effect of putting the parties in the same position

they would have been in had the default not occurred:

> Each quotation will be for an amount, if any, that would be paid to
> such party (expressed as a negative number) or by such party
> (expressed as a positive number) in consideration of an agreement
> between such party . . . and the quoting Reference Market-maker to
> enter into a transaction (the "Replacement Transaction") that
> would have the effect of preserving for [PFIL] the economic
> equivalent of any payment . . . by [JPMorgan] in respect of such
> Terminated Transactions . . . that would, but for the occurrence of
> the relevant Early Termination Date, have been required after that
> date.

ISDA Master Agreement § 14.[4]

Although JPMorgan does not dispute the meaning of the key provisions quoted above, it

does, with obvious inconsistency, dispute the meaning of the following passage:

> The party making the determination (or its agent) will request each
> Reference Market-maker to provide its quotation to the extent
> reasonably practicable as of the same day and time (without regard
> to different time zones) on or as soon as reasonably practicable
> after the relevant Early Termination Date.  The day and time as of
> which those quotations are to be obtained will be selected in good
> faith by the party obliged to make a determination under Section
> 6(e), and, if each party is so obliged, after consultation with the
> other.

---

[4] The ISDA Master Agreement's provisions freezing the parties' relationship, and valuing the
Terminated Transactions as of the default date, are similar to the bankruptcy code's automatic
stay upon a party declaring bankruptcy.  See 11 U.S.C. § 362(a).  "The general policy behind the
automatic stay is to grant complete, immediate, albeit temporary relief to the debtor from
creditors, and also to prevent dissipation of the debtor's assets before orderly distribution to
creditors can be effected."  SEC v. Brennan, 230 F.3d 65, 75 (2d Cir. 2000) (citation omitted);
see also In re Financial News Network, 158 B.R. 570, 573 (S.D.N.Y. 1993) ("The principal
policy behind the automatic stay of section 362 is to protect the bankrupt's estate from being
eaten away by creditors' lawsuits and seizures of property before the trustee has had a chance to
marshal the estate's assets and distribute them equitably among the creditors.") (citations
omitted).

ISDA Master Agreement § 14.

The focus of JPMorgan's argument is mistakenly placed on the "request" to the Reference Market-makers.  The argument overlooks that the standard of performance actually relates to the "quotation" to be provided.  A plain and complete reading of the ISDA Master Agreement confirms that the "quotations" must be "<u>as of the same date and time . . . on or as soon as reasonably practicable after the relevant Early Termination Date</u>."[5]

JPMorgan's argument also suggests that it was not required to value the Terminated Transactions as of January 12, 1998, because it was impracticable to do so.  However, it ignores the fact that JPMorgan did not even ask the Reference Market-makers to price their Market Quotations retroactively.[6]  Unfortunately, JPMorgan disregarded its contractual duty to preserve the economic status quo between the parties as of January 12, 1998, by improperly selecting dates well beyond the termination date, which caused it to enjoy more than a $14,000,000 windfall at PFIL's expense.

Moreover, JPMorgan expressly acknowledged in its motion to dismiss that historical, or retroactive, pricing is required by the ISDA Master Agreement:

> The plain meaning of this phrase requires that the quotations with

---

[5] "[I]t is axiomatic that where the language of the contract is clear and unambiguous, the parties' intent is to be determined from the four corners of the document without consulting extrinsic evidence."  <u>Blue Planet Software, Inc. v. Games Int'l, LLC</u>, 334 F.Supp. 2d 425, 433 (S.D.N.Y. 2004) (citing <u>Feifer v. Prudential Ins. Co. of America</u>, 306 F.3d 1202, 1210 (2d Cir. 2002) and <u>United States v. Liranzo</u>, 944 F.2d 73, 77 (2d Cir. 1991)).

[6] The ISDA Master Agreement supports the idea that Reference Market-makers may be requested to provide quotations retroactive to a specified date and time.  Section 14 states that each Reference Market-maker is "to provide its quotation to the extent reasonably practicable as of the same day and time . . . ."  This language contemplates that the determining party may be required to select a historical point in time for the Reference Market-makers to value the Terminated Transactions.  In addition, the provision requiring multiple market-makers to provide their quotations "as of the same date and time" further emphasizes the parties' intention to limit the valuing party's ability to speculate on the Terminated Transactions at the expense of the other party.

respect to a Terminated Transaction be requested to be made as of the same day and time, to the extent reasonably practicable. The practical reason for this is obvious: if a Non-defaulting Party requested quotations from four Reference Market-makers, but instructed each Reference Market-maker to use a different valuation day and/or time for its quotation, the resulting quotations provided could vary due to timing differences, and the quotations would not be sufficiently comparable to be used in calculating a Market Quotation, which is the "arithmetic mean of the quotations" obtained from the Reference Market-makers.

