Exhibit J

March 29, 2006

Michael S. Feldberg, Esq.
Allen & Overy LLP
1221 Avenue of the Americas
New York, NY 10020

   **Re:**  <u>**Peregrine Fixed Income Limited (in liquidation) ("PFIL") v.**</u>
      <u>**JPMorgan Chase Bank (formerly known as The Chase Manhattan**</u>
      <u>**Bank and having merged with Morgan Guaranty Trust Company of**</u>
      <u>**New York) ("JPMC")**</u>

Dear Mr. Feldberg:

At your request, I write this report to rebut the views, analysis, and opinions expressed in the Expert Report of David F. DeRosa, Ph.D, dated February 10, 2006 (the **"DeRosa Report"**), and submitted by PFIL in its lawsuit against JPMC.  I have divided my rebuttal report into eleven sections, as follows:

| | **Section** | **Page** |
|---|---|---|
| I. | Definitions Used In This Rebuttal Report | 3 |
| II. | Data And Other Information Reviewed Or Considered | 5 |
| III. | Compensation | 6 |
| IV. | Dr. DeRosa Is Not An Expert On The 1992 ISDA Master Agreement: His Views And Opinions On That Agreement Are Entitled To No Weight | 6 |
| V. | PFIL Has Abandoned, And The DeRosa Report Now Rejects, PFIL's Sole Claim For Damages Under Its Complaint | 7 |
| VI. | The Three New Theories Of Liability Advanced In The DeRosa Report Find No Support In The Language Of, Or Policies Underlying, The 1992 ISDA Master Agreement And Should Be Rejected Out of Hand | 9 |

Michael S. Feldberg, Esq.
March 29, 2006
Page 2 of 34

A. "Reasonably Practicable" Does Not Mean "Reasonably Possible" 9

B. By Providing Spot Prices Or Other Market Variables To Some Reference Market-Makers, JPMC Did Not Automatically Become Liable For Damages 12

C. By Requesting Some Of The Reference Market-Makers To Provide Indicative Quotations, JPMC Did Not Automatically Become Liable For Damages 15

VII. JPMC's Timing In Requesting Quotations Was Neither Unreasonable Nor Abusive 16

VIII. Because He Is Not An Expert On The 1992 ISDA Master Agreement, Dr. DeRosa's Views And Opinions On That Agreement Are Unfounded And Incorrect 25

IX. Other Errors And Mistakes In The DeRosa Report 28

X. Dr. DeRosa's Calculation Of "Damages" Is Conceptually Flawed, Based On An Incorrect Understanding Of The 1992 ISDA Master Agreement, And Has No Causal Connection To JPMC's Actions 29

A. Damages For The Alleged Breach Of The "Reasonably Practicable" Requirement 29

B. Damages For Allegedly "Improperly" Requesting Quotations 31

C. JPMC Is Not and Cannot be Liable For Any Damages Under the 1992 ISDA Master Agreement To PFIL Under Any Circumstances As long As PFIL Or Any Of Its Affiliates Owes Any Money to JPMC Or Any Of Its Affiliates 32

XI. Conclusion 33

Michael S. Feldberg, Esq.
March 29, 2006
Page 3 of 34

## I.    Definitions Used In This Rebuttal Report

In this rebuttal report, I use the following important defined terms:

A.    **"ISDA"** means the International Swaps and Derivatives Association, Inc., formerly known as the International Swap Dealers Association, Inc.  ISDA is the global trade association representing leading participants in the privately negotiated derivatives industry, a business that includes interest rate, currency, commodity, energy, equity, and credit swaps and options.  Chartered in 1985, ISDA today has more than 670 member institutions from 47 countries on 6 continents.  ISDA devotes considerable global effort to, among other things, preparing standardized documentation for privately negotiated derivative transactions (which I sometimes refer to simply as **"derivatives"** or **"derivative transactions"**), which are currently estimated to exceed $201 *trillion* in notional amount outstanding;

B.    The **"1987 ISDA Agreement"** means the 1987 ISDA Interest Rate and Currency Exchange Agreement, which was ISDA's first published pre-printed standard form master agreement for documenting interest rate and currency swaps.  I was an active participant in the ISDA Documentation Working Group that helped draft, and comment upon, the 1987 ISDA Agreement.  A copy of the 1987 ISDA Agreement is attached as Appendix A to the "Greene Report," as defined in Paragraph M below;

C.    The **"1992 ISDA Master Agreement"** means the 1992 (Multicurrency -- Cross Border) ISDA Master Agreement, which was ISDA's second published standard form master agreement.  The 1992 ISDA Master Agreement allows parties to document under a single agreement a much broader range of privately negotiated derivative transactions than the 1987 ISDA Agreement did.  I was an active participant in the ISDA Documentation Working Group that helped draft, and comment upon, the 1992 ISDA Master Agreement.  A copy of the 1992 ISDA Master Agreement is attached as Appendix B to the Greene Report;

D.    **"Automatic Early Termination,"** unless otherwise specified or the context otherwise requires, has the meaning provided in Section 6(a) of the 1992 ISDA Master Agreement;

E.    **"Counterparty,"** means, from the perspective of one of the two parties to a derivatives agreement or a derivatives transaction, the other party to the agreement or transaction.  Thus, from PFIL's perspective, JPMC was its counterparty and, from JPMC's perspective, PFIL was its counterparty;

F.    **"Defaulting Party,"** unless otherwise specified or the context otherwise requires, has the meaning provided in Section 14 of the 1992 ISDA Master Agreement;

G.    **"Early Termination Date,"** unless otherwise specified or the context otherwise requires, has the meaning provided in Section 14 of the 1992 ISDA Master Agreement;

Michael S. Feldberg, Esq.
March 29, 2006
Page 4 of 34

  H. **"Market Quotation,"** unless otherwise specified or the context otherwise requires, has the meaning provided in Section 14 of the ISDA Master Agreement.  It is an amount determined, in accordance with the procedures specified in the definition of Market Quotation, on the basis of quotations from leading dealers in the relevant derivatives markets;

