process could begin the first thing the next morning in Singapore on January 13, 1998. This is, in my opinion, an absurd contention that finds no support whatsoever in the language of, or policies underlying, the 1992 ISDA Master Agreement.

41. In my opinion, the 1992 ISDA Master Agreement **does not** require a Non-defaulting Party to jump through hoops in order to request quotations as fast as possible. That is not what the 1992 ISDA Master Agreement says; it is not what it means; and it is not what was intended. Greene Report, ¶ 48 (the 1992 ISDA Master Agreement no more requires a Non-defaulting Party to rush uncomfortably through the process than it punishes one for proceeding carefully and cautiously throughout). ISDA's CEO (and former General Counsel) agrees. See Pickel Deposition, 58:23-60:2 (not unreasonable for JPMC to wait until late afternoon hours in Singapore on January 13, 1998, to begin requesting quotations where JPMC is moving in a "careful methodical way"), 69:14-22 (explaining that the non-defaulting party has flexibility in how to proceed, subject to standards of reasonableness and good faith), 68:21-69:89 ("[T]here is generally a bias in the contract in favor of the non-defaulting party, since they are not the one who has defaulted . . . there is leeway in the contract."); see also User's Guide at 24-25 (discussing the flexibility accorded the Non-defaulting Party).

42. The DeRosa Reports also contends, against the weight of all the evidence in this case, that JPMC *should* have been able to close-out all the Terminated Transactions before **5:00 p.m.** in the afternoon in Singapore on January 13, 1998. DeRosa Report, at 23. Given that JPMC had not completed its initial coordination, verification, and approval processes, including the seeking and obtaining of legal advice, until between **3:00 and 4:00 p.m.** in Singapore on January 13, 1998, when the order to commence the close-out process was given, DeRosa Report, at 23, this means that the DeRosa Report "allocates" 1-2 hours to JPMC to complete the entire close-out process, which in my opinion and experience is so arbitrary and unreasonable as to be preposterous on its face. The issue is not what JPMC might have been able to do using heroic efforts; the issue is whether JPMC was unreasonable or abusive in its belief that it was not "reasonably practicable" to do so. In my opinion, the evidence as noted in paragraphs 33-41, *supra*, overwhelmingly supports the reasonableness of JPMC's position.

43. The DeRosa Report implies that the 1992 ISDA Master Agreement *required* JPMC to use all of the resources at its disposal to expedite the close-out process and to recruit or arrange for immediate personnel or material assistance whenever necessary. See DeRosa Report, at 24. In the same vein, and with as little justification, the DeRosa Report implies that the 1992 ISDA Master Agreement *required* JPMC's Asian offices to enlist the assistance of JPMC's London or New York offices so as to permit the close-out of all Terminated Transactions for which quotations had not been obtained by the close of business in Singapore on January 13, 1998. See DeRosa Report, at 24-25. In my opinion, this contention finds no support in the language of, or the policies underlying, the 1992 ISDA Master Agreement. As noted above, Robert Pickel was asked this *very* question at his deposition. His answer was as follows:

> Q. Based on your understanding of the agreement and the policies behind the ISDA Master Agreement, assuming the New York or London offices of JPMorgan could have closed out those two other positions . . . being earlier in the day, based on

Michael S. Feldberg, Esq.
March 29, 2006
Page 21 of 34

> time zones, is it reasonable for JPMorgan to have waited until the next day to close those out, as opposed to asking one of their New York or London offices to take the book and close those positions out themselves?
>
> A. **I don't believe that just because one of the other offices could have that there is a requirement, under the contract, that they would have to do that.**
>
> . . .
>
> Q. And, so, what I am asking is, do you find it to be reasonable that JPMorgan opted not to pass the book to their London or New York offices on the 13th as opposed to keeping those books in Asia and waiting until the following day and yet even another day [after that] for the Thai baht transactions?
>
> A. I would say that, again, my formulation, **I guess to me it's not unreasonable for them to have done that.**

Pickel Deposition, 67:25-71:5 (emphasis added). The DeRosa Report, again, confuses what is reasonably practicable with what is reasonably possible. Moreover, I note in passing that Piers Murray testified that JPMC **did not** even pass its *ordinary* Asian trading books to London in January 1998. See Murray Deposition, 114:4-11; see also Paragraph 50, *infra*.

      44.      In my opinion, the sworn testimony of Piers Murray and Arthur Magnus completely justifies the reasonableness of JPMC's decision not to pass responsibility for the close-out process from Singapore to JPMC's London or New York Offices. First, JPMC believed that the most accurate quotations were those requested in the local markets during local trading hours. Murray Deposition, 143:23-145:6 (explaining that market makers in New Zealand and in Australia were already going home for the day by the time that Indonesian Rupiah transactions were closed out in the late afternoon of January 13, 1998, in Singapore and that he did not ask London for help on the New Zealand Dollar option transactions because Asia was the primary dealing center and it was his belief that he would receive better market quotations and more accurate quotations by waiting until the next day in Singapore), 156:15-157:4 (explaining that JPMC did not ask the London or New York office for help because all the emerging Asian currencies were in a crisis mode at that time and the best source of liquidity and accurate pricing was in Asia, that asking for quotations in any other time zone would de facto give you a wider bid-offer spread, and that it might take longer to get the quotes in other time zones), 158:16-23, 177:20-21 ("The kiwi it was not possible to close out on the 13th in a liquid time zone."), 159:10-15 ("my idea, and what was communicated to us by legal, was to insure that we got as reasonable a price or as accurate a price as possible"); Magnus Deposition, 143:3-13 (explaining that JPMC "only really traded the local Asian currencies in the Asian time zone" and although they could be traded in other time zones "the bid/offer spread was ridiculously wide"), 187:21-189:16 (explaining that because liquidity in Asian currencies was much lower outside of the local time zone, trading out of NY in the Asian currencies was not practical and that JPMC's NY office would generally tell clients that it was to their advantage to wait until the local markets in Asia open ); see also DeRosa Report, at 8 (noting that smaller Asian currencies, such as the Hong Kong Dollar, the Thai Baht, the Indonesian Rupiah, and the Korean Won are most liquid in the Austral-Asian time zones and the New Zealand Dollar is most liquid when New Zealand and

