**DeRosa Research and Trading, Inc.**
495 White Oak Shade Road
New Canaan, CT 06840
Tel: (203) 801-4340; Fax: (203) 801-4342
derosa@derosa-research.com

# Expert Report of

# David F. DeRosa, Ph.D

## February 10, 2006

RE:  PEREGRINE FIXED INCOME LIMITED (in liquidation) vs. JPMORGAN CHASE BANK (formally known as The Chase Manhattan Bank and having merged with Morgan Guaranty Trust Company of New York)

## I.  **INTRODUCTION**

I, David DeRosa, have been retained on behalf of plaintiff Peregrine Fixed Income Limited ("PFIL") to testify as an expert witness in this lawsuit brought by PFIL against JPMorgan Chase Bank ("JPMorgan").  I submit this report in compliance with the requirements of Rule 26(a)(2) of the Federal Rules of Civil Procedure.  I expect to testify at trial regarding the matters stated in this report, if asked about these matters by the Court or by the parties' attorneys. I expect to testify at trial regarding any related matter that is raised by the parties after I submit this report, if asked to do so by the Court or the parties' attorneys.

## II.  **QUALIFICATIONS**

1.    I  am president and owner of DeRosa Research and Trading, Inc.  I am also an adjunct professor of finance at Yale School of Management and Fellow of the International

Center for Finance, where I have taught courses in international finance, derivatives, and emerging markets financial policy since 1996.

2.      I have had extensive experience with the international capital markets, and in particular the foreign exchange market, over the past thirty years. I have had direct experience in trading, modeling, and evaluating derivatives, and their uses in the foreign exchange market, for over twenty years. I was a derivatives portfolio manager at Alliance Capital Management, a currency and currency option trader at Swiss Bank Corporation, and a hedge fund trader at Quadrangle Investments LLC. I am currently on the board of directors of five hedge funds, Rubicon Fund Management, BlueCrest Capital International, The Children's Investment Fund, GSA Capital International, and the CCC Carbon Fund. The combined capital of these funds exceeds $14 billion.

3.      I received my Ph.D in finance and economics from the Graduate School of Business of the University of Chicago and my A.B. in economics from the College of the University of Chicago. In addition to Yale, I have served on the faculties of the Graduate School of Business of the University of Chicago, the University of Southern California, and Loyola University of Chicago.

4.      I am the author of three books on foreign exchange derivatives: Options on Foreign Exchange, 2nd ed., John Wiley & Sons, 2000 (Japanese Language Edition, Toyo Keizai, Tokyo); Currency Derivatives, John Wiley & Sons, 1998; and Managing Foreign Exchange Risk, Revised Edition, Irwin/McGraw-Hill, 1996 (Japanese Language Edition, Yuuhikaku, Tokyo).

5.      My full *curriculum vitae* is attached hereto as Exhibit A.

## III.    PREVIOUS TRIAL TESTIMONY

A list of cases in which I have testified as an expert at trial or by deposition within the four-year period specified by Rule 26(a)(2) of the Federal Rules of Civil Procedure is attached hereto as Exhibit A.

## IV.   DATA AND OTHER INFORMATION CONSIDERED

In connection with the preparation of this report, I have reviewed at least the following material (the "Data"):

- The ISDA Master Agreement schedules and annexes, executed between JPMorgan and PFIL, dated January 8, 1996 (the "PFIL/JPMorgan ISDA Master Agreement").

- Documents and records, including term sheets and confirmations, relating to the creation, execution and termination of the following 25 transactions between JPMorgan and PFIL (the "Subject Transactions"):

  (a) Eight Thai Baht/United States Dollar cross-currency swap transactions executed by the parties between January 8, 1996 and March 14, 1997;

  (b) One New Zealand Dollar/United States Dollar currency option executed by the parties on July 18, 1997;

  (c) Three Indonesian Rupiah/United States Dollar forward foreign exchange swap transactions executed by the parties between July 25, 1997 and November 4, 1997;

  (d) Eight Korean Won/United States Dollar non-deliverable forward foreign exchange swap transactions executed by the parties between August 28, 1997 and November 6, 1997;

  (e) Two Hong Kong Dollar/United States Dollar forward foreign exchange swap transactions executed by the parties between October 22, 1997 and October 27, 1997;

(f) Two Japanese Yen/United States Dollar foreign exchange options executed by the parties on November 7, 1997; and

(g) One Indonesian Rupiah/US dollar foreign exchange option executed by the parties on July 21, 1997.[1]

- Market data from the Bank of Korea, PricewaterhouseCoopers and Bloomberg Financial Services;

- Documents produced during discovery in this case;

- Correspondence between the parties;

- Deposition transcripts of Simon Copley, Don Thompson, Arthur Magnus, Piers Murray, Donna Reino, Annabelle Bexiga, David Hague and Robert Pickel;

- Affidavits submitted by Christopher Seaver, Don Thompson, Arthur Magnus and Piers Murray in connection with the Hong Kong proceedings related to this case; and

- JPMorgan's motion to dismiss, PFIL's opposition to the motion to dismiss and JPMorgan's reply papers.

## V.   BASIS FOR OPINIONS EXPRESSED

My testimony will be based on my professional background and work experience as set forth in Section II of this report, the information set forth in Section IV of this report, the opinions expressed by expert witnesses of JPMorgan during the expert discovery period of this action and on evidence presented at trial.

---

[1]   There were also eleven failed transactions that were included in the calculation statement because payment was due according to the trades' terms on January 12, 1998, but payment was not made on January 12, 1998.

## VI.   LIMITATIONS OF THIS REPORT

I am continuing my study and analysis of the information I have considered in the preparation of this report.  I may refine or expand my opinions during the course of further study. I may do the same in the event that additional information is brought to my attention.  I also reserve the right to provide additional source material or citation authority for the propositions set forth in this report.

## VII.   THE ISDA MASTER AGREEMENT

1.   Background:

a.   This case involves an interpretation of the ISDA Master Agreement. ISDA is an acronym for the International Swaps and Derivatives Association (formerly known as the International Swap Dealers Association).   ISDA describes itself on its website (www.isda.org) as:

> The global trade association representing participants in the privately-negotiated derivatives industry, a business covering swaps and options across all asset classes (interest rate, currency, commodity and energy, credit and equity).  ISDA was chartered in 1985, and today numbers over 670 member institutions from 50 countries on six continents.  These members include most of the world's major institutions who deal in, as well as leading end-users of, privately negotiated derivatives.

The principal objective of the ISDA Master Agreement is to create standards to minimize risk and establish a regime for timely, effective and fair dealing between counterparties to the Agreement.  ISDA published the following text on its website to describe its mission:

> Since its inception, ISDA has pioneered efforts to identify and reduce the sources of risk in the derivatives and risk management business.  Among its most notable accomplishments are: developing the ISDA Master Agreement; publishing a wide range of related documentation materials and instruments covering a variety of transaction types; producing legal opinions on the enforceability of netting and collateral arrangements (available only to ISDA members); securing recognition of the risk-reducing

5

effects of netting in determining capital requirements; promoting sound risk management practices, and advancing the understanding and treatment of derivatives and risk management from public policy and regulatory capital perspectives.

b.     A listed derivative is a contract that is listed for trading on an organized exchange.   Over-the-counter ("OTC") derivatives trade not on exchanges but between counterparty dealing institutions and their customers.   The importance of OTC derivatives was noted in ISDA testimony before the U.S. Senate on July 10, 2002:

> Almost all OTC derivatives transactions involve sophisticated counterparties, and, unlike the futures markets, there is virtually no "retail" market for these transactions.
>
> The use of OTC derivatives is a positive force in the financial markets.   As Federal Reserve Chairman Greenspan noted at a recent Senate Banking Committee hearing (March 7, 2002) "they (derivatives) are a major contributor to the flexibility and resiliency of our financial system.   Because remember what derivatives do. They shift risk from those who are undesirous or incapable of absorbing it to those who are."   OTC derivatives are used to unbundle risks and transfer those risks to parties that are able and willing to accept them.   For example, if a corporation has floating rate debt outstanding and is concerned that interest rates might rise, it could use an interest rate swap to effectively convert its debt into a fixed rate obligation, thereby fixing its exposure.   Similarly, if a business has the right to receive non-dollar denominated revenues from a foreign-based affiliate, it could use a currency swap to hedge the risk of exposure to fluctuating exchange rates.   This Committee has recognized that, as the result of OTC derivatives transactions such as these, "efficiency is enhanced as firms are better able to concentrate on their core economic objectives."

