Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------X

PEREGRINE FIXED INCOME LIMITED
(in liquidation),

        Plaintiff,

  vs.

JP MORGAN CHASE BANK (formerly
known As The Chase Manhattan
Bank and having merged with
Morgan Guaranty Trust Company
of New York),

        Defendant.

----------------------------------X

DEPOSITION OF JP MORGAN
BY DON THOMPSON
New York, New York
Wednesday, November 30, 2005

Reported by:
WENDY D. BOSKIND, RPR
JOB NO. 179637

Page 150

1  Thompson
2  JPMorgan or any other person or persons
3  that were contacted by or on behalf of
4  JPMorgan".
5        Are you competent to testify
6  about that area?
7     A.  I believe the calculation
8  statement that was provided broke out the
9  valuation of the specified transactions by
10 Reference Market makers.  I don't know
11 whether we were contacting any of the
12 other enumerated entities in item 6.
13    Q.  So can you tell me why the
14 Reference Market makers were only
15 contacted on January 15th, 1998 for the
16 Thai baht transactions versus some other
17 debt?
18    A.  I cannot tell you specifically
19 why it was that day as opposed to any
20 other day.
21       I suspect it was because we did
22 not have the requisite information needed
23 to contact them until that day.
24    Q.  But that's your speculation; is
25 that right?

Page 151

1  Thompson
2     A.  That's my understanding.
3        If you care to draw a
4  distinction between "speculation" and
5  "understanding", so be it.
6     Q.  Okay.  Well, did you gain that
7  understanding by talking to other
8  individuals?
9     A.  No.
10    Q.  And, so, it's your guess, as you
11 sit here today, as to --
12    A.  My understanding at the time was
13 as soon as we were ready and had the
14 requisite information to obtain market
15 quotations for Reference Market makers, we
16 did so.
17    Q.  Okay.
18    A.  And we did not do so until we
19 had that requisite level of information.
20    Q.  And with regards to valuing the
21 specified transactions by the Reference
22 Market makers, do you know why JPMorgan
23 only requested indications versus actual
24 market quotes?
25    A.  I believe that was -- yes, that

Page 152

1  Thompson
2  was, first of all, in accordance with the
3  provisions of the agreement, which does
4  not require or which does not prohibit the
5  obtaining of indicative quotations and,
6  secondly, it's in accordance with market
7  practice.
8     Q.  Well, we will start, then, with
9  ISDA Master Agreement.
10       Where in the agreement does it
11 say you were permitted to get indications?
12    A.  It does not prohibit the
13 obtaining of indications.
14    Q.  But it also does not say --
15    A.  It does not expressly provide
16 that indicative quotations are to be
17 obtained.
18    Q.  And then, with regards to market
19 practice, maybe you can explain to me what
20 you mean, that that is proper or used in
21 market practice.
22    A.  It is my understanding that
23 most, if not all, major dealers, when
24 involved in closeouts, obtain indicative
25 quotations.

Page 153

1  Thompson
2     Q.  Give me one second.  (Pause.)
3        You have testified that there
4  were approximately 12 other transactions --
5  strike that.
6        You have testified that there
7  were approximately 12 other closeouts that
8  you were involved in under an ISDA Master
9  Agreement.  Can you tell me, of those
10 other situations, how many of those used
11 indications in market quotations versus
12 real quotes?
13    A.  I can't give you a specific
14 breakdown of that.
15       I suspect most of them have
16 involved either being silent on the point,
17 in which case the Reference Market makers
18 can choose to quote either on a firm or
19 indicative basis or have said that
20 indicative quotations are okay.  They have
21 taken place over a 20-year career, they
22 are sporadic and episodic events.  I
23 simply cannot recall how many of them in
24 each category.
25    Q.  Sure.

39 (Pages 150 to 153)

Page 154

1  Thompson
2    A. And when I mentioned "market
3  practice", just to be clear, I believe
4  "market practice" often involves you ask
5  for quotations, there is no statement as
6  to whether they are firm or indicative,
7  and the Reference Market makers can choose
8  to quote on either basis.
9    Q. Am I correct in stating that
10 JPMorgan provided some of the variables to
11 these various transactions to the
12 Reference Market makers when obtaining the
13 quotations; is that right?
14   A. I believe -- I am not sure
15 whether -- some of it is accurate.
16        I know, in some of the
17 transactions, we did provide one of the
18 variables, which was the spot exchange
19 rate at the time.
20   Q. And, based on your understanding
21 of the ISDA Master Agreement, is that
22 appropriate?
23   A. Yes.
24   Q. Why?
25   A. Because it enables parties who

Page 155

1  Thompson
2  are providing, for instance, a valuation
3  of an option position, to isolate the
4  value of the option as opposed to the
5  separate immaterial value -- or
6  differences in value which may be
7  attributable to using different spot
8  rates.
9        As a practical matter, when you
10 are getting a quote for an option
11 position, it will be more difficult to
12 obtain that quotation if you also require
13 that option trader who is trading options,
14 not the spot position, to provide both the
15 spot position and the intrinsic value of
16 the option.
17   Q. Was --
18   A. So we made the decision at the
19 time to provide the spot rate in order to
20 isolate and fix that and enable the
21 quoting dealers to provide quotes on the
22 value of the option which was, by far, the
23 overwhelming value of the position, as I
24 understand it.
25   Q. But JPMorgan could have just

