David C. Singer (DS 1358)
Seth B. Waxman (SW 7409)
Dorsey & Whitney LLP
250 Park Avenue
New York, New York 10177
(212) 415-9200

Attorneys for Plaintiff Peregrine Fixed
Income Limited (in liquidation)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------X

Peregrine Fixed Income Limited (in
liquidation),

               Plaintiff,               05 CV 4351 (RMB)(THK)

-v-

JP Morgan Chase Bank (formerly known as The
Chase Manhattan Bank and having merged with
Morgan Guaranty Trust Company of New
York),

               Defendant.

-------------------------------------------------------X

**MEMORANDUM OF LAW OF PEREGRINE FIXED INCOME**
**LIMITED IN OPPOSITION TO MOTION OF JPMORGAN CHASE BANK**
**FOR LEAVE TO AMEND ANSWER AND FILE COUNTERCLAIMS, AND**
**IN SUPPORT OF CROSS-MOTION FOR LEAVE TO AMEND COMPLAINT**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION  …………………………………………………………………  1

FACTS  ……………………………………………………………………..………… 2

I.   JPMORGAN'S MOTION FOR LEAVE TO AMEND ANSWER
     AND FILE COUNTERCLAIMS SHOULD BE DENIED …………………………..7

     A.   Standard of Review  ……………………………………………………… 7

     B.   JPMorgan's Motion to Amend its Answer and File a Counterclaim for Set Off
          is Futile and Should Be Denied as a Matter of Law ……………………..…… 7

     C.   JPMorgan Cannot Establish Any of the Elements Necessary for its
          Motion to Amend its Answer and File a Counterclaim for Set Off……………. 10

     D.   JPMorgan's Motion to Amend its Answer and File a Counterclaim for
          Attorney's Fees Should Be Denied  ………………………………………... 15

II.  PFIL'S CROSS-MOTION FOR LEAVE TO AMEND ITS COMPLAINT
     TO SUPPLEMENT ITS EXISTING BREACH OF CONTRACT CLAIM
     SHOULD BE  GRANTED  ……………………………………………………… 15

     A.   PFIL Has Not Unduly Delayed Filing Its Claim, or Acted in Bad Faith or
     With a Dilatory Motive  ………………………………………………………… 16

     B.   JPMorgan Will Not Be Unduly Prejudiced by the Amendment……….……… 17

     C.   PFIL's Proposed Amendment Presents Meritorious Allegations ……………. 20

CONCLUSION ………………………………………………………………………. 22

## **TABLE OF AUTHORITIES**

**Cases**

Aramony v. United Way of Am., 969 F. Supp. 226 (S.D.N.Y. 1997) …………………..… 10

E*Trade Fin. Corp. v. Deutsche Bank AG, 420 F. Supp. 2d 273 (S.D.N.Y. 2006) ..…………..16

Fin. One Pub. Co., Ltd v. Lehman Bros. Spec. Fin., 414 F.3d 325, 336 (2d Cir. 2005) ……… 10

Fisher v. Outlet Co., 86 B.R. 768 (Bankr. S.D.N.Y. 1988) ……………………………….… 8

Fraser v. Astra Steamship Corp., 18 F.R.D. 240 (S.D.N.Y. 1995) …………………..……… 11

Hayden v. County of Nassau, 180 F.3d 42 (2d Cir. 1999) …………………………………….. 7

Health-Chem Corp. v. Baker, 915 F.2d 805 (2d Cir. 1990) …………………………………… 7

In re Kings Terrace Nursing Home and Health Related Facility, 91 B 11478 (FGC),
1995 WL 65531 (Bankr. S.D.N.Y. Jan. 27, 1995), aff'd 184 B.R. 200 (S.D.N.Y. 1995) ……… 8

Nordo, A.S. v. Ledes, 95 Civ. 7753 (RJW), 1999 WL 1243883 (S.D.N.Y. Dec. 21, 1999) ….. 10

Versace v. Versace, 160 F. Supp. 2d 657 (S.D.N.Y. 2001) …………………………………….. 7

**Statutes**

11 U.S.C. § 553(a)(2)(A) …………………………………………………………………… 8

11 U.S.C. § 101(54)(D) …………………………………………………………………… 8

Fed. R. Civ. P. §§ 12(b)(6), 13(f) and 15(a) …………………………………………….. 7

Fed. R. Civ. P. §§ 12(b)(6), 30(b)(6) …...…………………………………………………. 20

N.Y. Debt. and Cred. Law §§ 13 and 166 (McKinney 2006) …………………………………… 9

N.Y. Bus. Corp. Law § 1206(b)(1) (McKinney 2006) ………………………………………… 9

Hong Kong Bankruptcy Ordinance § Section 35 ……………………………………………… 9-10

**Secondary Authorities**

Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy § 553.03[5][a] – [5][a][i] ……… 9

91 N.Y. Jur. 2d Receivership §§ 94 and 95 (2006) …………………………………………….. 9

Am Jur. 2d § 698, *Counterclaims - - Setoffs* ……………………………………………11

**INTRODUCTION**

The Motion of JPMorgan Chase Bank ("JPMorgan") for Leave to Amend Answer and File Counterclaims fails as a matter of law because JPMorgan seeks to set off <u>claims</u> <u>that</u> <u>it</u> <u>acquired</u> <u>post-petition</u>, through either an assignment or various mergers, against a pre-petition debt owed by Morgan Guaranty Trust Company of New York ("MGT") to Peregrine Fixed Income Limited ("PFIL"). The key to this motion is the status of <u>MGT</u> at the time of PFIL's liquidation -- at the time PFIL filed for liquidation, neither PFIL nor any of its affiliates owed any debts to MGT. In fact, it is undisputed that neither MGT nor any alleged successor of MGT acquired any claim against PFIL (or an affiliate of PFIL) until <u>after</u> PFIL filed for liquidation.[1] It is firmly established that claims acquired by a creditor subsequent to a bankruptcy filing (or analogous event under New York or Hong Kong law) cannot be set off against pre-petition amounts owing by that creditor to the debtor.

