# EXHIBIT 3

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------X

PEREGRINE FIXED INCOME LIMITED
(in liquidation),
        Plaintiff,
    vs.
JP MORGAN CHASE BANK (formerly
known As The Chase Manhattan
Bank and having merged with
Morgan Guaranty Trust Company
of New York),
        Defendant.
----------------------------------X


      DEPOSITION OF JP MORGAN
        BY DON THOMPSON
       New York, New York
    Wednesday, November 30, 2005


Reported by:
WENDY D. BOSKIND, RPR
JOB NO. 179637

Page 14

Thompson

1  interpret that agreement.
2      A.  Sure.  As I said before, I sort
3  of grew up with the derivatives market,
4  which started in the 1980's.  I was
5  somewhat involved in the process of ISDA,
6  putting together the first standard ISDA
7  Master Agreement, which was published in
8  1987.  I was an active member of the
9  documentation committee when the agreement
10 was redrafted, in 1992, and was
11 extensively involved in its recent
12 re-publication as a 2002 version.  I spent
13 virtually all of my professional day on
14 derivatives matters, a lot involving
15 documentation in the ISDA Master
16 Agreement.  I am co-chair of ISDA's
17 documentation committee, so I run across
18 the ISDA Master with some degree of
19 frequency.
20     Q.  And in your affidavit in the
21 Hong Kong preceding, I believe you said
22 you were an active member of the ISDA
23 committee that drafted the ISDA Master
24 Agreement?

Page 15

Thompson

1      A.  That is correct.
2      Q.  Can you tell me what types of
3  things you do as part of that committee?
4      A.  Sure.  What you do is
5  essentially review drafts which are
6  prepared by ISDA's counsel, have internal
7  discussions with people at JPMorgan
8  concerning the structure and substance of
9  that agreement, participate in industry-
10 wide meetings at which various revisions
11 to that agreement are proposed or
12 rejected, and generally track the process
13 of the drafting of the document --
14     (Pause in proceedings.)
15     A.  -- from its initial drafting
16 through to its publication.
17     Q.  And who is ISDA's counsel?
18     A.  ISDA's counsel at the time was
19 Cravath Swaine & Moore.
20     Q.  And currently?
21     A.  Currently, it is -- ISDA has a
22 number of counsel, Allen & Overy is one of
23 them.
24     Q.  In these committee meetings, do

Page 16

Thompson

1  they take place annually, semi-annually?
2      A.  They take place as needed.
3      Q.  So there is not an annual
4  meeting of the ISDA committee?
5      A.  There are periodic meetings
6  scheduled by ISDA.  There is not a fixed
7  annual date.
8      Q.  Do you ever speak at ISDA
9  conferences?
10     A.  Yes.
11     Q.  And how often have you done
12 that?
13     A.  Probably, on average, six times
14 a year for the past ten years.
15     Q.  Are those all speaking to issues
16 having to do with the ISDA Master
17 Agreement?
18     A.  No.  Some of them deal with
19 issues concerning, for example, the ISDA
20 form of credit support annex, ISDA credit
21 derivatives definitions, they all deal
22 with some form of ISDA documentation
23 issues but not all with the ISDA Master
24 Agreement.

Page 17

Thompson

1      Q.  All right.  With regards to the
2  closeout of the Peregrine Fixed Income
3  Limited positions in 1998, can you
4  describe what your general role in that
5  procedure was.
6      A.  Sure.  My general role was to
7  provide legal advice in connection with
8  that process.
9      Q.  From a legal perspective, were
10 you the person in charge of that effort on
11 JPMorgan's behalf?
12     A.  I am not exact--
13     MR. FELDBERG:  I want to note an
14 objection to the form of the
15 question.
16     You may answer.
17     THE WITNESS:  Okay.
18     A.  I am struggling, because the
19 ethos of the JPMorgan legal department at
20 the time was very much a so-called flat
21 organizational structure where people
22 would work collaboratively and the words
23 of, quote, anyone being "in charge"
24 (indicating) were not part of that