JPMorgan's Memorandum in Support of Motion to Dismiss at 8.

PFIL will demonstrate at trial that, with the availability of historical, or retroactive, pricing, JPMorgan's claim that it could not value the Terminated Transactions as of January 12, 1998 has no merit. See JPMorgan's Memorandum in Support of Motion to Dismiss at 13. Thus, the supposed hurdles averred by JPMorgan to justify its performance under Section 14 are simply red herrings designed to mask its failure to act reasonably to close out the Terminated Transactions with PFIL at prices that reflect the market "on or as soon as reasonably practicable after the relevant Early Termination Date."

### 2. JPMorgan was not Privileged to Value the Terminated Transactions as of Dates Removed from the Early Termination Date under the "Good Faith" Provision of Section 14

JPMorgan's argument that it had unfettered discretion to select the valuation dates because the ISDA Master Agreement states that "[t]he day and time as of which those quotations are to be obtained will be selected in good faith by [JPMorgan]" is misplaced. This clause refers to the requirement that JPMorgan carry out its contractual obligation to "obtain" the requisite quotations in good faith. While JPMorgan may be given discretion in good faith to determine the date and time on which the relevant quotations shall be obtained, the date and time as of which those quotations shall relate is governed by the reasonable practicability standard in the preceding sentence.

Moreover, if the good faith clause (a subjective standard) were read to permit JPMorgan honestly but negligently to select valuation dates beyond January 12, 1998, it would render superfluous the language in the preceding sentence requiring JPMorgan to close out the Terminated Transactions as soon as "reasonably practicable" (an objective standard of performance).[7]  It is consistent with well settled principles of contract construction that the good faith standard should be interpreted to govern separately the selection of time at which the quotations shall be obtained – a function that is not otherwise identified with a particular standard of performance – rather than the time as of which those quotations shall relate – a function that is previously identified with a conflicting standard of performance.

This interpretation is also consistent with the intended purpose of the provision – *i.e.*, to fix the economic position of the parties at a definite point in time.  In this regard, the valuation date for the Terminated Transactions is far more important to the parties than the date upon which the Market Quotations shall be obtained.  It stands to reason, then, that it is more appropriate to apply to the former an objective (rather than subjective) standard of performance, which reduces the latitude and corresponding uncertainty in the determining party's obligation to freeze the parties' relationship as of the default date and to put them in the same position they would have been in had the default not occurred.  The Court, therefore, should reject JPMorgan's attempt to use the subjective, good faith clause, which is designed to govern when JPMorgan had to "obtain" Market Quotations, to void the objective, reasonably practicable clause, which is designed to govern the valuation date for the Terminated Transactions.

---

[7] "It is generally the case that courts do not favor interpretations of contracts which render a portion of their language nugatory."  Chemical Bank v. Affiliated FM Ins. Co., 815 F. Supp. 115, 119 (S.D.N.Y. 1993).  Instead, "it has become an accepted rule that the court must construe the contract so to give each provision meaning."  Greater Eastern Transport LLC v. Waste Management of Connecticut, Inc., 211 F. Supp. 2d 499, 503 (S.D.N.Y. 2002).

That JPMorgan did not behave reasonably in carrying out its contractual obligation to maintain the economic status quo is demonstrated by examining the valuation dates actually selected by JPMorgan.  Assuming, <u>arguendo</u>, that it was truly impracticable to obtain Market Quotations as of January 12, 1998, a fact that PFIL will disprove at trial, then the next available valuation date was January 13, 1998.  Accordingly, JPMorgan should have valued all of the Terminated Transactions as of that date as the next best alternative to preserving the economic status quo as of January 12, 1998.  However, JPMorgan did not do that.  Instead, it chose to value some of the Terminated Transactions as of January 13, 1998, valuing others as of January 14, 1998 and January 15, 1998.  As discussed below, through discovery it may become apparent that JPMorgan chose to value the Terminated Transactions as of these later dates in order to maximize its profits at PFIL's expense.  <u>See</u> Copley Decl. ¶ 4.

Either it was reasonably practicable to value the Terminated Transactions as of January 13, 1998, or it was not.  JPMorgan's own conduct demonstrates that it was practicable to value at least some of the Terminated Transactions as of January 13, 1998.  At the very least, discovery and a trial will demonstrate that JPMorgan's decision to value certain Terminated Transactions as of January 14, 1998, and as of January 15, 1998, was unreasonable and failed to maintain the economic status quo.