  I. **"Non-defaulting Party,"** unless otherwise specified or the context otherwise requires, has the meaning provided in Section 14 of the 1992 ISDA Master Agreement;

  J. **"Reference Market-makers,"** unless otherwise specified or the context otherwise requires, has the meaning provided in Section 14 of the 1992 ISDA Master Agreement;

  K. **"Terminated Transactions,"** unless otherwise specified or the context otherwise requires, has the meaning provided in Section 14 of the 1992 ISDA Master Agreement;

  L. **"User's Guide"** means ISDA's "User's Guide to the 1992 ISDA Master Agreements," 1993 edition, which is the official guide published by ISDA in 1993 to help users of the 1992 ISDA Master Agreement understand how that agreement was intended to work and to highlight significant changes made to the 1987 ISDA Agreement.  I was an active participant in the ISDA Documentation Working Group that helped draft, and comment upon, the User's Guide.  A copy of the User's Guide is attached as Appendix C to the Greene Report;

  M. The **"Greene Report"** means the expert report, dated February 10, 2006, that I prepared and submitted on behalf of JPMC in this lawsuit;

  N. **"Magnus Deposition"** means the deposition transcript of Arthur Magnus taken on December 5, 2005;

  O. **"Murray Deposition"** means the deposition transcript of Piers Murray taken on December 6, 2005;

  P. **"Pickel Deposition"** means the deposition transcript of Robert Pickel taken on December 9, 2005; and

  Q. **"Thompson Deposition"** means the deposition transcript of Don Thompson taken on November 30, 2005.

Michael S. Feldberg, Esq.
March 29, 2006
Page 5 of 34

## II.    Data And Other Information Reviewed Or Considered

I reviewed or considered the following data or other information in forming the opinions I express in this rebuttal report:

- A.    The standard form ISDA Interest Rate and Currency Exchange Agreement, published by ISDA in 1987, which is attached as Appendix A to the Greene Report;

- B.    The standard form ISDA Master Agreement (Multicurrency – Cross Border), published by ISDA in 1992, which is attached as Appendix B to the Greene Report;

- C.    The User's Guide to the 1992 ISDA Master Agreements, 1993 Edition, published by ISDA in 1993, which is attached as Appendix C to the Greene Report;

- D.    The ISDA Master Agreement dated as of 08 January 1996, between PFIL and JPMC, including the Schedule to that agreement and the Credit Support Annex to that Schedule;

- E.    The Complaint dated May 3, 2005 filed by PFIL against JPMC in this matter;

- F.    JPMC's Memorandum of Law in Support of its Motion to Dismiss PFIL's Complaint, PFIL's Memorandum of Law in Opposition to that motion, and JPMC's Reply Memorandum of Law to PFIL's Opposition, together with the supporting papers, exhibits, and declarations filed by the parties in connection therewith;

- G.    Reuters conversations regarding the Indonesian Rupiah options (JPMC 01088-83);

- H.    Reuters conversations regarding the Korean Won forward transactions (JPMC 01051-53);

- I.    Reuters conversations regarding the Japanese Yen options (JPMC 01054-60);

- J.    Reuters conversations regarding the Indonesian Rupiah forward transactions (top of JPMC 01061; JPMC 01062-63);

- K.    Reuters conversations regarding the Hong Kong Dollar forward transactions (bottom of JPMC 01061; JPMC 01064-65);

- L.    Reuters conversations regarding the New Zealand Dollar options (JPMC 01066-70);

- M.    Reuters conversations, draft request, faxes and summary of quotations received regarding Thai Baht swaps (JPMC 01080; JPMC 00120-122; JPMC 01071-79);

- N.    Murray Deposition;

- O.    Magnus Deposition;

Michael S. Feldberg, Esq.
March 29, 2006
Page 6 of 34

P.  Pickel Deposition;

Q.  Thompson Deposition;

R.  The deposition transcript of Donna Reino taken on December 12, 2005;

S.  The deposition transcript of Annabelle Bexiga taken on December 5, 2005;

T.  Confirmations of the Terminated Transactions referred to in Paragraph 7 of the
    Complaint (JPMC 0050-54, JPMC 00283-84, JPMC 00932-1031, JPMC 1086-87);

U.  Chart summarizing items G-S above; and

V.  The DeRosa Report, as well as supplemental addenda to the chart attached as Exhibit
    B to the DeRosa Report.

## III.  Compensation

I am being compensated at the rate of $550 an hour for my work in this case.

## IV.  Dr. DeRosa Is Not An Expert On The 1992 ISDA Master Agreement: His Views And Opinions On That Agreement Are Entitled To No Weight

1.  Dr. DeRosa's views and opinions regarding the history, meaning, or purpose of the 1992 ISDA Master Agreement are entitled to no weight because he is not an expert on that agreement. Dr. DeRosa does not claim to have been involved in any capacity in the drafting of the 1992 ISDA Master Agreement, and I do not recall ever seeing him at any ISDA Documentation Working Group meeting at which that agreement was drafted. Nor do I recall ever hearing his name mentioned as a participant in that process.

2.  Dr. DeRosa does not claim to have been involved in any capacity in the drafting of the User's Guide, which is the official guide published by ISDA in 1993 to help users of the 1992 ISDA Master Agreement understand how that agreement was intended to work and to highlight significant changes made to the 1987 ISDA Agreement, and I do not recall ever seeing him at any ISDA Documentation Working Group meeting at which the User's Guide was drafted. Nor do I recall ever hearing his name mentioned as a participant in that process.

3.  Dr. DeRosa does not claim to have been involved in any capacity in the drafting of the 1987 ISDA Agreement, and I do not recall ever seeing him at any ISDA Documentation Working Group meeting at which that agreement was drafted. Nor do I recall ever hearing his name mentioned as a participant in that process.