Australian financial institutions are open for dealing). In my opinion and experience, I have never heard anyone claim that requesting quotations in the most liquid markets could be unreasonable or abusive. See Greene Report, ¶ 46.[6] Second, JPMC proceeded cautiously and methodically to ensure precision and avoid errors due to miscommunication and/or lack of experience with these types of close-outs. See Murray Deposition, 123:22-124:23 (explaining that he "made a conscious decision" not to ask London for assistance in requesting quotations on the Yen and NZ dollar options to insure that the precise process that had been followed would be used in the other closeouts and that JPMC "proceeded in a very deliberate fashion"), 126:2-9 (explaining that he "didn't want to give instructions to London [and] have them mess something up, either by calling three instead of four or by not getting appropriate market price information at the same time" and so, "to protect the integrity of the situation [he] wanted to keep control of it; there were also liquidity considerations."), 127:20-28:6 (explaining that the PFIL close-out was the first for all of the traders in JPMC's global FX options desk, and why Piers Murray did not want to risk transmitting instructions to another FX options team in another office and risk errors either due to miscommunication by or inexperience of the other team), 133:10-16 (although the traders in London were perfectly capable of asking for four market quotes, in events beyond the norm, as the primary center of responsibility for Asian currencies, Piers Murray wanted to be in control of the situation). The DeRosa Report ignores this tidal wave of consistent, direct, and compelling evidence because it cannot dispute it.

    45. In my opinion, there was nothing at all unreasonable or abusive about JPMC's decision to complete the process of requesting quotations on all remaining Terminated Transactions by the close of business on January 14, 1998, in Singapore. Indeed, although it is clear that Dr. DeRosa does not realize it, the DeRosa Report concedes as much, once its argument that JPMC was required to enlist the help of JPMC's New York office on January 13, 1998, is rejected. See Paragraph 44, *supra*. In other words, the DeRosa Report argues that JPMC *could* have completed the process of requesting quotations by taking advantage of the entire trading day in New York that remained after Singapore closed for business on January 13, 1998. However, as discussed above, JPMC was under no such obligation. In my opinion, JPMC was well within its rights, instead, to use the trading day available to it in Singapore on January 14, 1998, to complete the process of requesting quotations on all Terminated Transactions, **which it did**. To put the matter into context, following extensive and parallel discussions between and among the business people and the lawyers, many of which took place in different time zones, JPMC was given the approval to begin the process of requesting quotations between 3:00 and 4:00 p.m. in Singapore on January 13, 1998. JPMC made, in my opinion, the reasonable decision to request quotations on the Indonesian rupiah transactions first, as these were the most volatile. Murray Deposition, 109:13-112:7. When this process was completed and the quotations were obtained, it was already **after** the close of trading in Singapore on January 13, 1998. See JPMC 01081-83, JPMC 01088-91. JPMC therefore made, in my opinion, the entirely reasonable decision to continue the process of requesting quotations the next

---

[6] If a Non-defaulting Party were to request quotations in a market and at a time that it believed would disadvantage the Defaulting Party, it is easy to imagine the Defaulting Party arguing that, by doing so, the Non-defaulting Party breached the 1992 ISDA Master Agreement. See Paragraph 55, *infra*.

Michael S. Feldberg, Esq.
March 29, 2006
Page 23 of 34

morning in Singapore on January 14, 1998. The quotations on all the remaining Terminated Transactions were requested by the end of day in Singapore on January 14, 1998. There is nothing *prima facie* unreasonable or abusive in this timing, and absolutely nothing in the evidence to suggest that JPMC was acting in bad faith or indifferently or that JPMC was seeking to profit at PFIL's expense in the timing of its requests.[7] On this evidence, the only conclusion possible is that JPMC did not breach its obligation under the 1992 ISDA Master Agreement to request quotations as soon as reasonably practicable after the Early Termination Date.

    46. The DeRosa Report next argues that JPMC could and therefore should have requested quotations on the New Zealand dollar option transactions and the Hong Kong dollar forward transactions before what he claims to be the close of business in Singapore at 5:00 p.m. on January 13, 1998. In Dr. DeRosa's opinion it was "unreasonable" for JPMC to have waited until the markets in Singapore opened for business the next day, January 14, 1998. I disagree. Putting aside once again that the DeRosa Report fails to understand the difference between what is "reasonably possible" and what is "reasonably practicable," the evidence in this case, as discussed in paragraph 43, *supra*, amply demonstrates that JPMC's decision to wait was both reasonable and made in good faith: there was nothing abusive whatsoever about it. As to the Hong Kong dollar forward transactions, Piers Murray testified that he and Ban Suan Wong, who was responsible for running JPMC's interest rate trading books in Asia, needed to coordinate their actions in requesting quotations for the Indonesian rupiah option transactions:

> I was primarily responsible for the FX options risk. If one of the other [trading] desks had risks that were similar to the risks that I had in my portfolio and in particular I know of one risk which was in the rupiah that was similar across the [trading] desks, then it was my responsibility to coordinate with Ban Suan's desk in order to ensure that we closed out at the same time, **because we didn't want to disadvantage, we might have disadvantaged Peregrine. We didn't want to run into that situation.** So I coordinated in that particular case with Ban Suan.