Discussing the Regulatory Authority of the Commodities Futures Trading Commission Over Swaps and Other Privately Negotiated Derivatives Transactions:  Hearing Before the Comm. on Agriculture, Nutrition and Forestry, 109th Congress (July 10, 2002) (prepared statement of ISDA).

c.      The Bank for International Settlements ("BIS") is "an international organisation which fosters international monetary and financial cooperation and serves as a bank for central banks." www.bis.org.  The BIS conducts triennial surveys of trading in foreign exchange, derivatives on foreign exchange and derivatives on interest-rate-related derivatives.  It reported the following volumes of trading in its April 1998 survey:

> After allowing for the double-counting resulting from local and cross-border inter-dealer transactions and for estimated gaps in reporting, the average **daily** turnover in "traditional" global foreign exchange instruments (spot transactions, outright forwards, and foreign exchange swaps) can be estimated at US\$ 1,490 billion in April 1998, compared with US\$ 1,190 billion in April 1995.  Although the rate of growth in other OTC foreign exchange derivative instruments (currency swaps and options) was considerably higher than in traditional ones, they remained, at \$US 97 billion, a small fraction of overall trading.  Meanwhile, the notional value of transactions in interest rate derivatives, i.e., forward rate agreements (FRAs), swaps and options, amounted to US\$ 265 billion, compared with US\$ 151 billion in 1995.

Bank for Int'l Settlements, Press Release, "Central Bank Survey of Foreign Exchange and Derivatives Market Activity in April 1998:  Preliminary Global Data" (Oct. 1998) (emphasis added).

The Federal Reserve Bank of New York describes the foreign exchange market as follows:

> Currencies are traded in, what is by far, the biggest market in the world.  Turnover in this market exceeds \$1.5 trillion per day.  To put this in perspective, it is more than 15 times the daily turnover on the New York Stock Exchange.  The foreign exchange market can be exciting, since most exchange rates change minute-to-minute and they are often quite volatile.

http://www.newyorkfed.org.

     d.     The foreign exchange market is a 24-hour a day market during weekdays, excluding bank holidays.  The market opens in New Zealand on Monday morning and later includes Sydney, Tokyo, Hong Kong and Singapore to make up the Austral-Asian trading time zone.  Trading then moves to Europe where London is the center of trading.  The North American trading time zone is centered in New York.  Major exchange rates, such as the euro against the dollar and the dollar against the yen trade with great liquidity in all time zones. Smaller currencies, such as the Hong Kong dollar, the Thai baht, the Indonesian rupiah and the Korean won are most liquid in the Austral-Asian time zones.  The New Zealand dollar is most liquid when the New Zealand and Australian financial institutions are open for dealing – this period overlaps late-afternoon New York dealing (*i.e.*, when it is 3:00 p.m. in New York it is 8:00 a.m. the next day in Auckland and Wellington; thus, the last two trading hours at the end of the trading day in New York overlap with the first two trading hours in Aukland and Wellington on the next day).

     e.     The vast majority of derivatives dealers and other market participants use the ISDA Master Agreement to effect OTC transactions in derivatives securities, and rely on the ISDA Master Agreement to provide uniform standards of performance with respect to those transactions.  One of the primary considerations for derivative dealers using the ISDA Master Agreement is managing risk.  Thus, sophisticated financial derivatives dealers like JPMorgan hedge their investments in order to reduce the risk of adverse price movements by taking an offsetting position in a related transaction.

    2.     <u>Key Provisions of the ISDA Master Agreement for Purposes of this Litigation</u>

     a.     Based on my review of the material set forth in Section IV above, it is my opinion that the following provisions of the PFIL/JPMorgan ISDA Master Agreement are key to

this litigation and, therefore, I am prepared to discuss the meaning, interpretation and policy behind these provisions, as well as the ISDA Master Agreement as a whole.

      b.    Because the insolvency of PFIL and its parent company form the basis for this case, the first triggering event under the PFIL/JPMorgan ISDA Master Agreement for purposes of this litigation was an event of default. The PFIL/JPMorgan ISDA Master Agreement provisions governing such an event are as follows:

### Events of Default and Termination Events

(a) *Events of Default.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:

*       *       *

(vii) *Bankruptcy.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:

*       *       *

(5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets . . . .

PFIL/JPMorgan ISDA Master Agreement § 5(a).

      c.    Because the parties elected automatic early termination in the event of a default, PFIL was not required to provide JPMorgan notice of the default. The governing provision regarding automatic early termination is as follows:

### Early Termination

> (a)   *Right to Terminate Following Event of Default*.  If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions.  If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8) . . . .

PFIL/JPMorgan ISDA Master Agreement § 6(a).

   d.   Because Part1(6) of the Schedule to the PFIL/JPMorgan ISDA Master Agreement expressly states that "Automatic Early Termination" applies to PFIL, the Early Termination Date occurred immediately on January 12, 1998.  As such, pursuant to the following section in the PFIL/JPMorgan ISDA Master Agreement, no further payments or deliveries with respect to the Terminated Transactions were required to be made, and the amount payable was to be determined pursuant to Section 6(e):

> Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement.  The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

PFIL/JPMorgan ISDA Master Agreement § 6(c)(ii).

   e.   Section 6(e) of the PFIL/JPMorgan ISDA Master Agreement states: "If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either 'Market Quotation' or 'Loss', and a payment method, either the 'First Method' or the 'Second Method.'"  PFIL/JPMorgan ISDA

Master Agreement § 6(e).   Because the parties opted for the "Market Quotation" payment measure and the "Second Method" of payment, see PFIL/JPMorgan ISDA Master Agreement Schedule Part 1(7)(a) and (b), the parties agreed to rely on independent, third-party Reference Market-makers to provide quotations for valuing the Terminated Transactions.

        f.      Reference Market-makers are defined in the PFIL/JPMorgan ISDA Master Agreement as:

> [F]our leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

PFIL/JPMorgan ISDA Master Agreement § 14.

        g.      The purpose of relying on Reference Market-makers to provide market quotations is to allow independent, third parties to determine the value of the Terminated Transactions as opposed to the parties to the transactions.   When requesting the market quotations, the non-defaulting party must be prepared to actually deal with the Reference Market-maker at the market quotation price in order to reflect as much as possible the true economic value of the Terminated Transactions at the time of the valuation.

        h.      The market quotations are also designed to freeze the parties' relationship at the moment of default in order to preserve the economic status quo as of the default event:

> "Market Quotation" means . . . an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party . . . or by such party . . . in consideration of an agreement between such party . . . and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of **preserving for such party the economic equivalent of**

> **any payment or delivery** . . . by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, **but for the occurrence of the relevant Early Termination Date,** have been required after that date.