Page 156

1  Thompson
2  simply asked for a quote without providing
3  the spot rate; correct?
4    A. Yes, yes, we could have done
5  that.
6    Q. And is that -- has that been
7  done on other occasions that you have been
8  involved in?
9    A. Uh -- I don't recall the precise
10 breakdown between options, forwards, and
11 swaps, and in the other closeouts I have
12 worked on.
13       I think what was different here,
14 and led us to that conclusion, was it was
15 overwhelmingly an option book.
16       Now, one of the things we were
17 mindful of, frankly, in doing that process
18 and, again, remember that the market
19 quotation provision is a liquidated
20 damages provision, which is designed to
21 provide objective third-party input into
22 the value of transactions, to ensure that
23 the legitimate interests of both the
24 non-defaulting party and the defaulting
25 party are protected, is that if we were to

Page 157

1  Thompson
2  ask for quotations on a basis that other
3  dealers would find burdensome or onerous
4  to provide them, the result is that you
5  fall away from the market quotation
6  provision and you fall back to the loss
7  provision, which does not have this
8  objective third-party input aspect the
9  market quotation does.
10   Q. (Pause.)
11       THE WITNESS: Is there any way
12   he can just ask you the questions?
13   Q. No.
14       So, it's your testimony that the
15 purpose of having this type of procedure
16 is to get an objective third-party
17 quotation that values these things
18 independently in the market; is that
19 right?
20   A. That is the ra--
21       MR. FELDBERG: Excuse me one
22   second.
23       Objection to the form.
24       Please answer.
25       THE WITNESS: Okay.

40 (Pages 154 to 157)

Page 158

1  Thompson
2      A.  The rationale of the market
3  quotation provision is to require people
4  to make good-faith attempts to go out and
5  obtain -- presumably, objective third-
6  party input from other dealers as to the
7  valuation of the position in a liquidated
8  damages provision which is designed to
9  make sure that both the legitimate
10 interests of the non-defaulting party and
11 the defaulting party are protected by
12 valuing that transaction based on the
13 market, as opposed to my say-so or your
14 say-so within the banding of the
15 provision.
16     Q.  So how is it objective if you
17 are supplying part of the variables?  It's
18 your subjective decision to pick what
19 variables to apply.
20     A.  Well, first of all, it is not a
21 subjective setting of the spot rate.  I
22 believe the spot rates that were supplied
23 were at the money spots.
24     Q.  Well, you say you "believe".
25 Are you the person to answer that

Page 159

1  Thompson
2  question?
3      A.  No.  That would be Piers Murray,
4  as to whether the spot rates that were
5  supplied to the quoting dealers for
6  purposes of valuing the option positions
7  was based on at the money spot rates.  It
8  is my understanding that they were.
9      Q.  And you gained that
10 understanding how?
11     A.  That is my recollection of the
12 discussion we had at the time as to
13 whether it was appropriate to supply
14 quoting dealers the spot rates.
15     Q.  Who was involved in that
16 discussion?
17     A.  Myself, Arthur Magnus, and Piers
18 Murray.
19     Q.  When did it take place?
20     A.  I do not recall the specific
21 date on which it took place.
22     Q.  Was it prior to January 12,
23 1998?
24     A.  No, it was not.
25     Q.  So it was sometime during that

Page 160

1  Thompson
2  week?
3      A.  It was sometime during that
4  week.
5      Q.  And you just can't remember the
6  particular day during that week?
7      A.  Correct.
8      Q.  Okay.
9      A.  It obviously would have been
10 prior to going out and asking for market
11 quotations on that basis.
12     Q.  So, for the Japanese yen and
13 Indonesian rubi--
14     A.  Rupiah.
15     Q.  -- rupiah, those two which were
16 closed out on the 13th of January, you are
17 telling me the conversation had been --
18 preceded that.
19     A.  Yes.
20     Q.  Now, did you-all -- and, when I
21 say "you-all" -- let me strike that.
22         Did you, Piers Murray, and
23 Arthur Agnes consult with anyone higher up
24 within JPMorgan in reaching that decision
25 to ask for indications?

Page 161

1  Thompson
2      A.  I don't know who -- we are now
3  back on indications, as opposed to
4  supplying the spots.
5      Q.  I'm sorry, let me strike my
6  question.
7          Did you, Piers Murray, and
8  Arthur Magnus consult with anyone else at
9  JPMorgan on the appropriateness of
10 supplying spot rates to obtain market
11 quotations?
12     A.  I know I did not.  I do not know
13 whether Arthur or Piers did or not.
14     Q.  So they could have, you just
15 don't know?
16     A.  Certainly possible.
17         It would have been a somewhat
18 bizarre conversation for me to have to ask
19 them had they consulted with anybody else
20 on this.
21     Q.  And why is that?
22     A.  Because it would be an odd
23 question to ask.
24     Q.  In other words, in your mind,
25 they had the authority to make that kind

41 (Pages 158 to 161)