JPMorgan's claim for attorney's fees is similarly without merit because it violates the rule barring set-off of post-petition claims against pre-petition debts, and it is expressly barred by the terms of the relevant International Swap Dealers Association Master Agreement (the "ISDA Master Agreement").

Furthermore, PFIL's Cross-Motion for Leave to Amend its Complaint to supplement its existing breach of contract claim should be granted. PFIL's Complaint currently alleges that JPMorgan improperly valued the Terminated Transactions at issue by unreasonably delaying its close-out. PFIL seeks to supplement its claim that JPMorgan improperly valued the Terminated Transactions by alleging that JPMorgan improperly influenced the market quotations that were used to value the Terminated Transactions, by (1) requesting hypothetical quotations (termed

---

[1]      Indeed, there is no allegation of claims against PFIL directly. Nor is it alleged that MGT <u>ever</u> possessed a claim against PFIL or any of its affiliates.

"indications") from Reference Market-makers rather than requesting market quotations; and (2) supplying exchange rates to Reference Market-makers for inclusion in the calculation of the quotations.

JPMorgan will not suffer any undue prejudice as a result of the amendment of the Complaint because (1) JPMorgan has been on notice of these potential allegations since shortly after this litigation commenced; (2) the parties engaged in extensive discovery regarding these issues; and (3) JPMorgan issued expert reports more than nine months ago that specifically addressed these aspects of PFIL's claims.

PFIL's proposed Amended Complaint is attached to the Declaration of David C. Singer in Opposition to JPMorgan's Motion for Leave to Amend Answer and File Counterclaims, and in Support of its Cross-Motion for Leave to Amend its Complaint (the "Singer Declaration") as Exhibit 1.   A red-lined version of PFIL's proposed Amended Complaint, showing PFIL's proposed modifications, is attached to the Singer Declaration as Exhibit 2.

## FACTS

On or about January 8, 1996, PFIL and MGT executed an industry standard contract that is used by financial institutions to govern derivative transactions, known as an ISDA Master Agreement.  A copy of the ISDA Master Agreement is attached to the Singer Declaration as Exhibit 3.  During 1996 and 1997, MGT and PFIL entered into a series of derivative transactions that were governed by the terms of the ISDA Master Agreement.

On January 12, 1998, PFIL's parent company, Peregrine Investment Holdings Limited ("PIHL"), resolved to enter into liquidation.  By operation of the ISDA Master Agreement, PIHL's liquidation automatically terminated the derivative transactions between PFIL and MGT (the "Terminated Transactions"), and MGT was required to close out and value the Terminated

Transactions on the Early Termination Date (*i.e.*, January 12, 1998) or "as soon as reasonably practicable thereafter."   ISDA Master Agreement § 14 (market quotation definition).   MGT closed out the Terminated Transactions on January 13, 1998, January 14, 1998 and January 15, 1998.

On January 15, 1998, PFIL submitted its winding up petition in the High Court of Hong Kong, which is the Hong Kong equivalent of an entity filing for bankruptcy in the United States. At that time, neither PFIL nor its affiliates owed any money to MGT.

On January 23, 1998, MGT determined that it owed PFIL $57,524,016 based on the market quotations it obtained from Reference Market-makers on January 13, 1998, January 14, 1998 and January 15, 1998.  On January 26, 1998, it paid that amount to PFIL.  However, MGT subsequently determined that it overpaid PFIL by $622,204.   Thereupon, PFIL's provisional liquidators returned the amount of the alleged overpayment, reducing MGT's net payment to PFIL to $56,901,812.

According to JPMorgan, on or about March 18, 1998, four proofs of debt were filed against PIHL in PIHL's Hong Kong liquidation proceeding:

- A claim for $23,229,372 submitted by The Chase Manhattan Bank - - that was subsequently transferred to JPMorgan as a result of The Chase Manhattan Bank/MGT merger that took place on November 10, 2001;

- A claim for $10,346,104 submitted by First Chicago Hong Kong Ltd - - that appears to have been transferred to the Bank of Hong Ltd. and subsequently assigned to JPMorgan on August 25, 2004;

- A claim for $37,655,006 submitted by The First National Bank of Chicago - - that was subsequently transferred to JPMorgan through a merger that took place on November 13, 2004; and

- A claim for $40,000 submitted by First Chicago International Finance Corporation - - that was subsequently transferred to

JPMorgan through a <u>merger</u> that took place on November 13, 2004.

<u>See</u> Declaration of Michael S. Feldberg in Support of Motion for Leave to Amend Answer and File Counterclaims (the "Feldberg Declaration"), at Exhibits B, C and D.  These four claims total $71,270,482.  PFIL has had no discovery on any of these claims.

On June 13, 2000, the United States Bankruptcy Court for the Southern District of New York issued an Amended Permanent Injunction, barring any party from filing counterclaims against PFIL, including counterclaims for set off.