Page 150

Thompson

1
2  JPMorgan or any other person or persons
3  that were contacted by or on behalf of
4  JPMorgan".
5      Are you competent to testify
6  about that area?
7      A.  I believe the calculation
8  statement that was provided broke out the
9  valuation of the specified transactions by
10 Reference Market makers.  I don't know
11 whether we were contacting any of the
12 other enumerated entities in item 6.
13     Q.  So can you tell me why the
14 Reference Market makers were only
15 contacted on January 15th, 1998 for the
16 Thai baht transactions versus some other
17 debt?
18     A.  I cannot tell you specifically
19 why it was that day as opposed to any
20 other day.
21     I suspect it was because we did
22 not have the requisite information needed
23 to contact them until that day.
24     Q.  But that's your speculation; is
25 that right?

Page 151

Thompson

1
2      A.  That's my understanding.
3      If you care to draw a
4  distinction between "speculation" and
5  "understanding", so be it.
6      Q.  Okay.  Well, did you gain that
7  understanding by talking to other
8  individuals?
9      A.  No.
10     Q.  And, so, it's your guess, as you
11 sit here today, as to --
12     A.  My understanding at the time was
13 as soon as we were ready and had the
14 requisite information to obtain market
15 quotations for Reference Market makers, we
16 did so.
17     Q.  Okay.
18     A.  And we did not do so until we
19 had that requisite level of information.
20     Q.  And with regards to valuing the
21 specified transactions by the Reference
22 Market makers, do you know why JPMorgan
23 only requested indications versus actual
24 market quotes?
25     A.  I believe that was -- yes, that

Page 152

Thompson

1
2  was, first of all, in accordance with the
3  provisions of the agreement, which does
4  not require or which does not prohibit the
5  obtaining of indicative quotations and,
6  secondly, it's in accordance with market
7  practice.
8      Q.  Well, we will start, then, with
9  ISDA Master Agreement.
10     Where in the agreement does it
11 say you were permitted to get indications?
12     A.  It does not prohibit the
13 obtaining of indications.
14     Q.  But it also does not say --
15     A.  It does not expressly provide
16 that indicative quotations are to be
17 obtained.
18     Q.  And then, with regards to market
19 practice, maybe you can explain to me what
20 you mean, that that is proper or used in
21 market practice.
22     A.  It is my understanding that
23 most, if not all, major dealers, when
24 involved in closeouts, obtain indicative
25 quotations.

Page 153

Thompson

1
2      Q.  Give me one second.  (Pause.)
3      You have testified that there
4  were approximately 12 other transactions --
5  strike that.
6      You have testified that there
7  were approximately 12 other closeouts that
8  you were involved in under an ISDA Master
9  Agreement.  Can you tell me, of those
10 other situations, how many of those used
11 indications in market quotations versus
12 real quotes?
13     A.  I can't give you a specific
14 breakdown of that.
15     I suspect most of them have
16 involved either being silent on the point,
17 in which case the Reference Market makers
18 can choose to quote either on a firm or
19 indicative basis or have said that
20 indicative quotations are okay.  They have
21 taken place over a 20-year career, they
22 are sporadic and episodic events.  I
23 simply cannot recall how many of them in
24 each category.
25     Q.  Sure.

Page 154

Thompson

A. And when I mentioned "market practice", just to be clear, I believe "market practice" often involves you ask for quotations, there is no statement as to whether they are firm or indicative, and the Reference Market makers can choose to quote on either basis.

Q. Am I correct in stating that JPMorgan provided some of the variables to these various transactions to the Reference Market makers when obtaining the quotations; is that right?

A. I believe -- I am not sure whether -- some of it is accurate.

I know, in some of the transactions, we did provide one of the variables, which was the spot exchange rate at the time.

Q. And, based on your understanding of the ISDA Master Agreement, is that appropriate?

A. Yes.

Q. Why?

A. Because it enables parties who

Page 155

Thompson

are providing, for instance, a valuation of an option position, to isolate the value of the option as opposed to the separate immaterial value -- or differences in value which may be attributable to using different spot rates.