### C.    <u>PFIL did not Breach the ISDA Master Agreement</u>

JPMorgan's argument that PFIL should bear the risk of market fluctuation based on the principle that a breaching party should suffer the consequences of its wrongful conduct is misplaced.  <u>See</u> JPMorgan's Memorandum in Support of Motion to Dismiss at 10 (citing <u>Halifax Fund  L.P. v. MRV Communs.</u>, No 00 Civ. 4878 (HB), 2001 U.S. Dist. LEXIS 20933, 2001 WL 1622261 (S.D.N.Y. Dec. 18, 2001), <u>aff'd</u>, 54 Fed. Appx. 718 (2d Cir. 2003) (holding that equity

required the non-breaching party to bear the risk of market fluctuations).  PFIL did not breach

the ISDA Master Agreement.  Rather, the ISDA Master Agreement set forth specific procedures

to follow in the event of a default.  PFIL strictly adhered to those procedures and should not be

penalized for following the protocol designed to govern the preconceived possibility that one of

the parties may be forced into liquidation.  It was JPMorgan that failed to honor the express

provisions of Section 14, in breach of the ISDA Master Agreement.

### D.      Discovery May Yield Evidence of Further Wrongful Behavior by JPMorgan

Factual issues that can only be settled through discovery and trial include whether

JPMorgan wrongfully supplied incorrect exchange rates to the Reference Market-makers instead

of allowing them to calculate their quotations based on independent, publicly available exchange

rates.  See Copley Decl. ¶ 5.  If, through discovery, PFIL learns that JPMorgan itself established

the exchange rates used by the Reference Market-makers, instead of allowing the publicly

available rate to control, then JPMorgan breached the ISDA Master Agreement in another way.

Moreover, discovery may further reveal that JPMorgan selected valuation dates that would

maximize its windfall, at PFIL's expense, which could explain why the Market Quotations relate

to three separate days, rather than one day.  This could substantiate a further breach by JPMorgan

of the ISDA Master Agreement.  See Copley Decl. ¶ 4.

### E.      Any Ambiguity in the ISDA Master Agreement Should be Resolved by Discovery and Trial

Finally, if this Court determines that JPMorgan's position that the ISDA Master

Agreement only required it to request Market Quotations as of a date determined by it in good

faith, and PFIL's interpretation that the ISDA Master Agreement required JPMorgan to request

the Market Quotations "as of" a date "on or as soon as reasonably practicable after the relevant

Early Termination Date," are both plausible, then the ISDA Master Agreement is ambiguous and

JPMorgan's motion should still be denied.  In such event, only after expert testimony is taken, evidence as to custom in the industry is gathered, and depositions and other discovery is conducted, and perhaps a trial is concluded, will the Court have the tools necessary to make a reasoned decision as to the correct meaning of the ISDA Master Agreement, and whether JPMorgan breached the ISDA Master Agreement.   See, e.g., Scott-Macon Securities, Inc. v. Zoltek Companies, No. 04 Civ. 2124, 2005 WL 1138476, at * 10 (S.D.N.Y. May 12, 2005) (discussing the well settled principle that the Court can rely on evidence outside the four corners of a contract to determine a contract's meaning when a contract is ambiguous).

Indeed, because this is a case of first impression under the ISDA Master Agreement, the Court's interpretation will not only affect this litigation, but will also impact others that rely on the same form of agreement to govern their relationships.  Thus, a full vetting of all of the legal and factual issues in this case is appropriate to assure the proper outcome for the parties to this lawsuit, as well as the industry as a whole.

## III.   <u>CONCLUSION</u>

The ISDA Master Agreement required JPMorgan to value the Market Quotations "as of" the January 12, 1998 Early Termination Date, or as soon as reasonably practicable thereafter.  As the facts at trial will demonstrate, it was entirely practicable for JPMorgan to obtain Market Quotations as of January 12, 1998, and, therefore, JPMorgan's failure to do so breached the ISDA Master Agreement, yielding it more than a $14,000,000 windfall at PFIL's expense.  As

such, JPMorgan's motion to dismiss should be denied.

Dated:  July 8, 2005                              **DORSEY & WHITNEY LLP**


By:  /s/_____
David C. Singer (DS 1358)
Benjamin J. Catalano (BC 9068)
Seth B. Waxman (SW 7409)
Ryan McCarthy (RM 6621)
250 Park Avenue
New York, NY 10177-1500
(212) 415-9200

Attorneys for Plaintiff
Peregrine Fixed Income Limited