Michael S. Feldberg, Esq.
March 29, 2006
Page 7 of 34

4.      Dr. DeRosa does not claim to have participated in any capacity at any ISDA meeting at which the 1992 ISDA Master Agreement, the User's Guide, or the 1987 ISDA Agreement was discussed or debated or approved by ISDA's members, and I do not recall ever seeing him at any such meeting.  Nor do I recall ever hearing his name mentioned as a participant at any time in that process.

5.      Dr. DeRosa does not claim to have any experience supervising or personally handling the requesting of quotations (so as to enable Market Quotation to be determined) following the occurrence of an Early Termination Date by reason of the Automatic Early Termination of even one 1992 ISDA Master Agreement or one 1987 ISDA Agreement.

6.      Dr. DeRosa does not claim to have ever been responsible at any firm for supervising or personally handling the close-out in any context of even one 1992 ISDA Master Agreement or one 1987 ISDA Agreement.

7.      Dr. DeRosa does not claim to have ever served on ISDA's Board of Directors or as a chairman or co-chairman of any ISDA documentation working group or committee, and I do not recall ever seeing him or hearing his name mentioned in any such capacity.

8.      Dr. DeRosa did not even *review* the User's Guide or the 1987 ISDA Agreement in connection with the preparation of the DeRosa Report.

9.      Dr. DeRosa does not claim to be to be an ISDA documentation historian, and does not list any credentials, qualifications, or experience that would enable him to express an authoritative opinion on the history, meaning, or purpose of any provision of the 1987 ISDA Agreement, the 1992 ISDA Master Agreement, the User's Guide, or the customs, practices and usages as to Market Quotation in the derivatives market.  Accordingly, Dr. DeRosa's views and opinions on the "meaning, interpretation and policy" of the 1992 ISDA Master Agreement are entitled to no weight whatsoever.  See DeRosa Report, at 8-9.

V.      **PFIL Has Abandoned, and Its Own Expert Now Rejects, PFIL's Sole Claim for Damages Under Its Complaint**

10.      PFIL's sole and exclusive claim for relief under its Complaint is predicated on the theory that the Reference Market-makers in this case were required to provide so-called retroactive quotations based on the historical prices in effect on the Early Termination Date, which was January 12, 1998.  See Complaint, ¶¶ 16, 18, 21, 24, 31.  I note that PFIL has never specified either the time or the place on the Early Termination Date that it contends must be used for purposes of the retroactive quotations that it seeks (for example, the quotations would clearly differ if PFIL based it claim on the historical prices in effect at 5:00 p.m., in Singapore, on January 12, 1998, as opposed to the historical prices in effect at 5:00 p.m., in New York City, on January 12, 1998).  Nor has PFIL specified any basis or rationale for requiring the historical prices of any particular time and place on January 12, 1998, over any other time and place.  In

Michael S. Feldberg, Esq.
March 29, 2006
Page 8 of 34

any event, and despite this obvious defect, PFIL has maintained its position in this regard
throughout this lawsuit. See, e.g., Memorandum of Peregrine Fixed Income Limited In
Opposition To Motion To Dismiss of JPMorgan Chase Bank, at 3-6 ("JPMorgan's motion to
dismiss should be denied because JPMorgan breached the ISDA Master Agreement when it
wrongfully instructed the Reference Market-makers to provide Market Quotations [*sic*] for the
Terminated Transactions as of dates other than the Early Termination Date of January 12,
1998.")

11.      As noted in the Greene Report, in my opinion, retroactive or historical quotations
are neither required nor permitted under the 1992 ISDA Master Agreement. See Greene Report,
¶¶ 24-41, for a complete discussion of this issue. Significantly, this was not the case under the
1987 ISDA Agreement, which in fact required that quotations given on any day following the
Early Termination Date would be based on the historical prices in effect on the Early
Termination Date. In other words, under the 1987 ISDA Agreement, the *non-defaulting party*
bore the risk that market prices would be less favorable to it on the day that quotations were
obtained from Reference Market-makers than they were on the Early Termination Date.

12.      In categorically rejecting the use of retroactive or historical quotations under the
1992 ISDA Master Agreement, the drafters of that agreement (of which I was an active
participant) consciously chose to subject the *Defaulting Party* to the risk that the
contemporaneous prices in effect on the day and time as of which Reference Market-makers
provide their quotations might be less favorable to it than the historical prices in effect on the
Early Termination Date or any other historical prices. See Greene Report, ¶ 34.

13.      In his 30-page expert report, Dr. DeRosa never once makes the argument that
quotations retroactive to January 12, 1998 (at any time or place) should have been obtained or
were otherwise required in this case, thus abandoning the sole basis for PFIL's claim for
damages against JPMC under its complaint.

14.      Dr. DeRosa, in fact, does more than just abandon PFIL's sole claim for relief. He
rejects it. On page 16 of the DeRosa Report, Dr. DeRosa concedes that PFIL bore the risk "of
future market fluctuations" during the time it took JPMC to request and obtain quotations on the
Terminated Transactions from Reference Market-makers, an opinion with which I agree. This
would, of course, not be the case if the 1992 ISDA Master Agreement required quotations
retroactive to January 12, 1998, as PFIL continues to insist under its Complaint. See Greene
Report, p. 14, N.2. Accordingly, PFIL's own expert recognizes that PFIL no longer has *any*
viable claim under PFIL's Complaint.

Michael S. Feldberg, Esq.
March 29, 2006
Page 9 of 34

VI.   **The Three New Theories of Liability Advanced In the DeRosa Report Find No Support In The Language Of, Or Policies Underlying, The 1992 ISDA Master Agreement And Should Be Rejected Out Of Hand**

A.    **"Reasonably Practicable" Does Not Mean "Reasonably Possible"**

15.    Having abandoned PFIL's sole claim for relief under its Complaint, the DeRosa Report advances three new unpled theories[1] of why JPMC should be liable to PFIL for damages, the first of which is that because Dr. DeRosa believes it was reasonably possible for JPMC to have requested and obtained quotations on all the Terminated Transactions "no later than January 13, 1998," JPMC is liable to PFIL for damages for failing to do so. See DeRosa Report, at 18, paragraph d. As was the case with PFIL's Complaint, Dr. DeRosa does not specify either the time or the place on January 13, 1998, to which he is referring, nor does he specify any basis or rationale for preferring one time and place over another. Putting aside this obvious defect, the DeRosa Report *assumes* that if quotations could have been requested more quickly than they were, JPMC was required to do so. This fundamentally flawed theory is simply incorrect and based on a complete misapprehension of the meaning of the phrase "reasonably practicable" in the definition of Market Quotation. Accordingly, in my opinion, this entire line of argument should be rejected out of hand.