Murray Deposition, at 33:24-34:15 (emphasis added). After quotations on the Indonesian rupiah option transactions were requested and obtained, it was after 5:00 p.m. in Singapore on January 13, 1998, and the decision was made to wait until the opening of trading in Singapore the next morning, January 14, 1998, to request quotations on the Hong Kong dollar option transactions. See Murray Deposition, 151:18-156:7 (explaining that Hong Kong Dollar forwards, which were handled by Ban Suan Wong, were not closed out at the end of the day on January 13, 1998, because he and Ban Suan Wong had to coordinate the closeout of the Indonesian rupiah options first when given the go-ahead in the late afternoon that day). Likewise, the Australian and New

---

[7] Piers Murray testifies that, although JPMC knew the markets were extremely volatile, JPMC did not know which way the markets might move. Murray Deposition, at 145:22-146:2. The evidence is undisputed that JPMC's timing decisions were not motivated or influenced by any desire to speculate or play the market or otherwise seek to profit at PFIL's expense. See DeRosa Report, at 16 (the "reasonably practicable" requirement attempts "to eliminate any undue speculation at the hands of the non-defaulting party.") There is no evidence of *any* speculation in this case, whether "undue" or otherwise.

Michael S. Feldberg, Esq.
March 29, 2006
Page 24 of 34

Zealand markets were already closed for the day by the time JPMC in Singapore had requested quotations on the Indonesian Rupiah transactions. See Murray Deposition, 143:23-145:6 (explaining that market makers in New Zealand and in Australia were already going home for the day by the time that Indonesian Rupiah transactions were closed out in the late afternoon of January 13, 1998, in Singapore and that he did not ask London for help on the New Zealand Dollar option transactions because Asia was the primary dealing center and it was his belief that he would receive better market quotations and more accurate quotations by waiting until the next day in Singapore), 158:16-23, 177:20-21 ("The kiwi it was not possible to close out on the 13th in a liquid time zone."). There is simply no hint of evidence that JPMC's decision was unreasonable or abusive. It was late in the day, and in JPMC's reasonable trading judgment it would be better **for PFIL** to wait until the next morning to request quotations from Reference Market-makers, who would be less busy and distracted with end of day matters. On this evidence, again, it is not possible to conclude that JPMC's decisions were unreasonable or abusive.

   47.   The DeRosa Report argues that other Non-defaulting Parties were able to complete the close-out process faster than JPMC did, and that this somehow "proves" that JPMC was unreasonable or abusive in not closing-out more quickly. See DeRosa Report, at 26. In my opinion, this entire line of argument is irrelevant. See Greene Report, ¶ 48 ("It is entirely irrelevant whether one Non-defaulting Party in different circumstances may have been able to request quotations more quickly than another Non-defaulting Party. Equally, it is irrelevant whether a Non-defaulting Party might have been able to request quotations earlier than it in fact did so, as long as it had reason to believe that it was not 'reasonably practicable' to request those quotation at that time"); see also Paragraphs 18, 41 and 45, *supra*.

   48.   Dr. DeRosa opines that JPMC's delay in this case is attributable in large part to the fact that JPMC owed PFIL money, not *vice versa*, implying that JPMC was therefore indifferent or careless as to how or when it proceeded to request quotations from Reference Market-makers. See DeRosa Report, at 26. Even if this were not idle speculation on Dr. DeRosa's part, the argument is wholly irrelevant. Dr. DeRosa erroneously assumes that how he *believes* JPMC might have responded in different circumstances is "proof" that JPMC acted unreasonably or abusively. In any event, in my opinion the evidence overwhelmingly demonstrates that JPMC did not act unreasonably or abusively in the circumstances of this case. See Paragraphs 33-47, *supra*.

   49.   Finally, the DeRosa Report argues that JPMC should have felt free to rush through the process of requesting quotations because the liquidator could and would have rectified any overpayments that JPMC mistakenly made. See DeRosa Report, at 27. The argument misses the point entirely. The issue is not whether JPMC could have done things faster without hurting itself; the issue is whether JPMC was acting unreasonably or abusively by choosing to be careful, methodical, and deliberate in requesting quotations in the manner that it felt most comfortable doing. In my opinion, the evidence in this case is clear and undisputed: JPMC did not act unreasonably or abusively. See Greene Report, ¶¶ 42-49; see also Paragraphs 18, 41 and 45, *supra*. I note, too, that Dr. DeRosa's argument that "mistakes" could be rectified assumes that all mistakes would be simple errors of an administrative nature, such as transposing

Michael S. Feldberg, Esq.
March 29, 2006
Page 25 of 34

numbers. The universe of possible mistakes, however, is not limited to that easy-to-fix subset. Some mistakes might not be discovered for months or longer. And some mistakes might not be reversible at all. In my opinion, Arthur Magnus had it right when he said "when you are going to start moving money and, particularly, we are paying money in this case to a creditor [liquidator], you want to be 110 percent right that you have got it right." Magnus Deposition, 102:20-24.

### VIII. Because He Is Not An Expert On The 1992 ISDA Master Agreement, Dr. DeRosa's Views And Opinions On That Agreement Are Unfounded And Incorrect

50. The DeRosa Report states at page 8, paragraph e, that the 1992 ISDA Master Agreement is used "to effect OTC transactions in derivatives securities." This is incorrect. OTC derivative securities **are not** and have never been documented as Confirmations under the 1992 ISDA Master Agreement, a fact that Dr. DeRosa would have known had he been familiar with the history, uses, and purpose of the 1992 ISDA Master Agreement.

51. The DeRosa Report states at page 8, paragraph e, that dealers like JPMC hedge their "investments" under the 1992 ISDA Master Agreement. This is a strange and incorrect remark. In my experience, I have never heard anyone familiar with the 1992 ISDA Master Agreement refer to privately negotiated derivatives transactions as "investments." Even colloquially speaking, most people would not consider a transaction in which they owe money to another as an "investment."