PFIL/JPMorgan ISDA Master Agreement § 14 (emphasis added).

      i.    To best freeze the parties' relationship as close in time to the event of default, the non-defaulting party is required to request the market quotations "on" or "as soon as reasonably practicable after" the event of default:

> The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) **on or as soon as reasonably practicable after the relevant Early Termination Date.** The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other . . . .

PFIL/JPMorgan ISDA Master Agreement § 14 (emphasis added) (Market Quotation Definition).

      j.    Once Market Quotations have been requested from the four Reference Market-makers, the non-defaulting party is required to average the middle two market quotations to determine the value of the Terminated Transactions:

> If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values.

PFIL/JPMorgan ISDA Master Agreement § 14 (Market Quotation Definition).

      k.    The final step in the valuation process is the calculation of the amount payable:

> If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the Non-defaulting

> Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the unpaid Amounts owing to the Defaulting Party.  If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

PFIL/JPMorgan ISDA Master Agreement § 6(e)(i)(3).

The Settlement Amount is defined in the PFIL/JPMorgan ISDA Master Agreement as the sum of:

> (a) The Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and
>
> (b) such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

PFIL/JPMorgan ISDA Master Agreement § 14.

## VIII.  **OPINIONS TO BE EXPRESSED**

    1.    <u>Timing for Closing Out the Terminated Transactions</u>

        a.    It is my opinion that it was reasonably practicable for JPMorgan to obtain market quotations and value the Terminated Transactions no later than January 13, 1998.  As such, JPMorgan's decision to value the Terminated Transactions on January 14, 1998 and January 15, 1998 violated the ISDA Master Agreement, causing PFIL to suffer damages.  The basis for my opinion is as follows.

b.       The PFIL/JPMorgan ISDA Master Agreement § 14, Market Quotation definition required JPMorgan to value the Terminated Transactions "on or as soon as reasonably practicable after the relevant Early Termination date," not merely "request" the market quotations as JPMorgan contends in its motion to dismiss and reply papers.  This is consistent with the understanding of JPMorgan's chief lawyer, Don Thompson, who testified in his deposition to the following:

> [The market quotation definition] requires the determining party to do, on or as soon as reasonably practicable following the designation of an early termination date, is to attempt to obtain market quotations from Reference Market makers,  both of those terms being defined terms in the ISDA Master Agreement, essentially for replacement transactions in order to determine the value of the transactions that have been terminated as a consequence of the designation of an early termination date under the ISDA Master Agreement.
>
> *           *           *
>
> The process is relatively straightforward. It requires the determining party to – on or as soon as practicable after the designation of the early termination date, to go out to Reference Market makers and obtain market quotations for the value of each of the transactions that has been terminated pursuant to the provisions of the ISDA Master Agreement.
>
> *           *           *
>
> Q:       And, so, based on your testimony, I understand you to say that JPMorgan had to obtain the market quotations on or as soon as reasonably practicable after the early termination date; is that right?
>
> A:       That is correct.
>
> Q:       Is it the case that JPMorgan actually has to obtain them or do they simply have to request - - make the request to the Reference Market makers?

14

A:     It has to try to obtain them from the Reference Market makers.

*          *          *

Assuming you have then designated an early termination date, as I have described before, you are required to obtain market quotations on or as soon as reasonably practicable following the early termination date that you have designated.

See Deposition Transcript of Don Thompson sworn to on November 30, 2005 at 91-92, 95, 97-98, 105 (hereinafter referred to as Thompson Dep. Tr. at___).

This is also consistent with the understanding of the Chief Executive Officer of ISDA, Robert Pickel, who testified in his deposition to the following:

Q:     Is it your understanding that the non-defaulting party has to obtain the market quotations on or as soon as reasonably practicable after the relevant early termination date?

A:     Yes, that's the standard of the contract.

*          *          *

Q:     What I am trying to understand is if you see any difference between trying to request a market quotation versus actually trying to go out and obtain a market quotation or, in your mind, is it essentially the same thing - - trying - -

A:     I guess I view them as pretty much the same thing but, you know, whether or not you actually obtain it will depend upon the party who you have made the request to.

*          *          *

Q:     So, based on your experience and understanding with this agreement, it's your opinion that the non-defaulting party needs to request or try to obtain the market quotations on or as soon as reasonably practicable after the relevant early termination date; is that correct?

15

A:     Yes, on or as soon as reasonably practicable, yes.

\*                    \*                    \*

Q:     Has anyone ever, in your experience with the ISDA Master Agreement, tried to take a different view as to what the phrase "request" means, as to actually going out and obtaining market quotations?

A:     I am not aware of anybody taking the position that there is any difference between those.  I think the contract says what it says.

Deposition Transcript of Robert Pickel sworn to on December 9, 2005 at 43-50 (emphasis added) (hereinafter referred to as Pickel Dep. Tr. at ____).[2]

    I disagree with JPMorgan's contention in its motion to dismiss and reply papers that the non-defaulting party is free to elect the valuation date as long as it acts in "good faith."  The ISDA Master Agreement applies an objective, reasonableness standard to the timing for the valuation of the Terminated Transactions (*i.e.*, "on or as soon as ***reasonably*** practicable after the relevant Early Termination date"), not a subjective, "good faith" standard.  By applying an objective, reasonableness standard, the ISDA Master Agreement seeks to compel the non-defaulting party to take action (*i.e.*, obtain market quotations) as close in time to the actual event of default to best preserve the economic value of the Terminated Transactions as of the Event of Default.  This requirement also attempts to reduce as much of the delay in valuation as possible so as to reduce the defaulting party's exposure to future market fluctuations and eliminate any undue speculation at the hands of the non-defaulting party.

    This conclusion is consistent with other sections of the PFIL/JPMorgan ISDA Master Agreement.  Specifically, section 6(d)(i) of the PFIL/JPMorgan ISDA Master Agreement

---

2   Mr. Pickel testified that he considers himself to be an expert in the interpretation and application of the ISDA Master Agreement.  Pickel Dep. Tr. at 74.

16

required JPMorgan to provide calculations to PFIL "[o]n or as soon as reasonably practicable following the occurrence of an Early Termination Date" specifying the amount payable. Because, as a matter of logic, a calculation statement setting forth the amount payable could not be provided to PFIL until after JPMorgan obtained the market quotations, it necessarily follows that JPMorgan had to obtain the market quotations "on or as soon as reasonably practicable after the relevant Early Termination date." In contrast, allowing a "good faith" standard to control would render the "on or as soon as reasonably practicable" language found in section 6(d)(i) moot. Thus, it is my opinion that the calculation statement requirement found in section 6(d)(i) provides further support for the conclusion that JPMorgan was required to obtain the market quotations "on or as soon as reasonably practicable after the relevant Early Termination Date."