In January 2004, PFIL filed suit against JPMorgan in the High Court of the Hong Kong Special Administrative Region Court of First Instance, alleging that MGT (by way of JPMorgan) improperly valued the Terminated Transactions by unreasonably delaying its close-out until as late as January 15, 1998.  In February 2005, the Hong Kong Court stayed the Hong Kong proceeding in favor of the United States District Court for the Southern District of New York, based on *forum non conveniens*.

On or about May 3, 2005, PFIL filed this action.  Shortly thereafter, JPMorgan filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  On July 8, 2005, PFIL filed its Opposition to JPMorgan's Motion to Dismiss, stating, in part, that PFIL may seek to amend its Complaint should it confirm that MGT improperly influenced the market quotations that were used to value the Terminated Transactions.  <u>See</u> Memorandum of Peregrine Fixed Income Limited in Opposition to Motion to Dismiss of JPMorgan Chase Bank at p. 9, a copy of which is attached to the Singer Declaration as Exhibit 4.

Between August 2005 and December 2005, the parties engaged in extensive fact discovery, including the exchange of voluminous document production, exchange of interrogatories and responses thereto, and numerous depositions.  During discovery, issues

4

relating to JPMorgan's request of indications and supply of market variables were comprehensively explored.  On December 31, 2005, fact discovery was completed.

On January 26, 2006, the Court denied JPMorgan's Motion to Dismiss PFIL's Complaint pursuant to Fed. R. Civ. P. 12(b)(6).

On February 9, 2006, JPMorgan filed its Answer to PFIL's Complaint, which included a "Proposed Counterclaim" for attorney's fees, but made no mention of any counterclaim for set-off.  A copy of the Answer and Proposed Counterclaim of Defendant JPMorgan to the Complaint is attached to the Singer Declaration as Exhibit 5.  On March 1, 2006, JPMorgan filed its Amended Answer to PFIL's Complaint, which again included a "Proposed Counterclaim" for attorney's fees, but made no mention of any counterclaim for set-off.  A copy of the Amended Answer and Proposed Counterclaim of Defendant JPMorgan to the Complaint is attached to the Singer Declaration as Exhibit 6.

On February 10, 2006, PFIL served its first expert report, which contained a thorough discussion of PFIL's allegation that MGT improperly influenced the market quotations that were used to value the Terminated Transactions.  See Expert Report of Dr. David DeRosa, a copy of which is attached to the Singer Declaration as Exhibit 7, at pp. 27-29.  On March 29, 2006, JPMorgan served its rebuttal expert report, which contained a lengthy analysis of PFIL's claim that MGT improperly influenced the market quotations that were used to value the Terminated Transactions.  See Expert Rebuttal Report of Stephen Greene, a copy of which is attached to the Singer Declaration as Exhibit 8, at pp. 12-16.  Mr. Greene's expert rebuttal report also raised an issue of set-off, but failed to provide any facts to explain such a claim.  See id. at p. 32.

On May 30, 2006, counsel for JPMorgan sent counsel for PFIL a letter which stated it was written to "call your attention in advance of the mediation to several arguments that we will

be developing should the litigation continue."  A copy of the May 30, 2006 letter is attached to the Singer Declaration as Exhibit 9.  One of the "developing" arguments set forth in the letter was "pursuant to Part 5(4) of the parties' Schedule to the Master Agreement, JPMC will seek to set-off any judgment award in the present litigation against the amount for which JPMC has asserted a claim in PIHL's liquidation in Hong Kong."  During a subsequent mediation session, counsel for JPMorgan for the first time explained the purported basis for JPMorgan's set-off claim.

On October 5, 2006, JPMorgan filed a motion to modify the Bankruptcy Court's Permanent Injunction.  On November 7, 2006, the Honorable Burton R. Lifland granted JPMorgan's motion, but made clear that he was not addressing the merits of JPMorgan's proposed set-off counterclaim:

> JUDGE LIFLAND:   I am not at all prepared, nor should I be prepared, to rule on the merits of the matter.  I am only concerned as to whether or not under Rule 11, for example, that there is a rational basis for them to ask me to modify the injunction.  And I am in no way ruling on any of the arguments that the parties seek to raise before me.   The litigation, as you have indicated, is matured in the District Court and it's appropriate that it continue there.

Transcript of the Hearing before Judge Lifland dated November 7, 2006, a copy of which is attached to the Singer Declaration as Exhibit 10, at p. 16.

MGT (by way of JPMorgan) now seeks to eliminate its pre-petition debt to PFIL by setting off more than $71 million in claims that were transferred to it through either an assignment or merger years _after_ PFIL liquidated.  JPMorgan's claim fails as a matter of law.

6

## I.   JPMORGAN'S MOTION FOR LEAVE TO AMEND ANSWER AND FILE COUNTERCLAIMS SHOULD BE DENIED

### A.   Standard of Review

In determining whether to allow JPMorgan to amend its Answer and file Counterclaims, the Court must consider three rules of procedure:  Federal Rules of Civil Procedure 12(b)(6), 13(f) and 15(a).  Rule 13(f) permits a party to add an omitted counterclaim where the failure to plead the counterclaim was the result of "oversight, inadvertence, or excusable neglect, or when justice requires . . . ."  Although Rule 15(a) states that amendment is "freely given when justice so requires," a motion to amend an Answer to add a counterclaim should be denied when the counterclaim is futile and fails to state a claim under Fed. R. Civ. P. 12(b)(6).  See e.g., Hayden v. County of Nassau, 180 F.3d 42, 53 (2d Cir. 1999) ("where the [moving party] is unable to demonstrate that he would be able to amend his [pleading] in a manner which would survive dismissal, opportunity to replead is rightfully denied."); Health-Chem Corp. v. Baker, 915 F.2d 805, 810 (2d Cir. 1990) ("where, as here, there is no merit in the proposed amendments, leave to amend should be denied."); Versace v. Versace, 160 F. Supp. 2d 657, 666 (S.D.N.Y. 2001) ("the Court should deny leave when an amendment . . . would be futile" and, "if the proposed claim would be subject to dismissal under 12(b)(6), the Court should 'refuse to grant leave to amend rather than assent and then await a motion to dismiss.'").