As a practical matter, when you are getting a quote for an option position, it will be more difficult to obtain that quotation if you also require that option trader who is trading options, not the spot position, to provide both the spot position and the intrinsic value of the option.

Q. Was --

A. So we made the decision at the time to provide the spot rate in order to isolate and fix that and enable the quoting dealers to provide quotes on the value of the option which was, by far, the overwhelming value of the position, as I understand it.

Q. But JPMorgan could have just

Page 156

Thompson

simply asked for a quote without providing the spot rate; correct?

A. Yes, yes, we could have done that.

Q. And is that -- has that been done on other occasions that you have been involved in?

A. Uh -- I don't recall the precise breakdown between options, forwards, and swaps, and in the other closeouts I have worked on.

I think what was different here, and led us to that conclusion, was it was overwhelmingly an option book.

Now, one of the things we were mindful of, frankly, in doing that process and, again, remember that the market quotation provision is a liquidated damages provision, which is designed to provide objective third-party input into the value of transactions, to ensure that the legitimate interests of both the non-defaulting party and the defaulting party are protected, is that if we were to

Page 157

Thompson

ask for quotations on a basis that other dealers would find burdensome or onerous to provide them, the result is that you fall away from the market quotation provision and you fall back to the loss provision, which does not have this objective third-party input aspect the market quotation does.

Q. (Pause.)

THE WITNESS: Is there any way he can just ask you the questions?

Q. No.

So, it's your testimony that the purpose of having this type of procedure is to get an objective third-party quotation that values these things independently in the market; is that right?

A. That is the ra--

MR. FELDBERG: Excuse me one second.

Objection to the form.

Please answer.

THE WITNESS: Okay.

40 (Pages 154 to 157)

Page 166

Thompson

1  
2  know, it's not so clear in a bankruptcy,  
3  it's not such an issue in a bankruptcy,  
4  but in these scenarios you always want to  
5  be careful about client confidentiality  
6  and making sure that any information which  
7  is imparted to other dealers is only  
8  information in the public domain.  
9       You want to make sure that  
10 people are not acting in a way to try and  
11 extract additional value from the client  
12 in a situation where the agreement  
13 provides a clear legal framework as to how  
14 you determine the value of the  
15 transactions.  
16      You want to act generally as a  
17 responsible dealer who is acting, frankly,  
18 with a twin mandate. One is to protect  
19 the assets of the firm and your own claim  
20 against the estate of the bankrupt entity  
21 and, number two, who enables the  
22 counterparty to realize fair value within  
23 the bounds of the agreement of the value  
24 of the positions that it defaulted on.  
25      Q. Did JPMorgan hedge its risk on  

Page 167

Thompson

1  
2  January 12th, 1998?  
3      A. Again, I don't run a trading  
4  book, so, aside from the imprecision of  
5  the question, I don't know the answer to  
6  it.  
7       We can talk about, really, what  
8  the question means, because to say "hedge  
9  its risk" is meaningless to me, because  
10 there are a bundle of risks that one has  
11 when one enters into a derivative  
12 transaction; right? You have credit risk,  
13 which can be hedged in the credit default  
14 market, you have the market risk from the  
15 underlying positions.  
16      So, I am not even sure what risk  
17 you are talking about, when you say did we  
18 hedge our risk.  
19      To my understanding, we did not  
20 undertake any additional hedging  
21 activities on January 12th or thereafter.  
22      Q. Okay. And let me ask you, are  
23 you competent to testify on the issue of  
24 hedging -- strike that.  
25      Are you competent to testify as  

Page 168

Thompson

1  
2  to any hedging that JPMorgan did during  
3  January 1998 in connection with these  
4  transactions, in whatever form it took?  
5      A. No.  
6       MR. FELDBERG: Excuse me. I am  
7  going to object to the form of the  
8  question.  
9       You may answer. And I think you  
10 did answer.  
11      A. No.  
12      Q. You are not competent?  
13      A. No, I am not competent to  
14 testify.  
15      Q. You have discussed, generally,  
16 how fairness is one of the goals of the  
17 ISDA Master Agreement. And, so, my  
18 question is, is, how does obtaining  
19 indications, as opposed to real quotes,  
20 allow for a fairness in determining the  
21 actual value of how these things should  
22 have been closed out?  
23      A. Okay, that's a very good  
24 question, with a very simple answer.  
25      Q. Okay.  