16.    The fifth sentence of the definition of Market Quotation reads in pertinent part as follows:

> The party making the determination [here JPMC] ... will request each Reference Market-maker to provide its quotation ... on or as soon as **reasonably practicable** after the relevant Early Termination Date."

1992 ISDA Master Agreement, Section 14 (emphasis added).

17.    As discussed in the Greene Report, ¶¶ 42-49, the definition of Market Quotation **does not** say that quotations must be requested as soon as "possible" or even as soon as "reasonably possible." It says as soon as "reasonably practicable," and the drafters of the 1992 ISDA Master Agreement chose this term purposefully. To prove that something is "reasonably practicable," it is necessary *but not sufficient* to demonstrate that it is possible. The drafters were aware of this important distinction and chose their language carefully. Accordingly, in my opinion any theory of liability that is predicated solely on the notion that quotations *could* have been obtained more quickly than they were is fundamentally flawed and based on a complete misapprehension of the meaning of the phrase "reasonably practicable." That is not what the drafters of the 1992 ISDA Master Agreement intended.

18.    Indeed, in this case the Court is fortunate to have available the sworn deposition testimony of Robert Pickel, the Chief Executive Officer of ISDA (and formerly its General Counsel). The DeRosa Report cites approvingly to Mr. Pickel's testimony in connection with an

---

[1] Not only are the theories unpled, but so is the factual predicate on which each theory depends.

Michael S. Feldberg, Esq.
March 29, 2006
Page 10 of 34

extraneous matter (which I address separately in Paragraph 54 below), and notes that Mr. Pickel
considers himself to be an expert in the interpretation and application of the 1992 ISDA Master
Agreement, as well he is. See DeRosa Report, at 16, N.2. In several places in his deposition,
Mr. Pickel makes clear that just because something is possible does not mean that the 1992
ISDA Master Agreement requires that it be done. So, for example, in addressing the question
whether it was unreasonable for JPMC **not** to have asked its London or New York offices to
assist JPMC's Asian offices in the requesting of quotations on certain groups of Terminated
Transactions, Mr. Pickel testified as follows:

> A.      **I don't believe that just because one of the other offices could have that there
>          is a requirement, under the contract, that they would have to do that.**
>
>          Again, there is generally a bias in the contract, if you will, in favor of the non-
>          defaulting party, since they are the one who has not defaulted, and one of the
>          ways in which there is maybe that bias in the contract is that the party – the non-
>          defaulting party has some ability to   select in good faith, as required in the
>          definition, the day and time as to which it's going to get quotations for all the
>          transactions, single transactions or groups of transactions.
>
>          So there is that leeway in the contract.
>
> Q.      When you say there is a bias in the contact for the non-defaulting party, what do
>          you mean?
>
> A.      I mean that there are provisions in here that put the non-defaulting party in the
>          driver's seat regarding the process that's        followed, regarding the steps that are
>          taken. You know, again, subject to standards of reasonableness and good faith,
>          but the defaulting party, having defaulted, has you know, less ability to control the
>          process.

Pickel Deposition, 68:16-69:10 (emphasis supplied), 41:18-24 (subject to standards of
reasonableness and good faith, the non-defaulting party has some flexibility in terms of how it
goes about and when it goes about getting these quotations), 59:7-60:1 (not unreasonable to
proceed in a careful methodical way); see also the Greene Report, ¶ 48 (the contract no more
commands a Non-defaulting Party to rush uncomfortably through the process than it punishes
one for proceeding carefully and cautiously throughout).

        19.     The User's Guide to the 1992 ISDA Master Agreement discusses the inherent
flexibility accorded to Non-defaulting Parties in determining how and when to request
quotations, to which Mr. Pickel refers above, as follows:

> In a significant change from the 1987 [ISDA] Agreement the definition of "Market
> Quotation" acknowledges the practical difficulties that may arise in obtaining quotations
> from Reference       Market-makers on the Early Termination Date and, accordingly,
> provides that [a Non-defaulting Party] may request quotations "on or as soon as

Michael S. Feldberg, Esq.
March 29, 2006
Page 11 of 34

> reasonably practicable after the relevant Early Termination Date." **Parties should be careful in utilizing this additional flexibility in Market Quotation, however, because any abuse of this flexibility could undermine its enforceability.**

User's Guide, pp. 24-25 (emphasis added).  As noted in the Greene Report, ¶ 47:

> Each Non-defaulting Party must, in the first instance, determine what is and what is not reasonably practicable for itself based on all the facts and circumstances then existing. But, the drafters gave no blank check to the Non-defaulting Party in this regard, and it was intended and understood that unreasonable or abusive conduct would not stand.

20.    Had Dr. DeRosa participated in the drafting of the 1992 ISDA Master Agreement and the User's Guide, I believe that he could not and would not have erroneously assumed that "reasonably practicable" and "reasonably possible" were synonymous terms. This misapprehension explains why the DeRosa Report does not even attempt to distinguish between the two formulations and why any theory of liability that is predicated solely on the notion that quotations *could* have been obtained faster, without identifying unreasonable conduct, is doomed from the start. See Greene Report, ¶ 48 ("There is no absolute standard for determining when the process of requesting quotations must be completed because the drafters understood that that process would differ for each and every Non-defaulting Party"); see also Pickel Deposition, 53:5-11 (the amount of time it will take to prepare to request quotations will vary depending on the circumstances).