52. The DeRosa Report states at page 11, paragraph g, that a Non-defaulting Party "must be prepared to actually deal with the Reference market-maker at the market quotation price…." I am not sure what this statement is intended to mean, but it is confusing and certainly imprecise. First, in my experience it is often the case that Non-defaulting Parties will request quotations without any intention whatsoever of actually accepting any of them. Second, it is not unusual for a quotation to be marked as "indicative," which means that a Non-defaulting Party could not accept it even if it wanted to. Third, if by "the market quotation price" Dr. DeRosa means the amount determined in accordance with the averaging procedures set forth in the definition of Market Quotation in the 1992 ISDA Master Agreement, then he is incorrect: the price so determined is an average and is not capable of being accepted by any party. See 1992 ISDA Master Agreement, § 14 (seventh sentence of definition of Market Quotation).

53. The DeRosa Report asserts at page 11, paragraph h, that "market quotations are **designed** to freeze the parties' relationship at the moment of default in order to preserve the economic status quo as of the default event." (Emphasis added.) Given that Dr. DeRosa does not claim to have been involved in any capacity in the drafting of the 1992 ISDA Master Agreement, it is not clear to me how he can authoritatively opine how that agreement was designed. In any event, he is incorrect. The Market Quotation provisions of the 1992 ISDA Master Agreement were designed, in the context of the Automatic Early Termination of the agreement, to preserve the outstanding cash flows (and, if applicable, deliveries) under all Terminated Transactions so that those cash flows (and, if applicable, deliveries) can later be contemporaneously valued by

Michael S. Feldberg, Esq.
March 29, 2006
Page 26 of 34

Reference Market –makers when they provide their quotations pursuant to the Market Quotation process.

54. The DeRosa Report asserts at page 12, paragraph j, that "[o]nce market quotations have been **requested** from the four Reference Market-makes, the non-defaulting party is required to average the middle two market quotations to determine the value of the Terminated Transactions." (Emphasis added.) This is a stunning contention, implying as it does that the averaging process must begin even before the necessary quotations are actually **obtained**. Nothing could better demonstrate PFIL's and Dr. DeRosa's persistent and utter confusion about the difference between "requesting" quotations and "obtaining" quotations than this statement. Throughout the DeRosa Report, time and again Dr. DeRosa maintains or implies that "requesting" quotations means the same thing as "obtaining" them. See, e.g., DeRosa Report, at 14, 16, 18. Quite obviously, however, they do not. Even with the best of intentions, a Non-defaulting Party cannot begin to average quotations that have been requested but not yet provided.[8] See Greene Report, ¶¶ 35-36. For the DeRosa Report to suggest that the terms are synonymous reflects a profound misunderstanding as to how the most basic Market Quotation procedures are intended to work. Indeed, in this case with respect to the close-out of the Thai Baht swap transactions, JPMC requested quotations on January 14, 1998, but the Reference Market-makers did not provide the quotations until the next day, January 15, 1998. See Murray Deposition, 59:17-60:13; JPMC 01071-80. Moreover, I note that the DeRosa Report erroneously assumes that four quotations will *always* be provided. That is not the case. The definition of Market Quotation expressly recognizes that four quotations will not always be provided, a fact the DeRosa Report overlooks or ignores. See 1992 ISDA Master Agreement, § 14 (seventh, eighth, ninth and tenth sentences of definition of Market Quotation).

55. Dr. DeRosa states at page 16, paragraph b, that he disagrees with JPMC's contention in its motion to dismiss and reply papers that it has the right under the 1992 ISDA Master Agreement to select the day and time as of which quotations are to be obtained as long as it acts "in good faith." But this is *precisely* what the sixth sentence of the definition of Market Quotation states: "The day and time as of which those quotations are to be obtained will be selected in good faith by [in this case, the Non-defaulting Party]...." In my opinion the DeRosa Report fails to understand that there *is* a difference between the fifth sentence and the sixth sentence of the definition of Market Quotation, although clearly and necessarily there is. See Greene Report, ¶¶ 35-36.

56. The DeRosa Report argues at the pages 16-17, that Section 6 (d)(i) of the 1992 ISDA Master Agreement provides support for its contention that JPMC was required "**to obtain** the market quotations on or as soon as reasonably practicable after the relevant Early Termination Date." (Emphasis added.) This contention is not only a non-sequitur, it reflects a

---

[8] The DeRosa Report looks to the deposition testimony of Robert Pickel in a vain attempt to support its misunderstanding. See DeRosa Report, at 15-16. All to no avail, however, as Mr. Pickel states in the very material that the DeRosa Report cites that "whether or not you actually obtain [the quotation] will depend upon the party who you have made the request to." See Pickel Deposition, 48:10-13. The import of this distinction was obviously ignored or misunderstood.

Michael S. Feldberg, Esq.
March 29, 2006
Page 27 of 34

*complete* misreading of what the fifth sentence of the definition of Market Quotation actually states: "The party making the determination [in this case, JPMC] ... will **request** each Reference Market-maker to provide its quotation ... on or as soon as reasonably practicable after the relevant Early Termination Date." (Emphasis added.) There is a difference between requesting quotations and obtaining quotations, even if the DeRosa Report is unwilling to acknowledge it. In my opinion, the requirements of Section 6(d)(i) of the 1992 ISDA Master Agreement are separate and distinct to the requirements of the fifth sentence of the definition of Market Quotation and they apply only after Market Quotation (or, if applicable, Loss) has been determined. Section 6(d)(i) provides no support whatsoever for the DeRosa Report's tortured misreading of the definition of Market Quotation.