Finally, the objective, reasonableness standard also serves the ISDA Master Agreement's purpose accommodating back-to-back transactions with different counterparties and supporting a chain of transactions among derivative market-makers and other market participants with the effect that a default on one transaction in the chain will result in the immediate valuation and replacement of that transaction for the benefit of the parties directly affected as well as other market participants indirectly affected by the trade. At the same time, the ISDA Master Agreement contemplates that the valuation of the Terminated Transactions will be coincident with the Non-defaulting party's interest in adjusting its hedging portfolio to counter the changed risk of its own exposure to trades.

c. The 25 transactions at issue in this case consisted of four types of OTC derivatives:

1) options: contracts that grant the holder the right, but not the obligation, to buy or sell currency at a specified price during a specified period of time;

17

2) <u>forwards</u>: agreements to purchase or sell an amount of foreign currency at a future date at a predetermined price;

3) <u>non-deliverable forwards</u>: agreements regarding a position in a specified currency, a specified exchange rate, and a specified future settlement date, that does not result in delivery of currencies. Rather, one party in the agreement makes a payment to the other party on the basis of the exchange rate at the future date; and

4) <u>currency swaps</u>: agreements to exchange stipulated amounts of one currency for another currency at one or more future dates.

d.     Pursuant to the requirements set forth in the PFIL/JPMorgan ISDA Master Agreement § 14, Market Quotation Definition, it is my opinion that it was reasonably practicable for JPMorgan to value the Terminated Transactions no later than January 13, 1998 and, therefore, JPMorgan's payment to PFIL should have been based on valuations no later than January 13, 1998, not January 14, 1998 or January 15, 1998.

e.     There are four essential steps in valuing or "closing out" transactions that terminate as a result of an event of default. Those steps are as follows:

1)     determining that a termination event has occurred;

2)     identifying all of the Terminated Transactions that are subject to the closeout;

3)     obtaining market quotations for the Terminated Transactions; and

4)     paying the amount due.

This is consistent with the deposition testimony of JPMorgan's chief lawyer on this matter, Don Thompson. <u>See</u> Thompson Dep. Tr. at 103-105.

f.     With regard to the first step, the PFIL/JPMorgan ISDA Master Agreement executed by the parties on January 8, 1996 states that an event of default occurs upon PFIL's Credit Support Provider passing a resolution for its winding-up, official management or

liquidation.  See PFIL/JPMorgan ISDA Master Agreement § 5(a)(vii)(5).  I am advised that PFIL's Credit Support Provider, Peregrine Investment Holdings Limited ("PIHL"), resolved to liquidate and wind-up PIHL on January 12, 1998, some time between 12:00 p.m. and 12:30 p.m. Singapore time.  See Deposition Transcript of David Hague sworn to on January 26, 2006 at 20, 30-32, 51-53, 56-58.  Accordingly, an event of default occurred on that date at or about that time.[3]

g.    JPMorgan has acknowledged through deposition testimony in this case that it learned no later than the late afternoon Singapore time on January 12, 1998 that an Event of Default had occurred on that day.  See Deposition Transcript of Arthur Magnus sworn to on December 5, 2005 at 98-99 (hereinafter referred to as Magnus Dep. Tr. at ___); Thompson Dep. Tr. at 86, 189-190, 192; Deposition Transcript of Piers Murray sworn to on December 6, 2005 at 190 (hereinafter referred to as Murray Dep. Tr. at ___).  In addition, an internal JPMorgan email sent by May Liu on January 12, 1998 at 6:23 a.m. New York time to several JPMorgan employees states:

> Please be advised that Peregrine Investment Holdings Ltd. has issued a statement announcing that the company has applied for liquidation.  Please pass this message to your staff and appropriate colleagues on the market side.  Thank you!

(JPMC 00006).

Similarly, an internal JPMorgan email sent by Arthur Magnus on January 12, 1998 at 7:27 a.m. New York time to several JPMorgan employees states:

> Peregrine has failed – DO NOT MAKE ANY PAYMENTS TO THEM UNLESS YOU HEAR OTHERWISE FROM

---

[3]   The PFIL/JPMorgan ISDA Master Agreement provides that Peregrine Investment Holdings Ltd. is PFIL's credit support provider.  See PFIL/JPMorgan ISDA Master Agreement Schedule Part 4 § 7.

THE PCR, CARA or MYSELF.  We will get guidance later today on what to do about open positions.

(JPMC 00355).

With the knowledge that Peregrine had failed, JPMorgan had the evening in Asia, as well as the entire business days in London and New York given the difference in time zones, on January 12, 1998 to make preparations to begin the close-out process when the markets opened at 9:00 a.m. on January 13, 1998 in the Austral-Asian time zones.[4]

h.     During that preparation time, JPMorgan should have completed step two in the close-out procedure by identifying all of the Terminated Transactions that were subject to the close-out.  It is my opinion that sophisticated financial institutions such as JPMorgan should have been able to identify the universe of the Terminated Transactions in less than one hour.

i.     Notwithstanding the fact that I believe a one hour frame is typically a reasonable amount of time to identify the universe of transactions, I also believe that much less time was necessary to identify the 25 Terminated Transactions at issue in this case because of the work JPMorgan had done prior to the Event of Default.   Arthur Magnus testified in his deposition that JPMorgan had positively identified all 25 Terminated Transactions that were subject to the close-out during the week prior to the event of default:

> Q:     And, so during the week of January 5th, 1998, JPMorgan had compiled a list of all the transactions that were outstanding with Peregrine?
>
> A:     I believe we did.

---

4     London is seven hours behind Singapore, and New York is twelve hours behind Singapore. Thus, when PIHL resolved to liquidate between 12:00 p.m. and 12:30 p.m. Singapore time on January 12, 1998, it was between 5:00 a.m. and 5:30 a.m. London time and between 12:00 a.m. and 12:30 a.m. New York time on January 12, 1998.  Likewise, because May Liu issued the email announcing Peregrine's default at 6:23 a.m. New York time on January 12, 1998, JPMorgan had actual knowledge of Peregrine's default no later than 11:23 a.m. London time and 6:23 p.m. Singapore time on January 12, 1998.

           *          *          *

Q:     Can you describe to me what that list might look like, and where it might be located?

A:     Probably doesn't exist anymore, it probably was in an Excel spreadsheet in some form on somebody's computer.  It was not in any official system.

           *          *          *

Q:     So is it the case that JPMorgan had identified all of the positions with Peregrine at least at some point on January 9th, 1998, or prior to that date?

A:     Generally, yes, mm-hmm.

Q:     And it was those same positions that were identified sometime on January 9th, 1998 or prior to then, that were, in fact, confirmed during the week of January 12th, 1998; is that right?

A:     Yeah.  As I testified before, I do not remember us making any changes or finding any transactions that were not there.

           *          *          *

Q:     Is it fair to say that on January 12, 1998, what JPMorgan was doing was simply reconfirming what it had already identified on January 9th, 1998 or prior to that time?

A:     That would be a reasonable characterization.

Magnus Dep. Tr. at 65-66, 69-70, 103.

        j.     In addition to Mr. Magnus' testimony, an internal JPMorgan email from Donna Reino, time stamped January 12, 1998 at 3:57 p.m. New York time, to several other JPMorgan employees attaches a report that lists all 25 of the Terminated Transactions.  (JPMC 00056).  As such, in addition to the missing report described by Mr. Magnus in his deposition testimony that was created during the week of January 5th, 1998 listing all 25 of the Terminated Transactions, JPMorgan produced a separate report showing that JPMorgan had positively

identified all 25 of the Terminated Transactions that were subject to the close-out as of 3:57 p.m. on January 12, 1998, New York time. Thus, it is my opinion that JPMorgan possessed all of the information it needed to complete step 2 in the close-out procedure prior to the actual event of default on January 12, 1998 and, therefore, no significant additional time was necessary on January 12, 1998 to complete step 2 and begin the process of obtaining market quotations (*i.e.,* step 3).

     k.     Having positively identified the universe of the Terminated Transactions by January 12, 1998, any other necessary preparation for the close-out should have been completed prior to the Austral-Asian markets opening on January 13, 1998. As such, it is my opinion that it was reasonably practicable for JPMorgan to begin step 3 of the close-out process immediately when the Austral-Asian markets opened on January 13, 1998.

     l.     It is also my opinion that it should have taken less than an hour for JPMorgan to obtain market quotations from the Reference Market-makers once the Austral-Asian markets opened on January 13, 1998. The four trading desks in charge of each type of derivative (*i.e.,* options, forwards, non-deliverable forwards and swaps) and their subordinates should have been working to close out their respective transactions when the markets opened on January 13, 1998. That would have meant that market quotations had to be obtained for a total of 21 transactions:

- Options: The options trading desk (managed by Piers Murray) was required to obtain market quotations for 3 transactions;

- Forwards: The forwards trading desk was required to obtain market quotations for 5 transactions;

- Non-deliverable Forwards: The non-deliverable forwards trading desk was required to obtain market quotations for 6 transactions; and

22

- Currency swaps:  The swaps trading desk was required to obtain market quotations for 7 transactions.[5]

Based on my experience, I know that a trading desk in a large, sophisticated financial institution can transact as many as 100 trades of this nature on a typical trading day.  Thus, it should have taken the individual trading desks at issue in this case only minutes (and certainly less than one hour) to obtain market quotations for the small number of transactions that each desk head had to individually handle in this case.  Indeed, Piers Murray testified that all of the transactions could have been closed out on January 13, 1998 had he been given authorization to commence the close-out procedure when the Austral-Asian markets opened on January 13, 1998. Murray Dep. Tr. at 181-182.

      m.    Even assuming JPMorgan asserts some justification for failing to give the order to commence the close-out procedure until between 3:00 p.m. and 4:00 p.m. on January 13, 1998, see Murray Dep. Tr. at 112-119, a contention I find unreasonable, the desk heads should still have been able to close out the Terminated Transactions within the hour or two time frame that remained before the Asian markets closed at 5:00 p.m.  As stated above, given the small number of transactions at issue in this case, it should have only taken minutes (and certainly less than one hour) to obtain market quotations for all of the Terminated Transactions.  As such, there is no reasonable justification for not closing out all of the Terminated Transactions on January 13, 1998.

---

[5]  There were actually four more transactions that were subject to the close-out for a total of 25 transactions.  However, four of the transactions had the same maturity date as at least one other transaction that was subject to the close-out.  Thus, the desk heads were only required to obtain market quotations for twenty one transactions because a single set of market quotations could be used to value transactions that had the same maturity date.

n.      I disagree with the contention Mr. Murray made in his deposition testimony that JPMorgan did not have the resources to close out all of the Terminated Transactions on January 13, 1998, even assuming the order to proceed was not given until between 3:00 p.m. and 4:00 p.m.   See Murray Dep. Tr. at 143.   JPMorgan is a highly sophisticated company with a vast array of resources.   Indeed, Mr. Thompson testified that JPMorgan was "one of the leaders in derivative products throughout the world." Thompson Dep. Tr. at 55-56.   In addition, all 25 of the transactions at issue in this case were plain "vanilla" transactions as opposed to complex "exotic" transactions, which is consistent with Mr. Murray's testimony in which he states that all of the transactions at issue in this case were plain "vanilla" transactions.   See Murray Deposition Tr. at 93-94.    Each of the four JPMorgan trading desks relevant in this case was tasked with closing out as few as three, but no more than seven, trades. It is my opinion that one trading desk should be more than capable of obtaining four market quotations for that small number of plain "vanilla" transactions within that time frame.

Moreover, to the extent the individual desk heads required assistance, each of the desk heads had subordinates that could assist in the close-out procedure by working on separate computer terminals or phone lines.   Likewise, each desk head or subordinate could carry on multiple conversations with Reference Market-makers on the same computer terminal at the same time.   The desk heads could have also enlisted assistance from other JPMorgan offices throughout the world to obtain market quotations from the Reference Market-makers to the extent resources were lacking in any particular office.   As previously discussed, the OTC market is a global market with little, or no, communication barriers.

Finally, because the Japanese yen is liquid in all markets throughout the world, Mr. Murray could have also asked his colleagues in either the London or New York markets to obtain

market quotations for the Japanese yen transactions to the extent he could not obtain market quotations in the Asian markets prior to the close of business at 5:00 p.m. on January 13, 1998. Given the difference in time zones, JPMorgan's London and New York offices still had entire business days left on January 13, 1998 to obtain market quotations for the Japanese yen transactions even after 5:00 p.m. Asia time. Indeed, Mr. Murray acknowledged in his deposition that there was nothing preventing him from communicating with JPMorgan's London or New York offices and walking them through the close-out procedure. See Murray Dep. Tr. at 139-141. Alternatively, Mr. Murray could have closed out the Japanese yen positions in the London or New York markets from his desk in Singapore. In short, once the order to commence the close-out had been given, there is no reasonable justification for JPMorgan's failure to close out the Terminated Transactions on January 13, 1998.

o.     It is my opinion that Mr. Murray's decision to wait until January 14, 1998 to close out the Japanese yen and New Zealand dollar transactions until January 14, 1998 was unreasonable.

p.     It is my opinion that JPMorgan's decision to wait to close out the Hong Kong dollar, Korean won and Thai baht transactions until either January 14, 1998 or January 15, 1998 was unreasonable. In addition, unlike Mr. Murray's attempt to justify his failure to close out the Japanese yen and New Zealand dollar transactions on January 13, 1998, I am advised that JPMorgan has offered no justification for failing to close out the Korean won and Hong Kong dollar transactions on January 13, 1998. See Murray Deposition Tr. at 56-58, 151-153, 160. Although Mr. Murray claimed that more time may have been required to close out the Thai baht transactions because term sheets had to be prepared in connection with those transactions, I am advised that Mr. Murray only speculated as to the amount of time the preparation of term sheets

would take or how the term sheets were prepared.  See Murray Deposition Tr. at 59-65, 160-168. Moreover, based on my experience, it should have taken less than one hour to prepare any such term sheets, making JPMorgan's failure to close out the Thai baht transactions on January 13, 1998 unreasonable.  In sum, it is my opinion that JPMorgan has failed to provide any reasonable justification for failing to close out any of the Terminated Transactions on January 13, 1998.

q.     My opinion is also consistent with the results of settlement negotiations between PFIL and the other counterparties that were of similar size and character as JPMorgan. Specifically, it is my understanding that all of the other counterparties of similar size and character to JPMorgan reached settlement amounts with PFIL that were consistent with the Terminated Transactions being valued on either January 12, 1998 or January 13, 1998.  Thus, as I understand it, JPMorgan was the only large, comparably sophisticated institution to value the Terminated Transactions beyond January 13, 1998.  I believe that this market practice is informative in determining whether JPMorgan acted reasonably when it valued the Terminated Transactions on January 14, 1998 and January 15, 1998.

r.     With regard to the fourth step, it is my opinion that the preparation of the calculation statement and transfer of funds were simply post-valuation ministerial steps which followed and, therefore, should have had no impact on the timing of the close-out of the Terminated Transactions.

s.     It is my opinion that JPMorgan's delay in this case can be attributed in large part to the fact that JPMorgan owed PFIL money, not vice versa.  Had PFIL owed JPMorgan money as of January 12, 1998, it is my belief that JPMorgan would have obtained market quotations and valued the Terminated Transactions upon the event of Default on January 12, 1998 with little or no delay.  JPMorgan would have proceeded expeditiously under those

circumstances because any delay would have left JPMorgan exposed to the risk of market fluctuations.  Instead, the reality was that JPMorgan owed PFIL money, so JPMorgan had the luxury of delaying the close-out because it had PFIL's money.  Delay based on which party owes money (*i.e.*, in trading terms, which party is "in the money" and which party "out of the money") contravenes the policy underlying the ISDA Master Agreement, which is to reduce risk and protect the interests of both parties equally.

t.       Finally, if JPMorgan had improperly calculated the amount due PFIL or failed to identify every transaction subject to the close-out, PFIL would have been required to reimburse JPMorgan for any overpayment.  Indeed, just such an event occurred in this case when JPMorgan mistakenly overpaid PFIL in mid-January 1998 for certain transactions that were subject to the close-out.  As a result, in February 1998, PFIL reimbursed JPMorgan for that overpayment.  Thus, it was not reasonable for JPMorgan to delay the valuation process beyond January 13, 1998 out of a stated concern for completeness.  JPMorgan had all the information necessary to make arrangements to begin the close-out process when the Austral-Asian markets opened on January 13, 1998.  If mistakes were made, PFIL was required to (and did) reimburse JPMorgan for any overpayments.