### B.   JPMorgan's Motion to Amend its Answer and File a Counterclaim for Setoff is Futile and Should be Denied as a Matter of Law

It is undisputed that the claims that MGT (by way of JPMorgan) seeks to set off were acquired by JPMorgan through either an assignment or merger years after PFIL entered into liquidation.  It is also undisputed that MGT's debts to PFIL arose pre-petition.  The Bankruptcy Code states that a creditor cannot set off claims that were transferred to it after a debtor has

entered into bankruptcy:

> [T]his title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case, **except to the extent that . . . such claim was transferred, by an entity other than the debtor, to such creditor . . . after the commencement of the case** . . . .

11 U.S.C. § 553(a)(2)(A) (emphasis added).   The term "transfer" is broadly defined in the Bankruptcy Code as "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with – (i) property; or (ii) an interest in property."   11 U.S.C. § 101(54)(D).   The post-petition transfer of claims to JPMorgan through either an assignment or merger clearly falls within this broad definition.   Moreover, this provision applies without regard to the intent of the party acquiring the claim – it could have been acquired simply through merger or assignment, as is the case here, or with an intent to use the claim for setoff.

It is firmly established that a petition for bankruptcy operates as a cleavage in time and that post-petition transactions cannot be used to offset pre-petition debts:

> A fundamental tenet of bankruptcy law is that a petition for bankruptcy operates as a "cleavage in time."   Once a petition is filed, debts that arose before the petition may not be satisfied through postpetition transactions . . . .

In re Kings Terrace Nursing Home and Health Related Facility, 91 B 11478 (FGC), 1995 WL 65531, at *10 (Bankr. S.D.N.Y. 1995), aff'd 184 B.R. 200 (S.D.N.Y. 1995); Fisher v. Outlet Co., 86 B.R. 768, 777 (Bankr. S.D.N.Y. 1988) (stating that "the filing of a bankruptcy petition effects a cleavage, with the condition of the estate being assessed as of the filing date.") (emphasis supplied).

A leading bankruptcy treatise aptly states that these rules are in place to prevent creditors from acquiring claims at favorable prices in order to escape debt and take unfair advantage of other creditors:

> [S]ection 553(a)(2)(A) proscribes setoff if the relevant "claim" was acquired from another creditor after the commencement of the debtor's bankruptcy case . . . .  Without the restrictions contained in section 553(a)(2)(A), any entity that owed a debt to a debtor in bankruptcy might simply purchase one or more claims against the debtor after the debtor files for bankruptcy relief (often at a very favorable price) in order to acquire a "claim" for the purpose of escaping the debt by offsetting the acquired "claim" against the preexisting "debt."  Permitting a creditor to create a right of setoff in this manner has very little to do with the underlying purposes of the doctrine of setoff, and is thought only to create unfair advantage at the expense of other creditors.

Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy § 553.03[5][a] – [5][a][i].

New York state law is also in agreement with these principles.  See N.Y. Bus. Corp. Law § 1206(b)(1) (McKinney 2006) (precluding setoff unless the debt was owed before the commencement of the action); N.Y. Debtor and Creditor Law §§ 13 and 166 (McKinney 2006) (precluding setoff when a claim is transferred to the creditor after the filing of the case); 91 N.Y. Jur. 2d Receivership § 95 (2006) ("no setoff or counterclaim is allowed in any action by the receiver to recover the corporations' property, debts, and causes of action for any demand unless it was owing by the corporation to the defendant before the commencement of the action . . . ."); 91 N.Y. Jur. 2d Receivership § 94 (2006) ("[a] receiver does not have power to allow a setoff in a case where no mutual debts existed at the date of the appointment of the receiver, but thereafter a demand against the corporation is assigned to a debtor of the corporation; what the receiver cannot thus do directly, he or she cannot do by way of ratification or waiver.").

Hong Kong law is also in agreement with these principles (the derivative transactions at issue in this case originated in Hong Kong):

> Where there have been mutual credits, mutual debts or other
> mutual dealings between a bankrupt against whom a bankruptcy
> order is made under this Ordinance and any other person proving
> or claiming to prove a debt under the bankruptcy order, an account
> shall be taken of what is due from the one party to the other in
> respect of such mutual dealings and the sum due from the other
> party and the balance of the account, and no more, shall be claimed
> or paid on either side respectively; **but a person shall not be
> entitled under this section to claim the benefit of any set-off
> against the property of a bankrupt in any case where he had,
> at the time of giving credit to the bankrupt, notice that the
> petition had been presented.**

Hong Kong Bankruptcy Ordinance § 35 (emphasis added).