Page 169

Thompson

1  
2      A. If you are in a situation where  
3  dealers, for instance, are unwilling to  
4  provide firm quotes but are willing to  
5  provide indicative quotes which, as we all  
6  know, are often extremely close to the  
7  eventual firm level, if you go through the  
8  process of asking a dealer to (indicating)  
9  firm up his indicative quote, you have  
10 provided for the realization of  
11 substantial value to your defaulting  
12 counterparty and, in my view, that is  
13 absolutely fair, commercially-reasonable,  
14 and in good faith.  
15      Remember, that the ISDA  
16 agreement market quotation process is a  
17 liquidated damages provision and, in fact,  
18 the agreement in Section 6 provides  
19 exactly that, both parties make an  
20 acknowledgment that amounts calculated  
21 pursuant to Section 6 are -- I believe the  
22 phrase is a reasonable pre-estimate of  
23 damages, and both parties acknowledge that  
24 if obtained in accordance with the process  
25 it's not a penalty.  

43 (Pages 166 to 169)

Page 170

Thompson

The significance of that, in the context of your question, is -- and this is why I described the twin goals that one needs to respect when one is conducting a closeout, you need to protect the interests of -- the legitimate interests of the non-defaulting party. Remember, he didn't default, he didn't go bankrupt, he would have preferred that the other party performed his remaining payment obligations in accordance with their original terms.

On the other hand, the defaulting party does have a legitimate interest of realizing -- let's just call it "fair value", for want of a better term, for the positions that he has defaulted on.

The agreement clearly provides that the process, the market quotation process, is an estimate only and may well not be the value that the defaulting party could have realized if, for example, he were to have conducted an auction as a

Page 171

Thompson

going concern and auctioned off all of the transactions to the highest bidder.

The clearest evidence of that is the fact that you get four quotations, you disregard the high, you disregard the low. The objective is to get rid of the outliers, look at the middle band (indicating) of reasonable value of the transactions, and that's the amount that's paid to the defaulting party.

Q. Okay.

A. So that is, I hope, responsive to your question as to why I think the market quotation process undertaken in connection with the obtaining of indicative quotations is fair to the counterparty.

Q. Were the Market Reference makers --

A. Reference Market makers.

Q. Were the Reference Market makers asked to give real quotes in this case versus giving indications?

A. I was not the one who asked the

Page 172

Thompson

Reference Market makers for quotes, I believe that was Piers. So I do not know the answer to that question.

Q. Are you competent to testify to anything relating to the actual quotes that were obtained in this case for the specified transactions?

A. I --

MR. FELDBERG: Objection to the form.

You may answer.

A. I was not the person on the ground when the quotes were obtained, which needed to be obtained during the trading day in the Asia-Pacific time zone. So, no, I am not competent to testify to that.

Q. Referring you back to Exhibit 2, which is the 30(b)(6) Notice, Number 7 at the bottom of page 4 reads: "The role of JPMorgan's trading staff, accounting staff, legal staff, risk staff, and compliance staff, in terminating and closing out the specified transactions in

Page 173

Thompson

January 1998".

Are you competent to testify as to those matters?

A. In varying degrees.

I believe I have already testified as to who the principal people were, first of all.

Secondly, obviously, I am highly qualified to testify on the role of the legal staff.

Third, there are some terms here which simply are either ambiguous or irrelevant in the context, such as I don't know what you mean by, quote, "risk staff", closed quote.

Q. Okay.

MR. WAXMAN: Just for the record, no objection was lodged by counsel as to this notice.

Q. But you can continue. So -- I'm sorry, so you are competent to testify as to the legal staff's role; is that correct?

A. That's correct.

44 (Pages 170 to 173)

ESQUIRE DEPOSITION SERVICES
212-687-8010