21.    **Simply put, the 1992 ISDA Master Agreement does not give the Defaulting Party the right to sit on the sidelines with a stopwatch and a whistle, calling fouls whenever the pace of requesting quotations is slower than it might like. The issue is whether the Non-defaulting Party acted unreasonably or abusively in doing what it did, not whether what the Non-defaulting Party did could have been improved upon had it chosen to proceed differently.**

22.    It is of the utmost importance to understand and appreciate that it will *always* be possible for a Non-defaulting Party to have requested quotations faster than it did by devoting more time, more attention, and more resources to the process or by requiring employees to ignore the press of other business. And that is precisely why the drafters of the 1992 ISDA Master Agreement did not say "reasonably possible," as that formulation would have opened a Pandora's box of never-ending problems for every Non-defaulting Party thrust in the position of having to request quotations because of the insolvency of its counterparty. As a policy matter, this distinction is crucial, because otherwise every Non-defaulting Party will find itself in the invidious position of facing liability whenever a Defaulting Party can point to an earlier point in time when quotations, had they been obtained, would have been more advantageous to it. Given that the DeRosa Report concedes that PFIL bore the risk "of future market fluctuations," if PFIL can now argue that JPMC breached the contract merely because quotations could have been obtained more quickly (if only JPMC had devoted more time, more attention, and more resources to the process), then the Defaulting Party will have succeeded in shifting the risk of market fluctuations back to JPMC, without proof of unreasonable or abusive conduct. And this is not

Michael S. Feldberg, Esq.
March 29, 2006
Page 12 of 34

what the drafters of the 1992 ISDA Master Agreement intended. For these reasons, and without regard to the details of PFIL's argument, which are all based on the same basic misunderstanding, this theory of liability finds no support in the language of, or the policies underlying, the 1992 ISDA Master Agreement. It should, therefore, be rejected out of hand.

**B.      By Providing Spot Prices Or Other Market Variables To Some Reference Market-Makers, JPMC Did Not Automatically Become Liable For Damages**

23.      The DeRosa Report makes the remarkable argument at page 27, paragraph 2 a, that *merely* by providing spot prices or other market variables to the Reference Market-makers,[2] JPMC automatically became liable to PFIL for damages of $13,002,023, based on calculations proposed by Dr. DeRosa, **without any proof that this actually caused PFIL to suffer any loss and, indeed, without regard to whether PFIL actually benefited from the manner in which JPMC requested those quotations.** DeRosa Report, at 29. This bizarre and illogical theory of liability and damages finds no support in the 1992 ISDA Master Agreement and should be rejected.

24.      The evidence in this case is clear, consistent, and wholly undisputed: JPMC provided spot or other market variables to some Reference Market-makers in connection with some groups of Terminated Transactions because it believed, reasonably and in good faith, that doing so would result in better (i.e., more advantageous) quotations **for PFIL.** For example, JPMC's head of foreign exchange options trading and marketing in Asia in January 1998, Piers Murray, has given sworn deposition testimony in this case stating that providing spot reference prices to Reference Market-makers was "a mechanism to achieve a narrower bid offer spread." Murray Deposition, 40:25-41:3. JPMC believed that by reducing the bid offer spread, the quotations it received would be better **for PFIL.** For example:

Q.      Assuming there was a wider bid offer spread does that mean the quote would be more favorable to J.P. Morgan or Peregrine or is it impossible to say?

A.      **A wider bid offer spread would mean that the quote would be worse for Peregrine.**

Murray Deposition, 158:16-23 (emphasis added). Piers Murray elaborated on this point as follows:

**My idea, and I believe this was communicated to us in the context of the discussion with legal around the closeout, was to insure that we got as**

---

[2] The DeRosa Report wrongly implies that JPMC provided spot prices or other market variables to *all* of the Reference Market-makers. See DeRosa Report, at 27, paragraph 2 a. The implication is misleading and untrue. See, e.g., JPMC 01061-63. Dr. DeRosa claims that he reviewed these materials in connection with the preparation of his expert report. It is one thing, perhaps, to quote material out of context; it is quite another, and far more troubling, to make statements that cannot be supported by even an aggressive reading of the evidence.

Michael S. Feldberg, Esq.
March 29, 2006
Page 13 of 34

> reasonable a price or as accurate a price or as close to the market of price as
> possible for the underlying risk.
>
> That would have meant definitionally getting the narrowest bid offer spread.  If
> you look at bid offer spreads in any market, if you were trying to get a price you
> never go to the market with the widest bid offer spread.  It's just – whether it's
> apples or stocks or foreign exchange.

Murray, 159:10-22 (emphasis added).

   25. JPMC believed that providing spot reference prices would not only result in a
narrower bid offer spread so as to benefit PFIL, it would also enable Reference Market-makers to
respond more quickly to JPMC's requests for quotations.  Over the course of many pages in his
deposition Piers Murray sought to explain to PFIL's counsel exactly how and why he believed
that providing spot reference prices to Reference Market-makers actually *benefited* PFIL.  For
example:

> Q. Is it fair to say that by providing the spot reference price [*sic*] for some or all of
> these transactions in obtaining market quotations it's your opinion that the market
> quotes that were obtained were more favorable to Peregrine than they would have
> been if J.P. Morgan had simply gone out and asked for a live price?
>
> A. **Certainly from the variability of the prices that we received and from, um,
> yes.**  By providing spot references we reduce the variability that we were going to
> receive back in terms of the prices.  Effectively if you think about the volatility of
> markets at the time, if you ask for a live price on an asset that took some time to
> price up, whether it was minutes or hours, you introduced another element of risk
> that affected both Peregrine and J.P. Morgan.

Murray Deposition, 42:19-43:12 (emphasis added).  And again:

> And in providing the spot references we did, one of the things that we achieved
> was getting, I believe, was in getting quicker responses to our requests for pricing.
>
> Now, in terms of the risk, it had to do with the volatility of the markets at the
> time.  The markets were prone to movement on news and on things like
> [government] intervention in the markets.
> …
> So if a news event were to intervene and cause the markets to move and you
> didn't know which way it was going to move, you were running a significant, you
> were running a significant amount of risk that that would happen, which is why
> the speed of the response was so critical.