57. Dr. DeRosa states that, in his opinion, "sophisticated financial institutions such as JPMorgan should have been able to identify the universe of the Terminated Transactions in less than one hour." He goes on to say that "a one hour [sic] frame is **typically** a reasonable amount of time to identify the universe of transactions." DeRosa Report, at 20 (emphasis added). I disagree. In my opinion and experience, there is no "typical" period of time within which "a universe of Terminated Transactions" should or can be identified, let alone verified. The amount of time that it takes will *always* depend on and vary with the circumstances. See Greene Report, ¶¶ 43, 45.

58. The DeRosa Report claims that one of the purposes of the 1992 ISDA Master Agreement is to accommodate

> back-to-back transactions with different counterparties and supporting a chain of transactions among derivative market-makers and other market participants with the effect that a default on one transaction in the chain will result in the immediate valuation and replacement of that transaction for the benefit of the parties directly affected as well as other market participants indirectly affected by the trade.

Quite apart from the fact that Dr. DeRosa makes no claim to have participated in any capacity in the drafting of the 1992 ISDA Master Agreement and therefore has no basis for his views and opinions as to the history or "purpose" of that agreement, his statement is unintelligible. It seems to suggest that there is a chain of third-party beneficiaries downstream from PFIL with some sort of interest in the agreement that was entered into between PFIL and JPMC in this case. In all my experience with the 1992 ISDA Master Agreement, I have never heard anyone express a similar view. In my opinion, the DeRosa Report's claim finds no support in the language of, or the purposes underlying, the 1992 ISDA Master Agreement.

59. The DeRosa Report states at page 26, paragraph p, that based on his "experience," it should have taken JPMC less than one hour to prepare the term sheets needed before quotations could be requested for the Thai Baht swap transactions. Since Dr. DeRosa does not claim to have *any* experience in requesting quotations in an insolvency (or in any other) context under the close-out provisions of the 1992 ISDA Master Agreement, the basis of his observations are unclear to me. In any event, the issue is not whether Dr. DeRosa could have prepared the term sheets faster than JPMC did, but whether JPMC was acting unreasonably or abusively in

Michael S. Feldberg, Esq.
March 29, 2006
Page 28 of 34

taking the several hours that it did take. In my opinion it was not. JPMC witnesses have testified that JPMC cautiously and methodically prepared the Thai Baht term sheets, a process that took at least the morning of 14th to complete. Murray Deposition, 63:24 (might have taken several hours), 59:17-21 (took some time to gather the documentation associated with the transactions and validate those transactions against the positions that we have on the books); 160-161 (details of the transactions had not been fully validated by the traders, and, given that this is a one time opportunity to catch a mistake before the closeout process happened, JPMC needed to make sure, very deliberately make sure that everything matched). As evidenced by a fax sent from JPMC's Hong Kong office at 2:30pm on January 14th to Chris Seaver, JPMC's internal counsel in Asia, enclosing a copy of the draft term sheet, a number of people and offices were involved in the finalization of the term sheet. See JPMC 00120-122. Given that JPMC **was not** required by the 1992 ISDA Master Agreement to drop everything else it was doing in order to expedite the drafting and subsequent legal review of the term sheets, there is nothing to suggest unreasonable or abusive conduct in this matter.

   60. Dr. DeRosa contends at page 23, paragraph n, that based on his "experience" a large firm like JPMC can transact as many as 100 trades of this nature on a typical trading day. Accordingly Dr. DeRosa opines that JPMC *should* have taken less than an hour 'to obtain" quotations on the Terminated Transactions at issue in this case. This is a breathtaking assertion – and a wildly inapt analogy – that betrays a wholesale misunderstanding of what the Market Quotation process actually entails. It is entirely irrelevant how many trades JPMC might be able to effect on a typical trading day. The issue is whether JPMC's timing in requesting quotations was unreasonable or abusive, not whether in totally different circumstances it could trade faster than it did. Once again, the DeRosa Report confuses what is possible with what is reasonably practicable, thereby applying the wrong standard from the start. Moreover, Dr. DeRosa does not claim to have *any* experience supervising or personally handling the requesting of quotations under the 1992 ISDA Master Agreement in the context of an insolvency (or in any other context for that matter). There is simply no factual basis for his opinion that the number of trades JPMC could effect "on a typical trading day" has any bearing whatsoever on the speed with which JPMC could or should have requested quotations in the freighted circumstances of this case.

### IX. Other Errors and Mistakes in the DeRosa Report

   61. The DeRosa Report states at page 8, paragraph d, that foreign exchange trading moves from Asia to London during the (presumably typical) trading day. That may be so generally speaking in other contexts, but it simply untrue and misleading as applied to JPMC's foreign exchange trading during the time in question in this case. Piers Murray testified that JPMC **did not** pass its Asian trading books to London in January 1998. Murray Deposition, 114:4-11. Moreover, during the Asian currency crisis, some Asian currencies stopped trading at all for some periods. Murray Deposition, 86:7-11 (explaining how the Malaysian Ringgit disappeared as a traded currency during the Asian currency crisis). Obviously, therefore, not all foreign exchange trading moved to London in January 1998, even for those banks that at that time generally did so.