2.       JPMorgan Improperly Influenced the Reference Market-makers

a.       The ISDA Master Agreement's reliance on Reference Market-makers is designed to allow independent third parties to determine the value of the Terminated Transactions, as opposed to the parties to the transactions.  Thus, when Mr. Murray made the decision to supply certain market variables such as the spot price to the Reference Market-makers for inclusion in the calculation of the market quotations, JPMorgan violated the terms of the ISDA Master Agreement.  See Murray Dep. Tr. Page 41-44 (discussing his decision to

supply certain market variables to the Reference Market-makers).  If JPMorgan is permitted to supply the market variables to the Reference Market-makers, the Reference Market-maker provision in the ISDA Master Agreement is rendered meaningless because the Reference Market-makers become, in effect, third party calculators that input JPMorgan's variables and produce a JPMorgan generated market quotation.

      b.     Similarly, when Mr. Murray made the decision to indicate to the Reference Market-makers that he was only seeking hypothetical prices (*i.e.*, termed "indications") as opposed to live quotes that he was willing to trade on, JPMorgan again violated the ISDA Master Agreement. See Murray Dep. Tr. Page 41-44 (discussing his decision to ask for indications as opposed to live quotes).  Any external influence exerted by JPMorgan on the Reference Market-makers skewed the independence of the market quotations, thereby causing the market quotations not to reflect accurately the true value of the Terminated Transactions.  In short, the non-defaulting party is required to obtain objective, arms-length quotations from third-party dealers to properly value the Terminated Transactions.

      c.     Indeed, Mr. Thompson testified in his deposition in this case that the PFIL/JPMorgan ISDA Master Agreement required the Reference Market-makers to provide independent, arms length market quotations:

> [T]he market quotation provision is a liquidated damages provision, which is designed to provide objective third-party input into the value of transactions, to ensure that the legitimate interests of both the non-defaulting party and the defaulting party are protected . . . .

>        *         *         *

> The rationale of the market quotation provision is to require people to make good-faith attempts to go out and obtain - - presumably, objective third-party input from other dealers as to the valuation of the position in a liquidated damages provision which is designed to

> make sure that both the legitimate interests of the non-defaulting party and the defaulting party are protected by valuing that transaction based on the market, as opposed to my say-so or your say-so within the [meaning] of the provision.

Thompson Dep. Tr. at 156-158.

3.    Retroactive Market Quotations

It is my opinion that, to the extent a Court finds that JPMorgan was unable to obtain market quotations and value the Terminated Transactions no later than January 13, 1998, the remedy is to retroactively price the Terminated Transactions to no later than January 13, 1998.

4.    Damages

a.    It is my opinion that JPMorgan's failure to value the Terminated Transactions no later than January 13, 1998 was a violation of the PFIL/JPMorgan ISDA Master Agreement that caused PFIL to suffer damages in the principal amount of US $13,002,023.  A copy of PFIL damages calculation statement is attached hereto as Exhibit B.

b.    Even if JPMorgan did not breach the PFIL/JPMorgan ISDA Master Agreement when it failed to value the Terminated Transactions no later than January 13, 1998, JPMorgan still breached the PFIL/JPMorgan ISDA Master Agreement by (1) supplying certain market variables to the Reference Market-makers; and (2) asking the Reference Market-makers for "indications" as opposed to live quotes.  As such, the market quotations JPMorgan obtained on January 13, 1998, January 14, 1998 and January 15, 1998 are of no value.  Without valid market quotations, it is my opinion that the Terminated Transactions should be valued using the midpoint price on January 13, 1998, resulting in damages in the principal amount of US $13,002,023.

29

5.    <u>Interest</u>

It is my opinion that, as a result of JPMorgan's failure to properly value the Terminated Transactions and make prompt payment, JPMorgan also owes PFIL interest on the principal amount owed, based on PFIL's cost of funds plus 1% per annum compounded daily which translates to an amount not less than the London Interbank Offer Rate ("LIBOR") plus four percent.   <u>See</u> PFIL/JPMorgan ISDA Master Agreement §§ 2(e) (Default Interest), 6(d)(ii) (Calculation Payment Date) and 14 (Default Rate Definition).

IX.    **COMPENSATION**

I am being compensated at my standard billing rate of $400 per hour in this case.

X.    **TRIAL EXHIBITS**

I have not yet prepared exhibits to be used at trial to support my opinions, but I expect to do so prior to trial.

Respectfully submitted,

David F. DeRosa, Ph.D

30

# DeRosa Research and Trading, Inc.
495 White Oak Shade Road
New Canaan, CT 06840
Tele (203) 801-4340  Fax (203) 801-4342
derosa@derosa-research.com

## David DeRosa

### Education

**The University of Chicago, Graduate School of Business**  Chicago, Illinois
Doctor of Philosophy (Ph.D.), December 1978.  Finance and Economics.
- Dissertation: Rates of Return on Common Stocks and Inflation

**The University of Chicago**  Chicago, Illinois
Bachelor of Arts (AB), August 1972.
- Major Field: Economics

### Experience

**1997 - Present**   **DeRosa Research and Trading, Inc.**  New Canaan, Connecticut
*President and Owner*
- Consultant for international financial markets and derivative instruments matters.
- Expert witness in foreign exchange, international finance, emerging markets, derivatives, and risk management.
- Commodity Trading Advisor (effective May 1998).

**Spring 1996 - Present**   **Yale School of Management**  New Haven, Connecticut
*Adjunct Professor of Finance*
- Instructor for advanced graduate courses in international finance, financial policy in emerging markets, foreign exchange, derivatives, and asset management.

**1998 - 2004**   **Midwest Independent Transmission System Operator**  Carmel, Indiana
*Director, Chairman of the Markets Committee,  Member of the Finance and Audit Committee*
- Member of a seven-director board for MISO, which oversees wholesale transmission electricity in the Midwest and portions of Canada.

**1999 - Present**   **Rubicon Fund Management**  Cayman Islands
*Director*
- Member of board of directors of Cayman Islands-registered macro-hedge fund.

**2002 - Present**   **BlueCrest Capital International**  Cayman Islands
*Director*
- Member of board of directors of Cayman Islands-registered investment company.

**2003 - Present**   **The Children's Investment Fund**  Cayman Islands
*Director*
- Member of board of directors of Cayman Islands-registered European equity, event-driven hedge fund.

**2005 - Present**   **GSA Capital International**   Cayman Islands
*Director*
- Member of board of directors of Cayman Island-registered statistical arbitrage hedge fund.

**1998 - 2004**   **Bloomberg News**  New Canaan, Connecticut
*Financial Columnist*
- Regular columnist for Bloomberg News, Bloomberg Radio, and Bloomberg Magazines on international finance, foreign exchange, and global politics.