JPMorgan's setoff claim should also be rejected because the ISDA Master Agreement executed by MGT and PFIL is no longer in effect.  When PFIL liquidated, it ceased operation as a going concern.  As a result, the contractual obligations of the parties were frozen at that time, and the ISDA Master Agreement effectively came to an end.  By refusing to pay the amount that it owes to PFIL, MGT (and later JPMorgan) delayed winding up the parties' pre-petition contractual obligations for more than 8 ½ years.  Permitting JPMorgan to now first assert a counterclaim for setoff, based on claims that it acquired post-petition through either assignment or merger, would allow it to unfairly bootstrap its set-off claim to its wrongful refusal to make payment on its pre-petition debts.  Equity and common sense cannot permit such a result.

### C.    JPMorgan Cannot Establish Any of the Elements Necessary for its Motion to Amend its Answer and File a Counterclaim for Setoff

When deciding whether to allow a defendant to amend its Answer to add an omitted counterclaim, the courts consider the following four factors (1) whether the counterclaim is compulsory; (2) whether the movant has acted without undue delay; (3) whether any undue prejudice will result; and (4) whether the counterclaim has merit.  See Nordo, A.S. v. Ledes, 95

Civ. 7753 (RJW), 1999 WL 1243883, at *5 (S.D.N.Y. Dec. 21, 1999).  Here, all four factors weigh against JPMorgan.

First, a counterclaim based on setoff is "always permissive." Aramony v. United Way of Am., 969 F. Supp. 226, 231 n.5 (S.D.N.Y. 1997); see also Fin. One Pub. Co., Ltd v. Lehman Bros. Spec. Fin., 414 F.3d 325, 336 (2d Cir. 2005) (a "setoff claim is effectively a permissive counterclaim", and setoff claims "by definition aris[e] out of different transactions . . . they are distinguished from recoupment which involves claims arising from the same transaction."); Fraser v. Astra Steamship Corp., 18 F.R.D. 240, 242 (S.D.N.Y. 1995) (setoff is recognized as a permissive counterclaim); Am Jur. 2d § 698, *Counterclaims - - Setoffs* ("setoff is a permissive counterclaim . . . .").

Second, JPMorgan unduly delayed in seeking to further amend its Answer.  JPMorgan's purported setoff right is based on the ISDA Master Agreement that was executed by MGT and PFIL in 1996.  The Bankruptcy Court's Permanent Injunction has been in place since 2000.  The claims that JPMorgan seeks to set off have been in its possession since either 2001 or 2004.  Thus, all facts existed and were known to JPMorgan since before PFIL initiated this lawsuit.

JPMorgan's argument that the Bankruptcy Court's Permanent Injunction precluded it from filing a set off counterclaim is a red herring.  JPMorgan could have moved to lift the Permanent Injunction at any time since PFIL filed suit against JPMorgan in Hong Kong in 2004.  Instead, JPMorgan waited more than:

- two and one half years after PFIL filed suit in the Hong Kong Court;

- one and one half years after PFIL filed suit in this Court;

- ten months after the close of discovery;

- nine months after its Motion to Dismiss was denied;

- nine months after it filed its Answer and Proposed Counterclaim; and

- eight months after it filed its Amended Answer and Proposed Counterclaim.

JPMorgan is simply using the Permanent Injunction as an excuse to justify its inexcusable delay.

Third, PFIL will suffer undue prejudice if JPMorgan is permitted to assert a setoff counterclaim at this time. JPMorgan's counsel first explained the basis for its setoff counterclaim during a mediation session that took place in June 2006.[2] If JPMorgan is permitted to amend its Answer to add a setoff counterclaim, discovery will have to be reopened regarding the alleged assignment and various mergers through which JPMorgan claims to have acquired claims against PFIL's affiliate. The documents that JPMorgan appends to the Feldberg Declaration fail to demonstrate how the claims that previously were held by third parties were acquired by JPMorgan.

For example, First Chicago International Finance Corporation and First National Bank of Chicago filed proofs of claims against PIHL on or about March 18, 1998, in the amounts of $40,000 and $37,655,006.83, respectively. See Feldberg Declaration Exhibit C. However, there are no documents appended to the Feldberg Declaration that purport to show how the claim of First Chicago International Finance Corporation was transferred to JPMorgan. There are no

---

[2]     JPMorgan's argument that it provided notice to PFIL of its setoff claim in documents served on PFIL during Spring 2006 is misleading. See JPMorgan's Memorandum of Law at pp. 4-5, 8. JPMorgan's Answer and Proposed Counterclaim dated February 9, 2006 (Singer Declaration, Exhibit 5) made no mention of any purported setoff claim; JPMorgan's Amended Answer and Proposed Counterclaim, dated March 1, 2006 (Singer Declaration, Exhibit 6) made no mention of any purported setoff claim; JPMorgan's rebuttal expert report dated March 29, 2006 (Singer Declaration, Exhibit 8) merely raised the issue of set-off, but failed to provide any facts to support or explain its claim; and JPMorgan's letter to PFIL dated May 30, 2006 (Singer Declaration, Exhibit 9) also failed to provide any facts to support a claim for setoff. Indeed, JPMorgan's letter of May 30, 2006 expressly stated that JPMorgan was "developing" a set-off argument. It is obvious that JPMorgan first thought up its setoff argument during late Spring-early Summer of 2006.

official documents appended to the Feldberg Declaration that purport to show how First National Bank of Chicago's claims were transferred to JPMorgan.  Instead, JPMorgan appends to the Feldberg Declaration an article from the Encyclopedia of Chicago and a press release that purport to show that First National Bank of Chicago merged with several entities in 1995, which later merged with Bank One.  <u>See</u> Feldberg Declaration at Exhibit D.  These hearsay documents do not constitute admissible evidence of the transfer and do not satisfy JPMorgan's obligations under the Federal Rules of Civil Procedure.