Murray Deposition, 55:23-56:24.

Michael S. Feldberg, Esq.
March 29, 2006
Page 14 of 34

26.     Nor did JPMC provide spot reference prices to Reference Market-makers as a
lark, or because it was lazy, or because it was indifferent to its affect on PFIL.  The issue was
first carefully discussed with JPMC's senior derivatives lawyer in New York, Don Thompson,
who, it should be noted, is currently co-chairman of ISDA's Documentation Committee, a
standing committee of ISDA's Board of Directors responsible for overseeing all of ISDA's
documentation projects globally.  Murray Deposition, 44:11-14 (discussions with Don
Thompson regarding whether it was permissible to provide spot reference prices); Thompson
Deposition, 14:17-18 (identifying himself co-chairman of ISDA's documentation committee),
154:20-23 (appropriate to provide spot reference prices to Reference Market-makers), 155:9-16
(as a practical matter it will be more difficult to obtain a quote on an option if you require the
options trader, who is trading options, not the spot position, to provide both the spot position and
the intrinsic value of the option).

27.     PFIL has had 8 *years* to develop or obtain evidence that the Reference Market-
makers in this case would have provided more favorable quotations to PFIL if JPMC had not
provided spot reference prices to them.  It is particularly ironic that PFIL bases its case against
JPMC under its Complaint on the theory that retroactive quotations can and should be obtained,
and yet PFIL has provided no such retroactive quotations or shown any evidence from the
Reference Market-makers in this case that, but for JPMC's provision of spot prices, they would
have provided more favorable quotations from PFIL's perspective.  The DeRosa Report offers no
such evidence and it disputes *none* of JPMC's claims; it simply ignores the issue entirely.  In any
event, in my opinion, without affirmative proof that by providing spot reference prices or other
market variables to Reference Market-makers, JPMC caused PFIL to suffer loss, PFIL's claim to
damages cannot be sustained.  This is particularly true in a case where the undisputed evidence
raises a presumption that PFIL was actually *benefited* from the manner in which JPMC requested
quotations.

28.     In my opinion, the 1992 ISDA Master Agreement does not adopt or embrace a
concept of strict liability without regard to, or proof of, loss.  Nor does it prohibit a Non-
defaulting Party from taking steps to obtain more favorable quotations for the Defaulting Party.
Accordingly, the theory of liability and damages articulated by the DeRosa Report (i.e., PFIL is
entitled to damages without proof that JPMC caused PFIL to suffer a loss and without regard to
whether PFIL actually *benefited* from JPMC's actions) finds no support in the language of, or the
policies underlying, the 1992 ISDA Master Agreement.  It should be rejected out of hand.

Michael S. Feldberg, Esq.
March 29, 2006
Page 15 of 34

    **C.**      **By Requesting Some Of The Reference Market-Makers To Provide Indicative Quotations, JPMC Did Not Automatically Become Liable For Damages**

      29.     Borrowing from the same conceptually flawed argument for its second new theory of liability and damages, the DeRosa Report articulates a third new theory of liability and damages: *merely* by asking the Reference Market-makers[3] for indicative quotations, JPMC automatically became liable to PFIL for damages of $13,002,023, based on calculations proposed by Dr. DeRosa, **without proof that this actually caused PFIL to suffer any loss and, indeed, without regard to whether PFIL actually benefited from the manner in which JPMC requested those quotations.** See DeRosa Report, at 28-29. Once again, this bizarre and illogical theory of liability and damages finds no support in the 1992 ISDA Master Agreement and should be rejected out of hand.

      30.     The issue here could not be more straightforward. The undisputed evidence in this case shows that for some, but not all, of the Terminated Transactions, JPMC asked some of the Reference Market-makers for indicative quotations (sometimes referred to as "indications"). The DeRosa Report **does not** purport to develop or introduce evidence showing that the quotations given by those Reference Market-makers were less favorable to PFIL than they would have been had JPMC not asked for indications. The DeRosa Report **does not** claim to have ruled out the possibility that the indicative quotations so provided actually benefited PFIL. The DeRosa Report does **not claim** to have ruled out the possibility that the indicative quotations so provided had no affect (i.e., the quotations given were neutral as far as PFIL was concerned) on the quotations that would have been given if JPMC had not asked for indications. Bear in mind that PFIL has had 8 *years* to develop or obtain evidence that the quotations given by Reference Market-makers in this case were less favorable to PFIL than they would have been if JPMC had not asked for indications.

      31.     Quite apart from this conceptually disqualifying defect, I disagree with the contention implicit in the DeRosa Report that the 1992 ISDA Master Agreement prohibits "indicative quotations." Although the definition of Market Quotation does not expressly address the issue one way or another, in my opinion such quotations should be accorded as much respect as "firm" or "live" quotations. See Thompson Deposition, 152:22-25 ("It is my understanding that most, if not all, major dealers, when involved in closeouts, obtain indicative quotations."). Dr. DeRosa does not opine that market practice is any different. As Dr. DeRosa does not claim to have *any* experience in requesting quotations (so as to enable Market Quotation to be determined) under the 1992 ISDA Master Agreement, his opinion that indicative quotations are *prima facie* a breach of contract should be accorded no weight at all.

      32.     In my opinion, the 1992 ISDA Master Agreement does not adopt or embrace a concept of strict liability without regard to, or proof of, loss. PFIL has not *proved* that it suffered

---

[3] The DeRosa Report again wrongly implies that JPMC requested *all* of the Reference Market-makers to provided indicative quotations. See DeRosa Report, at 28-29. This is misleading and untrue. See, e.g., JPMC 01071-80.

Michael S. Feldberg, Esq.
March 29, 2006
Page 16 of 34

any loss by reason of the manner in which JPMC requested quotations. Indeed, it has not even bothered to negate the very real possibility that it actually benefited from JPMC's actions. Without proof of loss, PFIL's claim to be entitled to damages cannot be sustained. Accordingly, the theory of liability and damages articulated by the DeRosa Report (i.e., PFIL is entitled to damages without proof of loss and without regard to actual benefit) finds no support in the language of, or the policies underlying, the 1992 ISDA Master Agreement. It too should be rejected out of hand.