62. The DeRosa Report contends at page 25, paragraph p, that JPMC has offered no justification "for failing to close out the Korean won and Hong Kong dollar transactions on January 13, 1998." This is simply untrue. As discussed at some length in Paragraph 43, *supra*, JPMC in Singapore **was not** required to pass responsibility for the requesting of any quotations to JPMC's New York or London offices. This means that at the close of business in Singapore on January 13, 1998, JPMC **did not** have to request quotations on the remaining Terminated Transactions until the next day in Singapore, January 14, 1998. Indeed, with respect to the New Zealand Dollar options transactions, that market was already closed. See Paragraphs 44-46, *supra*. With respect to the Korean Won transactions and the Hong Kong dollar transactions, in my opinion JPMC 's position is neither unreasonable nor abusive. See Paragraphs 43-46, *supra*. The issue, once again, is not whether JPMC *could* have requested quotations more quickly than it did. See Paragraph 21, *supra*. That is why the Defaulting Party must prove that the Non-defaulting Party's actions were unreasonable or abusive, and this PFIL cannot do. Curiously, Dr. DeRosa asserts, "I am advised that JPMorgan has offered no justification for failing to close out the Korean won and Hong Kong dollar transactions on January 13, 1998." Since Dr. DeRosa states that he has reviewed the Deposition Transcripts of Piers Murray, Arthur Magnus, and Robert Pickel, it is unclear to me how he can in good faith rely on what he has been "advised" [presumably by PFIL's lawyers] when that clearly is contradicted by evidence he himself has reviewed in preparation for his expert report.

63. Dr. DeRosa also erroneously states that "JPMorgan has acknowledged through deposition testimony in this case that it learned no later than the late afternoon Singapore time on January 12, 1998 that an Event of Default had occurred on that day." DeRosa Report, at 19. This is incorrect. Piers Murray, Don Thompson and Arthur Magnus all testified that JPMC in Singapore learned of the default in the evening of January 12, 1998, after the close of business. Murray Deposition, 190:12-15 ("The date on which we had an event of default . . . was January 12th in the evening); Thompson Deposition, 190:2-8 ("[W]e did not know of the passing of the resolution for PFIL's winding up until after the close of business local time in Asia on January 12th."); Magnus Deposition, 98:9-20 ("[W]e learned through the press that this happened in the early morning, in New York time, on the 12th."); see also JPMC 00006 (e-mail sent 6:23am New York time, which is 7:23pm in the evening Asia time, on January 12, 1998).

X. **Dr. DeRosa's Calculation Of "Damages" Is Conceptually Flawed, Based On An Incorrect Understanding Of The 1992 ISDA Master Agreement, And Has No Causal Connection To JPMC's Actions**

A. **Damages For Alleged Breach Of The "Reasonably Practicable" Requirement**

64. Dr. DeRosa states at page 29, paragraph 4 a, that he has calculated PFIL's damages based on JPMC's "failure to value [*sic*] the Terminated Transactions as of January 13, 1998." One must presume that Dr. DeRosa means by this that quotations should have been obtained no later than 5:00 p.m., New York time, on January 13, 1998, although he does not specify the precise time or place that he has in mind. Dr. DeRosa attaches a copy of PFIL's damages calculation statement as Exhibit B to the DeRosa Report, showing "damages" of $13,002,023. In my opinion, PFIL's entire case against JPMC regarding the timing of when it

Michael S. Feldberg, Esq.
March 29, 2006
Page 30 of 34

requested quotations is without merit and based on the mistaken belief that "reasonably practicable" means the same thing as "reasonably possible." Since JPMC in Singapore **was not** required to pass responsibility for requesting quotations to JPMC's London or New York offices at the close of business in Singapore on January 13, 1998, JPMC cannot be liable to PFIL for *any* damages under the 1992 ISDA Master Agreement for failing to request quotations "as of January 13, 1998," whatever the time and place. ISDA's CEO and former general counsel, Robert Pickel, agrees. Notwithstanding the lack of any predicate that would justify JPMC's paying damages, I note that Dr. DeRosa's "damages" calculation is, in any event, logically inconsistent and conceptually flawed *on its face*. As of the close of business in New York on January 13, 1998, JPMC had already requested and obtained quotations on the Indonesian rupiah transactions. See Murray Deposition, 123:10-18 (explaining that it took approximately an hour to obtain quotations on the Indonesian Rupiah transactions in the late afternoon in Singapore on January 13, 1998). Nevertheless, without explanation or reason, Dr. DeRosa wrongly includes these closed-out transactions in his calculation of PFIL's damages for JPMC's "failure to value [*sic*] the Terminated Transactions as of January 13, 1998.

65.    Nor is that the only immediately transparent flaw in Dr. DeRosa's "damages" calculation. The evidence in this case is undisputed that the transactions at issue were larger (in some cases, much larger) than the "standard" transactions normally traded in the Asian currency markets at this time. See Murray Deposition, 46:15-19, 173:22-25 (noting that Japanese Yen option transactions were above the standard size and New Zealand dollar option transactions were very large), 51:2-5 (explaining that there was no longer any standard size for the Indonesian Rupiah), 59:22-60:13 (noting that portfolio of Thai Baht transactions was unusual and "abnormal"). The evidence is also undisputed that the Asian currency markets at this time were in crisis and illiquid, showing extreme volatility and that the best and most accurate prices for these currencies were in local markets during local trading hours. See Murray Deposition, 45:18-19 (noting that volatility in the market at his time was extreme), 156:15-23 (explaining that the Indonesian rupiah, Thai Baht, Hong Kong dollar, and Korean Won, all of the emerging Asian currencies, were in "crisis mode"); see generally Paragraph 44, *supra*. Now, given this *undisputed* evidence, in my opinion, and based on my experience, it was wholly unreasonable for Dr. DeRosa to base his calculation of "damages" based on any screen prices in *New York* unadjusted to reflect the illiquidity of that market and the large sizes of the transactions at issue.