## David DeRosa – Continued

| | |
|---|---|
| 1996-1997 | **Quadrangle Investments, LLC**  Greenwich, Connecticut<br>*Co-Founder and Managing Partner*<br>Global proprietary trader of foreign exchange, options, and exotic options on foreign exchange.<br>• Founder of macro-fundamental hedge fund with $32 million in assets. |
| 1993 - 1996 | **Swiss Bank Corporation**  New York, New York<br>*Director, Foreign Exchange Trading*<br>• Global proprietary trader of foreign exchange, options, and exotic options on foreign exchange.<br>• Head of SBC technical education for North America.<br>• Instructor, intensive training courses for traders.<br>• Spoke to financial press (wire services, newspapers, and television) re: foreign exchange issues. |
| Spring 1995 - Fall 1996 | **The University of Chicago, Graduate School of *Business***  Chicago, Illinois<br>*Lecturer in Finance*<br>• Concurrent with Swiss Bank. |
| 1992 – 1993 | **BEA Associates**  *New York, New York*<br>*Vice President and Derivatives Portfolio Manager*<br>• Portfolio Manager in $7 billion hedging and arbitrage group. |
| 1988 - 1992 | **Alliance Capital Management L.P.**  New York, New York<br>*Vice President – Derivatives and Synthetics*<br>• Handled portfolio management, product design, trading, and marketing for start-up derivatives group. |
| 1985 - 1988 | **DeRosa & Company**  Los Angeles, California<br>*President and Owner*<br>• Established NASD broker-dealer firm which performed soft-dollar funded quantitative research for investment managers.  Company sold in 1988. |
| 1984 - 1985 | **International Financial Advisers**  Kuwait City, Kuwait<br>*Acting General Manager*<br>• Advised and ran operations of IFA, a registered investment banking firm in Kuwait owned by members of the royal family and their close business associates. |
| 1981 - 1983 | **Consulting Center For Finance and Investment**  Riyadh, Saudi Arabia<br>*Senior Vice President* |
| 1980 - 1981 | **Wilshire Associates**  Santa Monica, California<br>*Senior Associate* |
| 1979 - 1980 | **The University of Southern California**  Los Angeles, California<br>*Assistant Professor of Finance and Business Economics* |
| 1979 | **Ministry of Finance and National Economy**  Riyadh, Saudi Arabia<br>*Economic Advisor* |
| 1975 - 1978 | **Loyola University of Chicago**  Chicago, Illinois<br>*Instructor in Finance* |

## David DeRosa – Continued

### Books

In Defense of Free Capital Markets: The Case Against a New International Financial Architecture, Bloomberg Press, January, 2001.

Options on Foreign Exchange, 2nd ed. John Wiley & Sons, 2000 (Japanese Language Edition, Toyo Keizai, Tokyo).

Currency Derivatives, John Wiley & Sons, 1998.

Managing Foreign Exchange Risk, Revised Edition, Irwin / McGraw-Hill, 1996 (Japanese Language Edition, Yuuhikaku, Tokyo).

### Expert Witness

Jade Trading, et. Al.  v. United States – Expert Report and Testimony in the United States Court of Federal Claims (2005)

Tusher v. Bulldog Capital Management, L.P. – Expert report and testimony in JAMS Arbitration December (2003-September 2004)

DOJ v. Evergreen International Spot Trading – Testimony in U.S. District Court, Eastern District of New York (May – June 2003)

"Opening Trade in Financial Services – The Chile and Singapore Examples" – Testimony before the U.S. House of Representatives Committee on Financial Services (March 2003)

High Risk Opportunities Hub Fund LTD. v. Credit Lyonnais and Societe Generale – Affidavit to Supreme Court of the State of New York (May 2002)

Hermes v. J.P. Morgan – Affidavit to Superior Court of New York (2002)

Re: Enron – Testimony in U.S. Bankruptcy Court (Jan 2001)

De Kwiatkowski v. Bear Stearns – Testimony in U.S. District Court, Southern District of New York (May 2000)

Dorigol v. J.P. Morgan – NASD Arbitration

Kiely v. Gunnar and Crew – NASD Arbitration

LMP v. Morgan Stanley – NASD Arbitration

MK Link v. WSW Capital – NASD Arbitration

National Reserve Bank v. Credit Agricole – Arbitration

Morano v. Access Wealth Planning – NASD Arbitration

Evergreen Security, LTD v. Windels Marx Lane & Mittendorf, LLP – Expert Report in U.S. District Court, Middle District of Florida (November 2003)

State of Florida v. Richard Maseri -- Deposition

Exhibit B

# Peregrine Fixed Income vs JP Morgan Chase
## Trade Valuation Comparison
### As of 1/13/98

## FX Options

| Trade Date | Maturity Date | Pairs | Local Notional | USD Notional | Put/Call | Strike | JPM Valuation | DRT Valuation (High Spot) | DRT Valuation (Mid Spot) | DRT Valuation (Low Spot) | DRT vs JPM Variance vs High | DRT vs JPM Variance vs Mid | DRT vs JPM Variance vs Low |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 7/18/1997 | 7/22/1998 | NZD-USD | 383,638,364 | 200,000,000 | NZD PUT | 0.5550 | 2,224,000 | 3,670,045 | 3,165,515 | 2,482,454 | 1,775,045 | 961,515 | 278,454 |
| 11/7/1997 | 5/12/1998 | USD-JPY | 12,000,000,000 | 100,000,000 | JPY PUT | 0.0083 | 7,675,000 | 8,845,904 | 8,134,304 | 7,828,444 | 1,070,904 | 559,304 | 53,444 |
| 11/7/1997 | 5/12/1998 | USD-JPY | 12,000,000,000 | 100,000,000 | JPY CALL | 0.0083 | 830,000 | 409,359 | 543,319 | 844,034 | (173,641) | (86,681) | 14,034 |
| 7/24/1997 | 4/23/1998 | USD-IDR | 27,570,000,000 | 10,000,000 | IDR CALL | 0.0004 | 125 | | | 125 | | (125) | (125) |
| | | | | | | | **10,409,125** | **13,081,208** | **11,843,138** | **10,754,932** | **2,672,183** | **1,434,013** | **345,807** |

## FX - Fwd

| Trade Date | Maturity Date | Pairs | Local Quantity | USD Quantity | Contract Rate | JPM Valuation | DRT Valuation (High Spot) | DRT Valuation (Mid Spot) | DRT Valuation (Low Spot) | DRT vs JPM Variance vs High | DRT vs JPM Variance vs Mid | DRT vs JPM Variance vs Low |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 7/24/1997 | 2/9/1998 | USD-IDR | (54,300,000,000) | 20,000,000 | 2,745 | 13,212,255 | 14,238,818 | 13,729,802 | 13,124,038 | 1,024,563 | 517,547 | (88,217) |
| 11/4/1997 | 2/9/1998 | USD-IDR | 51,300,000,000 | (15,000,000) | 3,420 | (8,689,360) | (8,611,906) | (8,138,730) | (8,573,390) | (872,694) | (449,425) | 115,912 |
| 10/24/1997 | 4/28/1998 | USD-IDR | (38,000,000,000) | 10,000,000 | 3,900 | 5,267,110 | 6,026,449 | 5,696,738 | 5,304,883 | 666,139 | 389,628 | (22,747) |
| 10/22/1997 | 4/24/1998 | USD-HKD | 38,562,500 | (5,000,000) | 7.9185 | 97,525 | 69,991 | 82,714 | 98,964 | (31,450) | (27,534) | (23,611) |
| 10/22/1997 | 4/24/1998 | USD-HKD | (79,240,000) | 10,000,000 | 7.9240 | (11,510) | (4,971) | (12,500) | (20,040) | (989) | (8,529) | |
| | | | | | | **9,935,275** | **10,712,461** | **10,345,301** | **9,909,082** | **776,187** | **409,027** | **(27,193)** |