The Honorable Theodore Katz closed fact discovery on December 31, 2005.  JPMorgan sought to re-open fact discovery in September 2006, and Judge Katz denied that request on October 3, 2006.  JPMorgan's argument that the claims that form the basis for its setoff "were accepted and there is no dispute that plaintiff and its affiliates owe over $70 million to JPMC in the Hong Kong liquidation proceedings, and that plaintiff and its affiliates have been making payments on that claim to JPMC," is irrelevant.  <u>See</u> JPMorgan's Memorandum of Law at 2.  JPMorgan's claims are against PIHL, not PFIL.  PFIL is entitled to discovery on any purported counterclaim asserted by JPMorgan under the Federal Rules of Civil Procedure.  Given that JPMorgan's purported set-off counterclaim of more than $71 million is many times greater than PFIL's claim for damages against JPMorgan, the potential prejudice to PFIL is overwhelming.

<u>Fourth</u>, for the reasons discussed in section I(B) above, JPMorgan's set-off counterclaim is futile and fails as a matter of law.  JPMorgan repeatedly argues that "plaintiff and its affiliates owe over $70 million to JPMC . . . ."  JPMorgan's Memorandum of Law at 2, and at 10-12.  This

statement is factually misleading.  PFIL does not owe -- and has never owed -- MGT  (or JPMorgan) any money.  The claims that JPMorgan seeks to set off are against PIHL, not PFIL.[3]

JPMorgan also argues that it was the "Non-Defaulting Party" as that term is used in the "set-off" and "condition precedent" provisions in the ISDA Master Agreement Schedule, Part 5(4)(i) and (iv).  See JPMorgan's Memorandum of Law at 2-3.  JPMorgan is incorrect.  MGT was the "Non-Defaulting Party" at the time that PFIL filed for liquidation, not JPMorgan. JPMorgan apparently did not come into existence until years later through various mergers.  Had PFIL or its affiliates owed money to MGT at the time that PFIL filed for liquidation, then MGT would have had a right to set off claims against MGT's debt to PFIL.  But, no such claims existed.  Thus, JPMorgan's argument based on the ISDA Master Agreement's "set off" and "condition precedent" provisions fails.

JPMorgan's reliance on general principles of New York and federal banking law is misplaced.  See JPMorgan's Memorandum of Law at 11.  JPMorgan's claim that, as a general proposition, merged banks take on the rights and responsibilities of their predecessors-in-interest does not address the effect of a bankruptcy petition filed by a debtor of one of JPMorgan's predecessors-in-interest.   The Bankruptcy Code and other sources cited herein directly address this issue and establish that pre-petition debts cannot be set off by claims that were obtained through post-petition transfers.  See Section I(B), supra.

JPMorgan misleads this Court in its reference to Judge Lifland's decision on JPMorgan's Motion to Modify the Permanent Injunction as a decision on the merits of JPMorgan's counterclaim for set-off.  See JPMorgan Memorandum of Law at 4 and 9.  It was not.  Judge Lifland expressly stated: "I am not at all prepared, nor should I be prepared, to rule on the merits

---

3   PFIL requests that JPMorgan correct and clarify this misleading statement in its Reply papers, which are due on January 5, 2007.

of the matter . . . .   And I am in no way ruling on any of the arguments that the parties seek to raise before me."   Transcript of the Hearing before Judge Lifland dated November 7, 2006 (Singer Declaration, Exhibit 10) at p. 16.

Finally, in all of its filings in the Bankruptcy Court and in this Court concerning the set-off issue, JPMorgan has never provided any reason why the sources cited by PFIL (*i.e.*, the U.S. Bankruptcy Code, New York statutes, Hong Kong statutes, and various secondary sources) do not control.  Instead, JPMorgan retreats to general legal principles about the effect of merger that are trumped by the specific legal principles regarding setoff in this instance.  It is JPMorgan's burden to establish its entitlement to leave to amend, and to demonstrate why this Court should reject the firmly established principles and controlling authorities cited by PFIL.

**D.     JPMorgan's Motion to Amend its Answer and File a Counterclaim for Attorney's Fees Should be Denied**

JPMorgan's attorney's fees were acquired post-petition.   For the reasons discussed in Section I(B) and (C) above, JPMorgan's post-petition claim cannot be set off against MGT's pre-petition debts.  JPMorgan's claim for attorney's fees is also barred by the express terms of the ISDA Master Agreement:

> "Loss" means . . . the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs . . . in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position . . . .   **Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11**.

ISDA Master Agreement § 14 (emphasis added).  Accordingly, JPMorgan's motion for leave to further amend its Answer to add a counterclaim for attorney's fees should be denied.

## II.   PFIL'S CROSS-MOTION FOR LEAVE TO AMEND ITS COMPLAINT TO SUPPLEMENT ITS EXISTING BREACH OF CONTRACT CLAIM SHOULD BE GRANTED

The crux of this litigation has always been that MGT breached the ISDA Master Agreement by failing to properly value the Terminated Transactions.  In its Complaint, PFIL alleges that MGT improperly valued the Terminated Transactions by unreasonably delaying its close-out.  Through discovery, PFIL confirmed that MGT also improperly valued the Terminated Transactions by (1) requesting hypothetical quotations (termed "indications") instead of live quotes from Reference Market-makers; and (2) supplying the spot exchange rate to Reference Market-makers for inclusion in the calculation of market quotations.  These two additional pieces of evidence supplement PFIL's existing breach of contract claim that MGT improperly valued the Terminated Transactions.