## VII.   JPMC's Timing In Requesting Quotations Was Neither Unreasonable Nor Abusive

33.    Putting aside the fact that the DeRosa Report erroneously assumes that "reasonably practicable" means "reasonably possible," it is clear that Dr. DeRosa's understanding of what the basic close-out process actually entails is profoundly mistaken. The DeRosa Report asserts that "there are four essential steps" to closing-out Terminated Transactions under the 1992 ISDA Master Agreement. He lists these steps:

1)    determining that a termination event has occurred;
2)    identifying all of the Terminated Transactions that are subject to the closeout;
3)    obtaining market quotations for the Terminated Transactions; and
4)    paying the amount due.

DeRosa Report, at 18. Thus, in Dr. DeRosa's considered opinion, once the Terminated Transactions have been identified, quotations must immediately be "obtained," although presumably he would grant the reasonableness of the need to "request" those quotations first; I address PFIL's confusion about this issue in Paragraph 54, *infra*. I cannot disagree with the DeRosa Report more strongly about what the close-out process actually entails. Clearly, before quotations could be requested by JPMC, let alone obtained, many discreet and time-consuming steps needed to occur, as the undisputed evidence in this case amply demonstrates.

34.    The DeRosa Report implies by its checklist that it was unreasonable or abusive for any of the business people at JPMC to seek legal advice at *any* time about what the 1992 ISDA Master Agreement required upon the insolvency of PFIL's parent before commencing the process of "obtaining" quotations. The DeRosa Report similarly implies that that it was unreasonable or abusive for JPMC's lawyers in Hong Kong and in New York to confer about how the 1992 ISDA Master Agreement works in an insolvency context. I disagree. In my opinion, this conduct was perfectly appropriate. The DeRosa Report simply ignores the avalanche of overwhelming evidence in this case that it took time to seek and obtain legal advice about JPMC's obligations under the contract. See, e.g., DeRosa Report, at 19-20 (quoting e-mail from Arthur Magnus regarding "need to get guidance later today" – 7:27 a.m. NY time on January 12, 1998, which was **8:27 p.m.**[4] **Asia time** – on what to do about PFIL's open

---

[4] The DeRosa Report mistakenly asserts that New York is 12 hours behind Singapore. See DeRosa Report, at 20, paragraph g, footnote 4. Dr. DeRosa apparently failed to take into

Michael S. Feldberg, Esq.
March 29, 2006
Page 17 of 34

positions); Thompson Deposition, 18:7-9 (coordinated with Chris Seaver, JPMC's derivatives
lawyer in Asia); Magnus Deposition, at 19:25-20:11 (among several groups involved in the
closeout process were legal, credit risk management, finance, credit and operations), 87:10-12,
88:6-89:3 (explaining multiplicity of tasks, including need to "understand our rights and how
effectively to perform the tasks of close-out: and need "to unwind in such a way that we would
not disadvantage Peregrine or ourselves"), 91:8-92:12 (explaining need for legal counsel on the
form on how to do close-out properly); Murray Deposition, 25:24-27:5 (listing, among other
things, need to consult with counsel and that JPMC did not want to unwind positions at different
times because that would be to PFIL's detriment), 32:9-18 (primary direction on process and
procedure came from Don Thompson in NY), 159:10-15 (legal communicated that it was
necessary to insure reasonable prices were obtained).

     35.     The DeRosa Report implies by its checklist that it was unreasonable or abusive
for JPMC to have taken *any* time to consider whether, when, and how to hedge its trading books,
or for business people to coordinate their actions, before commencing the process of "obtaining"
quotations. I disagree. In my opinion, this conduct was perfectly appropriate. Again, the DeRosa
Report simply ignores the evidence. As testified to by several JPMC witnesses, staff from
various different departments and offices had to coordinate with each other before JPMC could
begin the process of requesting quotations. See Magnus Deposition, 92:13-17 (many facets
within JPMC needed to work together in order to complete close-out process), 98:9-20 (JPMC
learned of liquidation in the early morning of January 12, 1998 in NY, but staff in NY needed to
coordinate with people in Asia, who had gone home for the night, and had to deal with time zone
issues); Murray Deposition, 28:4-7 (JPMC had to coordinate across three different trading areas),
29:8-30:12 (describing various factors "to think about at the same time" when considering
whether and how to rebalance risks in a portfolio during the unwind process), 33:17-34:19
(explaining need to coordinate with other trader, Ban Suan Wong, "to make sure we didn't
disadvantage Peregrine"), 61:14-62:2 (explaining that the traders and desk heads needed to
review and become comfortable with the list of trades and documentation before going out and
getting quotations), 116:16-21 (decision as to which currencies to close out in which order and
which Reference Market-makers to request quotations from was left up to individual desk
heads), 176:3-12 (explaining that, with New Zealand Dollar, "there was a lot of deliberation
around the language we used to request the quotations"); Pickel Deposition, 58:23-60:2 (not
unreasonable for JPMC to wait until late afternoon hours in Singapore on January 13, 1998, to
begin requesting quotations where JPMC is moving in a "careful methodical way").

     36.     The DeRosa Report implies by its checklist that it was unreasonable or abusive
for JPMC to have taken *any* time to consider or discuss the order and timing of how and when
quotations would be requested in respect of different groups of Terminated Transactions before
commencing the process of "obtaining" quotations. I disagree. In my opinion, this conduct was
perfectly appropriate. Quite obviously, this is *always* something that must be considered by a

---

account daylight savings time in calculating the time zone differences between New York and
Singapore **at that time of year**. When one calculates the effect of daylight savings at this time
of year, the correct time difference is 13 hours. See the World Clock – Time Zone Converter,
available at www.timeanddate.com/worldclock/converter.html.