66.    I also note that, conceptually, it is entirely inappropriate for Dr. DeRosa to base his calculation of "damages" on what he calls "Mid Spot" prices. The Defaulting Party in a Market Quotation context is *always* subject to the full bid-offer spread of the quoting Reference Market-makers. This requirement is inherent in the definition of Market Quotation. In other words, whenever a Non-defaulting Party requests a quotation from a Reference Market-maker, the Reference Market-maker will build its bid-offer spread --think of it as its profit margin-- into the price that it provides the Non-defaulting Party. (For example, if you want to sell me something that I think is worth $100, my offer to buy it from you might be, say, $90; my expected profit margin of $10 is "built into" the price that I offer to pay you. This reflects my bid-offer spread.) If four such quotations are obtained, the highest and the lowest quotations are dropped, and Market Quotation will be the average of the middle two quotations. This average "price" determines the amount that, in a case such as this, the Non-defaulting Party must pay to

Michael S. Feldberg, Esq.
March 29, 2006
Page 31 of 34

the Defaulting Party. Notice that this means that the amount that the Non-defaulting Party must pay the Defaulting Party is, in effect, reduced by the average profit margins charged by the relevant Reference Market-makers. And this is *always* the case. Dr. DeRosa's calculations of "damages," on the other hand, are not reduced by the average expected profit margins. On the contrary, he takes the position that half the expected profit margin should be added to the amount that JPMC must pay PFIL. This is wrong, and any calculation of damages that seeks to replicate what Market Quotation *requires* must pass the full bid-offer spread through to the Defaulting Party.

67.     Finally, there is yet another major disqualifying flaw in Dr. DeRosa's calculation of "damages." He bases his calculations on the highest and lowest prices that occurred at any time during the *entire* trading day in New York on January 13, 1998, rather than on the highest and lowest prices at the close of business in New York (5:00 p.m.) on that day. This is conceptually incorrect. Any calculation of damages that seeks to replicate what Market Quotation would have been as of the close of business in New York on January 13, 1998, must be based on the prices in effect at the close of business on that day, and only on those prices. I can explain it best this way: the theory of liability on which this calculation of "damages" is predicated is that JPMC breached the 1992 ISDA Master Agreement by not obtaining quotations on all of the Terminated Transactions by the close of business in New York on January 13, 1998. If PFIL is correct in this assertion, and in my opinion it is not, then it is unreasonable in the extreme for Dr. DeRosa to cherry-pick the highest possible prices that occurred *during* the day, when according to its own theory, JPMC's liability for damages did not attach until the close of business on that day. Stated more simply yet, Dr. DeRosa cannot use prices to determine PFIL's "damages" that occurred before JPMC's alleged breach of the agreement.[9]

### B.    Damages For Allegedly "Improperly" Requesting Quotations

68.     Dr. DeRosa states at Page 29, paragraph 4 b, that he has calculated PFIL's damages based on JPMC's [assumed, but erroneous] strict liability, without any proof of loss or even without regard to PFIL's actual benefit, for JPMC's (a) supplying certain market variables to Reference Market-makers, and (b) requesting indicative quotations. Dr. DeRosa attaches a copy of PFIL's damages calculation statement as Exhibit B to the DeRosa Report, showing "damages" of $13,002,023. It is curious and bizarre that Dr. DeRosa's calculation of PFIL's "damages" under these two separate theories of liability is exactly the same, to the dollar, as his calculation of "damages" by reason of JPMC's failure to request and obtain quotations on the remaining Terminated Transactions (after the Indonesian rupiah transactions were closed-out) "no later than January 13, 1998." Improbabilities aside, once again the DeRosa Report reflects a stunning indifference to the evidence in this case. Dr. DeRosa does not claim that JPMC provided spot reference prices or other market variables to each of the Reference Market-makers

---

[9] And, as noted in Paragraphs 64-67 above, the prices that form the basis of any reasonable calculation of "damages" must be consistent with the facts of this case (Paragraph 64), must be adjusted to reflect undisputed illiquidity considerations (Paragraph 65), must pass through to PFIL the full bid-offer spread (Paragraph 66), and must be based on prices in effect at the close of business in New York on January 13,1998 (Paragraph 67).

Michael S. Feldberg, Esq.
March 29, 2006
Page 32 of 34

in respect of each group of Terminated Transactions, and that is because JPMC did not do so. Nevertheless, Dr. DeRosa includes all of the Terminated Transactions in his "damages" calculation statement. Similarly, Dr. DeRosa does not claim that JPMC requested indicative quotations in respect of each group of Terminated Transactions, and that is because JPMC did not do so. However, one will search in vain for any hint in Dr. DeRosa's calculation of "damages" that the evidence supports his conclusions. Moreover, the same failure to adjust his calculations based on illiquidity considerations that I discuss in Paragraph 60, *supra*, applies here. As does the problem of not passing the full bid-offer spread to PFIL that I discuss in Paragraph 61, *supra*. Moreover, the same problem with the timing of Dr. DeRosa's calculations that I discuss in Paragraph 62, *supra*, applies here too. (Dr. DeRosa makes no effort to match the time at which a breach is alleged to occur to the time at which prices are used to calculate damages.) Simply put, whatever these calculations purport to be, **on their face** they are not causally related to the evidence in this case. In my opinion, these calculations cannot be supported by the language of, or the policies underlying, the 1992 ISDA Master Agreement.

### C. JPMC Is Not and Cannot be Liable For Any Damages Under the 1992 ISDA Master Agreement Under Any Circumstances As long As PFIL Or Any Of Its Affiliates Owes Any Money to JPMC Or Any Of Its Affiliates

69. Dr. DeRosa states that in connection with the preparation of his report he has reviewed "The ISDA Master Agreement [sic] schedules and annexes, executed between JPMorgan and PFIL, dated January 8, 1996 (the 'PFIL/JPMorgan ISDA Master Agreement')." DeRosa Report, at 3. It is surprising, therefore, that the DeRosa Report does not analyze or discuss JPMC' rights under Part 5, Paragraph 4 ("Right of Set Off"), of the Schedule to that agreement. Suffice it to say, that Paragraph (among other things) provides in clause (iv) that any obligation of JPMC as a Non-defaulting Party to make *any* payment to PFIL as a Defaulting Party shall

> be conditioned upon and shall arise only upon the date that all indebtedness and obligations, whether matured or unmatured, of the Defaulting Party or any Affiliate of the Defaulting Party to the Non-defaulting Party or any Affiliate of the Non-defaulting Party shall have been paid in full.