## LMA Non-Deliverable Forwards (NDF's)

| Trade Date | Maturity Date | Pairs | Local Quantity | USD Quantity | Contract Rate | JPM Valuation | DRT Valuation (High Spot) | DRT Valuation (Mid Spot) | DRT Valuation (Low Spot) | DRT vs JPM Variance vs High | DRT vs JPM Variance vs Mid | DRT vs JPM Variance vs Low |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8/28/1997 | 9/2/1998 | USD-KRW | (9,845,000,000) | 10,000,000 | 994.50 | 3,748,884 | 4,449,458 | 4,436,495 | 4,385,496 | 742,774 | 699,811 | 638,782 |
| 8/29/1997 | 3/2/1998 | USD-KRW | (19,270,000,000) | 20,000,000 | 963.50 | 7,863,512 | 9,143,508 | 8,962,719 | 8,866,355 | 1,236,696 | 1,129,254 | 1,022,843 |
| 8/28/1997 | 9/2/1998 | USD-KRW | (14,400,000,000) | 20,000,000 | 968.00 | 5,870,032 | 6,808,226 | 6,725,222 | 6,545,247 | 929,194 | 846,190 | 786,215 |
| 10/24/1997 | 10/28/1998 | USD-KRW | 11,400,000,000 | (10,000,000) | 1,140.00 | (3,182,833) | (3,758,892) | (3,689,094) | (3,841,691) | (576,049) | (516,691) | (493,848) |
| 8/7/1997 | 8/7/1998 | USD-KRW | (11,800,000,000) | 10,000,000 | 1,180.00 | 2,731,189 | 3,616,415 | 3,557,105 | 3,497,069 | 888,226 | 825,916 | 765,880 |
| 11/10/1997 | 11/10/1998 | USD-KRW | (12,650,000,000) | 10,000,000 | 1,265.00 | 2,005,657 | 2,981,836 | 2,914,471 | 2,840,565 | 975,879 | 908,814 | 842,808 |
| 11/10/1997 | 11/10/1998 | USD-KRW | (12,650,000,000) | 10,000,000 | 1,265.00 | 2,180,895 | 3,133,733 | 3,067,028 | 3,004,528 | 952,838 | 887,033 | 825,631 |
| 11/5/1997 | 7/9/1998 | USD-KRW | (12,650,000,000) | 10,000,000 | 1,265.00 | 1,952,899 | 2,814,154 | 2,754,565 | 2,692,152 | 861,255 | 801,666 | 744,283 |
| 10/28/1997 | 10/28/1998 | USD-KRW | (11,400,000,000) | 9,011,858 | 1,265.37 | | | | | | | |
| | | | | | | **23,177,535** | **29,191,347** | **28,748,458** | **28,323,700** | **6,013,812** | **5,571,923** | **5,146,165** |

## LMA - Swaps

| Effective Date | Maturity Date | Pairs | Local Quantity | USD Quantity | Contract Rate | JPM Valuation | DRT Valuation (High Spot) | DRT Valuation (Mid Spot) | DRT Valuation (Low Spot) | DRT vs JPM Variance vs High | DRT vs JPM Variance vs Mid | DRT vs JPM Variance vs Low |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1/10/1996 | 1/10/1999 | USD-THB | 1,283,600,000 | (50,000,000) | 25.28 | 7,032,000 | (30,930,048) | (30,275,192) | (29,868,741) | 6,519,314 | 5,981,871 | 5,414,794 |
| 1/10/1996 | 1/10/1999 | USD-THB | 767,800,000 | (30,000,000) | 25.26 | | (18,524,294) | (18,191,350) | (17,840,079) | | | |
| 3/18/1996 | 3/18/1998 | USD-THB | 30,000,000 | (779,100,000) | 25.67 | | 16,590,324 | 16,216,382 | 15,816,765 | | | |
| 4/15/1996 | 4/15/1998 | USD-THB | 20,000,000 | (508,840,000) | 25.44 | | 14,023,494 | 13,708,197 | 13,706,187 | | | |
| 7/12/1996 | 7/12/1998 | USD-THB | 20,000,000 | (83,000,000) | 25.44 | | 8,667,787 | 8,518,743 | 8,340,379 | | | |
| 7/11/1996 | 7/11/1998 | USD-THB | 15,000,000 | (127,075,000) | 25.42 | | 2,897,740 | 2,841,357 | 2,781,896 | | | |
| 7/9/1996 | 7/9/1998 | USD-THB | 5,000,000 | (508,100,000) | 25.42 | | 12,245,981 | 12,245,000 | 12,030,414 | | | |
| 6/28/1996 | 6/28/1998 | USD-THB | 20,000,000 | (1,014,800,000) | 25.41 | | 23,186,690 | 22,744,387 | 22,294,993 | | | |
| | | | 40,000,000 | | 25.37 | | | | | | | |
| | | | | | | **22,000,000** | **28,519,314** | **27,981,871** | **27,414,794** | **6,519,314** | **5,981,871** | **5,414,794** |

## Failed Transactions

Proceeds of PFIL IDR put sale to JPM on 1/8
JPM buys 28,040,000,000-IDR on 1/8 (failed delivery AET at 6100)
PFIL sells 28,040,000,000-IDR on 1/8 vs 2,800,000-USD

| Pairs | Local/USD Quantity | JPM Valuation | DRT Valuation (High Spot) | DRT Valuation (Mid Spot) | DRT Valuation (Low Spot) | DRT vs JPM Variance vs High | DRT vs JPM Variance vs Mid | DRT vs JPM Variance vs Low |
|---|---|---|---|---|---|---|---|---|
| IDR | 50,400,000 | 7,032,000 | 7,032,000 | 7,032,000 | 7,032,000 | 0 | 0 | 0 |
| USD | (20,000,000) | (3,166,092) | (3,258,890) | (3,258,890) | (3,258,890) | | | |
| USD | | 2,800,000 | 2,800,000 | 2,800,000 | 2,800,000 | 488,390 | 225,540 | (84,796) |
| USD | | 6,194,049 | 5,277,487 | 5,747,520 | 6,309,464 | (906,562) | (435,529) | 125,415 |
| USD | (20,000,000) | (20,000,000) | (20,000,000) | (20,000,000) | (20,000,000) | 0 | | |
| USD | (2,298,250) | (2,298,250) | (2,298,250) | (2,298,250) | (2,298,250) | | | |
| USD | (1,386,700) | (1,386,700) | (1,386,700) | (1,386,700) | (1,386,700) | | | |
| USD | (16,530,382) | (101,883) | (104,613) | (107,507) | | 12,458 | 9,733 | 6,839 |
| THB | (336,409) | (296,788) | (307,773) | (316,201) | | 30,850 | 26,838 | 20,122 |
| THB | 62,000,397 | 1,631,419 | 1,453,683 | 1,492,550 | 1,533,889 | (177,727) | (138,869) | (97,530) |
| THB | 49,238,238 | 978,852 | 872,210 | 895,530 | 920,394 | (108,642) | (83,322) | (58,550) |
| | | **(8,691,477)** | **(9,364,919)** | **(9,086,288)** | **(8,780,027)** | **(673,442)** | **(394,811)** | **(68,550)** |

| | Total | JPM Valuation | DRT Valuation (High Spot) | DRT Valuation (Mid Spot) | DRT Valuation (Low Spot) | DRT vs JPM Variance vs High | DRT vs JPM Variance vs Mid | DRT vs JPM Variance vs Low |
|---|---|---|---|---|---|---|---|---|
| | **Total** | **56,831,457** | **72,139,512** | **69,833,480** | **67,642,480** | **15,308,054** | **13,002,023** | **10,811,023** |