The standards governing PFIL's motion to amend its Complaint are well established:

> Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend a complaint "shall be freely given when justice so requires."  The federal courts, however, have interpreted Rule 15 to permit such amendments only when (1) the party seeking the amendment has not unduly delayed, (2) when that party is not acting in bad faith or with a dilatory motive, (3) when the opposing party will not be unduly prejudiced by the amendment, and (4) when the amendment is not futile.

E*Trade Fin. Corp. v. Deutsche Bank AG, 420 F. Supp. 2d 273, 282 (S.D.N.Y. 2006).  PFIL fully meets these standards.

### A.   PFIL Has Not Unduly Delayed Filing Its Claim, or Acted in Bad Faith or With a Dilatory Motive

PFIL confirmed during discovery that MGT requested "indications" instead of live quotes from Reference Market-makers.  After the close of fact discovery, and extended

mediation, PFIL now seeks to supplement its existing breach of contract claim to include further evidence of MGT's failure to properly value the Terminated Transactions.

While PFIL has been generally aware of the fact that MGT may have supplied spot reference prices to Reference Market-makers, the extent and impact of this improper conduct was not fully developed until discovery was completed in this case and PFIL's expert had an opportunity to review the evidence.  There is no basis to claim that PFIL acted in bad faith or with dilatory motive in bringing these claims.  Moreover, since PFIL is simply supplementing its existing breach of contract claim, JPMorgan's statute of limitations argument has no relevance.

**B.      JPMorgan Will Not Be Unduly Prejudiced by the Amendment**

JPMorgan will not suffer any undue prejudice if the Court permits PFIL to amend its Complaint to supplement its existing claims because JPMorgan has been on notice of PFIL's potential claims since shortly after this litigation commenced, and PFIL's claims have been extensively explored throughout the course of fact discovery and in expert reports.  On July 8, 2005, PFIL served its Opposition to JPMorgan's Motion to Dismiss, which included the following:

> Factual issues that can only be settled through discovery and trial include whether JPMorgan wrongfully supplied incorrect exchange rates to the Reference Market-makers instead of allowing them to calculate their quotations based on independent, publicly available exchange rates.  See Copley Decl. ¶ 5.  If, through discovery, PFIL learns that JPMorgan itself established the exchange rates used by the Reference Market-makers, instead of allowing the publicly available rate to control, then JPMorgan breached the ISDA Master Agreement in another way.

Memorandum of PFIL in Opposition to the Motion to Dismiss of JPMorgan at p. 9. (Singer Declaration, Exhibit 4).

JPMorgan conducted extensive discovery on this point throughout the Fall of 2005.  See JPMorgan's First Request for Production of Documents to Plaintiff at 8 (seeking documents on PFIL's claim that "JPMorgan supplied exchange rates to the Reference Market-makers instead of allowing them to provide their quotations independently"); JPMorgan's First Set of Interrogatories to Plaintiff at 6 (seeking persons with knowledge of PFIL's claim that "JPMorgan supplied exchange rates to the Reference Market-makers instead of allowing them to provide their quotations independently."); JPMorgan's Notice of Deposition Pursuant to Fed. R. Civ. P. 30(b)(6) at 4 (informing PFIL that its corporate representative was going to be questioned on JPMorgan's "provision of exchange rates . . . .").  Copies of these three discovery documents are attached to the Singer Declaration as Exhibits 11, 12 and 13, respectively.

JPMorgan continued its exploration of these issues in November 2005 during its deposition of the Liquidator of PFIL, Simon Copley.  (For example: "Q:  Is there anything else that you contend JPMorgan Chase Bank did wrong?  A:  I think we've contended that in the process of getting market quotations, they gave input information to those counterparties . . . .  I think that is commercially not right to do that, because it's influencing the market maker to give a particular evaluation . . . .").  See Transcript of Deposition of Simon Copley, a copy of the relevant portions of which are attached to the Singer Declaration as Exhibit 14 at 46-51.

PFIL also questioned JPMorgan's corporate representatives, Don Thompson and Piers Murray, with regard to JPMorgan's improper influence on the market quotations.  See Transcript of Deposition of Don Thompson at 151-152, 155-158 (For example: "Q:  And with regards to valuing the specified transactions by the Reference Market-makers, do you know why JPMorgan only requested indications versus actual market quotes?  A:  I believe that was - - yes, that was, first of all, in accordance with the provisions of the agreement, which does not require or which

does not prohibit the obtaining of indicative quotations . . . ."); Transcript of Deposition of Piers Murray at 41-42 (For example: "Q:  In this case is it correct to say that JPMorgan supplied the spot reference price to some of the reference market makers that were providing market quotations to JPMorgan?  A:  Yes.").  Copies of the relevant portions of the transcripts of the Depositions of Mr. Thompson and Mr. Murray are attached to the Singer Declaration as Exhibits 15 and 16, respectively.