Michael S. Feldberg, Esq.
March 29, 2006
Page 18 of 34

Non-defaulting Party whenever Market Quotation applies. Murray Deposition, 116:16-21
(decision as to which currencies to close out in which order and which Reference Market-makers
to obtain quotations from was left up to individual desk heads), 176:3-12 (explaining that, with
New Zealand Dollar, "there was a lot of deliberation around the language we used to request the
quotations"); Magnus Deposition, 91:8-19 (explaining need for legal counsel on the form on how
to do close-out properly and why and how to close out in a particular order); Pickel Deposition,
53:10-54:2 (the length of the closing out process will vary depending on the circumstances,
including how carefully requests for quotations are put together).

     37.     The DeRosa Report implies by its checklist that it was unreasonable or abusive
for JPMC to take the time it believed in good faith necessary to make absolutely sure that it had
correctly identified all Terminated Transactions before commencing the process of "obtaining"
quotations. I disagree. In my opinion, there was nothing at all unreasonable or abusive about this
conduct, which JPMC amply justifies. See Magnus Deposition, 59:10-60:12 (explaining that
approximately 1 to 2 percent of settlements had operational errors in them, which were "fine in
the normal course of business but not in a bankruptcy context" and for that reason JPMC
"wanted to make sure we triple and quadrupled checked to get it right"), 64:23-65:18 (explaining
need in bankruptcy context to "double-and triple check[] things to make sure [JPMC] got it all
right before we started doing anything"), 103:13-24 (in a bankruptcy context you want to be
110% right); Pickel Deposition, 53:10-54:2 (the length of the closing out process will vary
depending on the circumstances, including how carefully requests for quotations are put
together).
And indeed, contrary to what the DeRosa Report states erroneously at page 20, Arthur Magnus
did not testify that JPMC had "positively identified" all 25 Terminated Transactions the week
before PFIL's default but instead testified that JPMC did not have a fully complete and accurate
list until January 14, 1998:

     Q.     So it wasn't until Wednesday, January 14th, that JPMorgan felt comfortable that it
               had identified all the open positions that it had with Peregrine; is that right?

     A.     Correct.

Magnus Deposition, 54:13-18.

     38.     Dr. DeRosa implies that the process of requesting quotations cannot, and should
not, be expected to take longer for people with little or no experience in the Market Quotation
process in the context of an insolvency triggering Automatic Early Termination of the 1992
ISDA Master Agreement. I disagree. It is perfectly reasonable, and should be expected, that
people with little or no experience in such matters will take more time and be particularly
cautious and careful in the close-out process. The DeRosa Report again simply ignores the
evidence that this was the case. See, e.g., Murray Deposition, 32:15-18 (noting that this was his
first closeout experience and that the team "had never experienced a closeout situation before"),
127:20-28:6 (explaining that the PFIL close-out was the first for all of the traders in JPMC's
global FX options desk, and why Piers Murray did not want to risk transmitting instructions to
another FX options team in another office and risk errors because of miscommunication or

Michael S. Feldberg, Esq.
March 29, 2006
Page 19 of 34

inexperience of the other team); Magnus Deposition, 124:2-8 ("this was non-typical . . . we had a
very small number of defaults, particularly in the derivative marketplace.  So – this was
abnormal"); Thompson Deposition, 19:15-19 ("I had more experience in the derivatives area
than Chris Seaver [JPMC's in-house counsel in Asia] did").

     39.     The DeRosa Report contends that its list of essential four steps in the close-out
process "is consistent with the testimony of JPMorgan's chief lawyer, Don Thompson."  See
DeRosa Report, at 18.  This is a misrepresentation of what Don Thompson actually said:

> As I state in the affidavit, what I am describing "broadly", and that is the term
> used in the affidavit, was a generalized high level description of some of the
> essential parts of the process....

Thompson Deposition, 103:6-11.  That Dr. DeRosa took a "generalized high level description of
some of the essential parts of the process" to be a detailed and exclusive enumeration of
everything that might be reasonable or not abusive in the close-out process, is just another
manifestation of his lack of knowledge, let alone expertise, of how the 1992 ISDA Master
Agreement was intended to work and how it works in practice.

     40.     Putting aside the utter deficiency of the checklist he uses to measure what is or is
not unreasonable or abusive, Dr. DeRosa contends that it *should* have taken less than an hour for
JPMC to have obtained quotations when markets opened in Singapore on January 13, 1998.  See
the DeRosa Report, at 22.  **Bear in mind that it was already 7:23 p.m. in the evening in
Singapore on January 12, 1998, when JPMC first learned in New York of the Automatic
Early Termination of its 1992 ISDA Master Agreement with PFIL.**[5]  Dr. DeRosa brushes
away the lateness of the day and the fact that key employees in Singapore, who were critical to
the close-out process, were no longer in the office, with the following cavalier statement:

> With the knowledge that Peregrine had failed, JPMorgan had the evening in Asia,
> as well as the entire business days in London and New York given the time zone
> differences, on January 12, 1998 to make preparations to begin the close-out
> process when markets opened at 9:00 a.m. on January 13, 1998 in the Austral-
> Asian time zones.

DeRosa Report, at 20.  Dr. DeRosa implies by this opinion that if business people at JPMC
needed to discuss and coordinate their actions, obtain any needed approvals from their bosses, or
seek any legal advice (let alone obtain it; in my experience lawyers do not always have instant
answers to their client's questions; nor are they always immediately available to provide advice),
the 1992 ISDA Master Agreement *required* JPMC to track the necessary people down at home
or elsewhere, or to wake them in the dead of the night if necessary, to ensure that the quotations

---

[5] Dr. DeRosa mistakenly claims that it was 6:23 p.m. in Singapore on January 12, 1998, when
JPMC in New York first learned of PFIL's default.  See DeRosa Report, at 20, paragraph g,
footnote 4.  It was, in fact, **7:23 p.m.** in the evening in Singapore when the e-mail that
Dr. DeRosa refers to was sent by an employee of JPMC in NY.  See FN 4, *supra.*