I am advised that PFIL and its "Affiliates" (as that term is defined in Part 5, Paragraph 5 of the Schedule to the PFIL/JPMorgan ISDA Master Agreement) have not paid in full all indebtedness and obligations owing to JPMC and its Affiliates. Accordingly, in my opinion, JPMC is not, and cannot be, liable to pay *any* amount (including, but not limited to, interest on any such amount) to PFIL under that agreement, whether based on any theory articulated under the DeRosa Report or otherwise.

Michael S. Feldberg, Esq.
March 29, 2006
Page 33 of 34

## XI. Conclusion

70.  Dr. DeRosa is not an expert on the history, drafting or meaning of the 1992 ISDA Master Agreement or custom and practice in the industry. His views and opinions on that agreement are entitled to no weight whatsoever. Notwithstanding this, the DeRosa Report abandons and rejects PFIL's sole theory of liability under its Complaint. Instead, the DeRosa Report posits three new unpled theories of liability, each of which is as incorrect as PFIL's initial theory. The first theory is based on the erroneous assumption that the phrase "reasonably practicable" is synonymous with the phrase "reasonably possible." For this reason alone, the theory should be rejected out of hand. In any event, the evidence in this case is simply overwhelming that JPMC did not act unreasonably or abusively in its timing of when it requested quotations. The 1992 ISDA Master Agreement **did not** require JPMC to wake people up in the middle of the night in Singapore on January 12, 1998, in order to expedite the discussions, coordination, approvals, and obtaining of legal advice that JPMC found necessary or appropriate before it commenced the close-out process on January 13, 1998. Robert Pickel, the CEO (and former general counsel) of ISDA agrees with my opinion in this regard. The 1992 ISDA Master Agreement **did not** require JPMC in Singapore to enlist the assistance of JPMC's New York or London offices to request quotations after Singapore's close of business on January 13, 1998. Mr. Pickel again agrees. The 1992 ISDA Master Agreement **did not** require JPMC to complete the process of requesting quotations before the close of business in Singapore on January 13, 1998, or before the close of business in New York on January 13, 1998. Again Mr. Pickel agrees. The 1992 ISDA Master Agreement **does not** require a Non-defaulting Party to request quotations more quickly than it reasonably feels comfortable doing. Finally the 1992 ISDA Master Agreement **does not** require the Non-defaulting Party to devote whatever personnel or material resources might be necessary to expedite the quotations process. On these matters too, Mr. Pickel agrees. There is nothing *prima facie* unreasonable or abusive in the timing of JPMC's requests for quotations, and absolutely nothing in the evidence to suggest that JPMC was acting in bad faith or indifferently or that JPMC was seeking to profit at PFIL's expense in the timing of its requests. On the contrary, the undisputed evidence demonstrates that JPMC's timing decisions were both reasonable and made in good faith. On this evidence, the only conclusion possible is that JPMC did not breach its obligation under the 1992 ISDA Master Agreement to request quotations as soon as reasonably practicable after the Early Termination Date.

71.  The second theory of liability articulated by the DeRosa Report is based on the erroneous assumption that the 1992 ISDA Master Agreement imposes strict liability without regard to, or proof of loss. The evidence in this case is clear and, again, undisputed: spot prices and other market variables were provided in certain cases to certain Reference Market-makers because JPMC believed reasonably and in good faith that by so doing it would *benefit* PFIL. The DeRosa Report does not attempt to rebut the presumption of benefit that this evidence raises. Rather, PFIL claims it is entitled to damages without regard to whether it actually benefited from the manner in which JPMC requested these quotations. On the face of it, this is a preposterous contention that finds no support in the language of, or the policies underlying, the 1992 ISDA Master Agreement.

Michael S. Feldberg, Esq.
March 29, 2006
Page 34 of 34

      72.     The third theory of liability articulated by the DeRosa Report is a clone of the second and is equally without merit. Dr. DeRosa contends that the 1992 ISDA Master Agreement imposed strict liability on JPMC when it requested indicative quotations from some of the Reference Market-makers in some of the Terminated Transactions. PFIL again claims that it is entitled to damages in the absence of *any* evidence that the quotations so provided were less favorable to PFIL than they would have been had JPMC not asked for indicative quotations or, indeed, without regard to whether the quotations provided were actually more advantageous to PFIL than they would otherwise have been. This theory is all the more disconnected from the 1992 ISDA Master Agreement because indicative quotations are not prohibited by it, and it is not uncommon for Reference Market-makers to provide them. In any event, as with the first and second theories advanced by Dr. DeRosa, the third theory finds no support in the language of, or the policies underlying, the 1992 ISDA Master Agreement. It is a conceptually and logically flawed theory that should be rejected out of hand.

      73.     Finally, for the sake of argument, even assuming that JPMC did breach the 1992 ISDA Master Agreement based on some theory of liability articulated by the DeRosa Report, Dr. DeRosa's calculation of "damages" is so conceptually flawed and so causally unrelated to the conduct complained of that it too should be rejected on its face. In any event, although the DeRosa Report ignores the issue entirely, it is clear that under the PFIL/JPMC ISDA Master Agreement, JPMC is not and cannot be liable to pay *any* amount to PFIL as long as PFIL or its Affiliates owes any indebtedness or obligations to JPMC or its Affiliates.

Please let me know if you have any questions.

Very truly yours,

Stephen R. Greene