In February and March 2006, the parties exchanged expert reports, both of which contained lengthy discussions of PFIL's claim that JPMorgan improperly influenced the market quotations.  See Singer Declaration, Exhibit 7 -- PFIL's Expert Report, dated February 10, 2006, at 27-28 (Section entitled "JPMorgan Improperly Influenced the Reference Market-makers").  See Singer Declaration, Exhibit 8.  JPMorgan's Expert Rebuttal Report dated March 29, 2006 at 12-16 (Sections entitled "By Providing Spot Prices Or Other Market Variables To Some Reference Market-Makers, JPMC Did Not Automatically Become Liable for Damages" and "By Requesting Some Of The Reference Market-Makers To Provide Indicative Quotations, JPMC Did Not Automatically Become Liable For Damages").

JPMorgan contends in its Memorandum of Law:  "Had JPMC known during discovery that this issue was in the case, JPMC would have asked, for example, plaintiff for documents and witness testimony relating to these issues, including but not limited to information concerning what plaintiff's other counterparties did with respect to supplying market variables and requesting indications."  JPMorgan's Memorandum of Law at 13-14.  JPMorgan did, in fact, seek such information during discovery.  During Mr. Copley's deposition, the following colloquy took place:

> Q:  . . . . I think you testified earlier today that you believe that JPMorgan supplied in some instances exchange rates to reference market makers?
>
> A:     Yes.
>
> Q:     Any of your other counterparties do that?
>
> A:     I don't recall.
>
> Q:     Is there anything wrong with that?
>
> A:     Anything wrong with doing it?
>
> Q:     Yes.
>
> A:     Yes.
>
> Q:     What's wrong with it?
>
> A:     It doesn't seem commercially - - it doesn't seem fair if you're asking for an independent - - a market quotation, you're supposed to just in normal commercial terms, if you ask for something that's independent, you don't feed relevant data into that calculation.

Copley Deposition Transcript at 144-145 (Singer Declaration Exhibit 14).

Moreover, JPMorgan served several discovery requests that sought information relating to PFIL's other counterparties, which necessarily included information relating to other counterparties supplying exchange rates to Reference Market-makers or requesting indications. See JPMorgan's Second Supplemental Request for Production of Documents to Plaintiff at 7-8 (requesting any and all documents relating to PFIL's other counterparties); JPMorgan's Second Supplemental Interrogatories to Plaintiff at 6-7 (seeking the identity of people with knowledge of PFIL's transactions with other counterparties); JPMorgan's Amended Notice of Deposition Pursuant to Fed. R. Civ. P. 30(b)(6) at 4 (listing as a topic area for inquiry any transactions with

PFIL's other counterparties); Copies of these discovery documents are attached to the Singer Declaration as Exhibits 17, 18 and 19, respectively.

### C.    PFIL's Proposed Amendment Presents Meritorious Allegations

JPMorgan's Fed. R. Civ. P. 30(b)(6) witness, Don Thompson, admitted during his deposition that the ISDA Master Agreement required MGT to obtain objective independent market quotations from third parties, not market quotations influenced by JPMorgan.  See Thompson Deposition Transcript at 155-158 (stating that "the market quotation provision . . .. is designed to provide objective third-party input into the value of transactions . . . to make sure that both the legitimate interests of the non-defaulting party and the defaulting party are protected by valuing the transaction based on the market, as opposed to my say-so or your say-so . . . .") (Singer Declaration Exhibit 15).

Both Mr. Thompson and Mr. Murray then admitted that JPMorgan requested indications from Reference Market-makers instead of live quotes, and supplied the exchange rate to Reference Market-makers, in breach of the requirement that JPMorgan obtain objective independent market quotations.  See Thompson Deposition Transcript at 152, 158; Murray Deposition Transcript at 41-42 (Singer Declaration Exhibits 15 and 16, respectively).

Finally, JPMorgan has claimed that this Court issued a ruling on May 31, 2005 precluding PFIL from amending its Complaint as requested herein.   See JPMorgan's Memorandum of Law at 6.   PFIL respectfully submits that JPMorgan misconstrues the Court's Order.  At the time the Order was issued, the question before the Court was whether PFIL sought to amend its Complaint to add an allegation that JPMorgan acted in bad faith when it delayed its close-out of the Terminated Transactions until as late as January 15, 1998.  This was in the context of JPMorgan's motion to dismiss, in which JPMorgan asserted that only a good faith

21

standard applied, not the reasonableness standard asserted by PFIL.  Counsel for PFIL informed the Court that PFIL would not seek to amend its Complaint to add an allegation of bad faith (in the event the motion to dismiss was granted) and the Court issued its Order on that basis.  In fact, PFIL does not seek to amend its Complaint to add allegations of bad faith.  Rather, PFIL seeks to supplement its existing breach of contract claim with further allegations of MGT's improper valuation of the Terminated Transactions.[4]

## CONCLUSION

For the reasons set forth above, PFIL respectfully requests that the Court deny JPMorgan's motion for leave to amend its Answer and file counterclaims; and grant PFIL's cross-motion for leave to amend its Complaint by supplementing its existing breach of contract claim.

Dated:  December 22, 2006          **DORSEY & WHITNEY LLP**

By: ____/s/_____
        David C. Singer (DS 1358)
        Seth B. Waxman (SW 7409)
        250 Park Avenue
        New York, New York 10177-1500
        (212) 415-9200

        Attorneys for Plaintiff Peregrine Fixed Income
        Limited (in liquidation)

---

[4]  PFIL is also seeking to amend its Complaint to reflect that damages suffered by PFIL are in an amount to be determined at trial, consistent with the reports of PFIL's expert, Dr. David DeRosa.

4835-4606-0289\1