# EXHIBIT 5

**DeRosa Research and Trading, Inc.**
495 White Oak Shade Road
New Canaan, CT 06840
Tel: (203) 801-4340; Fax: (203) 801-4342
derosa@derosa-research.com

## Expert Report of

# David F. DeRosa, Ph.D

## June 1, 2006

RE:   PEREGRINE FIXED INCOME LIMITED (in liquidation) vs. JPMORGAN CHASE BANK (formally known as The Chase Manhattan Bank and having merged with Morgan Guaranty Trust Company of New York)

**I.**   **INTRODUCTION**

I, David DeRosa, have been retained on behalf of plaintiff Peregrine Fixed Income Limited ("PFIL") to testify as an expert witness in this lawsuit brought by PFIL against JPMorgan Chase Bank ("JPMorgan"). I have reviewed Stephen Greene's report, dated February 10, 2006 (hereinafter referred to as the "Greene Report"), and Mr. Greene's rebuttal report, dated March 29, 2006 (hereinafter referred to as the "Greene Rebuttal Report"). I have written the following report to rebut the material issues raised in Mr. Greene's Report and Mr. Greene's Rebuttal Report.

**II.**   **QUALIFICATIONS**

**A.**   **Stephen Greene's Qualifications**

I have reviewed Mr. Greene's qualifications and experience as set forth in the Greene Report and the Greene Rebuttal Report. Significantly, in neither report does Mr. Greene assert that he has any experience trading, modeling or evaluating derivatives in the foreign exchange market. Rather, Mr. Greene appears to be an attorney who assisted in the drafting of the 1987

1

and 1992 ISDA Master Agreements (and the User's Guides thereto) and provided legal guidance for certain close-outs under the 1992 ISDA Master Agreement. See Greene Report ¶¶ 6-23.

A key issue in this case is a determination of when it became "reasonably practicable" for JPMorgan to obtain market quotations and value the Terminated Transactions during the week of January 12, 1998. Because Mr. Greene apparently has no practical experience obtaining market quotations, trading foreign derivatives, or participating in the foreign exchange market, I do not believe he is qualified to offer an expert opinion as to when it became reasonably practicable from a trading perspective to value the Terminated Transactions.

For example, through deposition testimony, JPMorgan has stated that from the time it learned of the liquidation on January 12, 1998 to the afternoon of January 13, 1998, JPMorgan's legal department and senior executives discussed how to manage and proceed through the close-out process, resulting in the order being given to the four relevant trading managers to commence the close-out procedure on the afternoon of January 13, 1998. See Piers Murray Deposition Transcript at 25-27, 31-32, 112-116, 150-151 (hereinafter referred to as "Murray Dep. Tr. at ___"). In addition, through deposition testimony, JPMorgan has stated that as of the afternoon of January 13, 1998, JPMorgan's legal department and senior executives delegated the decision-making authority to the four relevant trading managers to decide how to proceed through the close-out of the Terminated Transactions. See Murray Dep. Tr. at 115-116, 150-151.

Thus, while Mr. Greene may have experience in supervising close-out procedures from a legal perspective, Mr. Greene has no experience in trading foreign derivatives or obtaining market quotations that would qualify him as an expert to opine on the reasonableness of the steps taken to close out the Terminated Transactions.

### B.   David DeRosa's Qualifications

My qualifications are set forth in my first report dated February 10, 2006. Notwithstanding, I emphasize that I have negotiated and executed scores of ISDA Master Agreements, and I have over twenty years of experience in obtaining market quotations in the foreign exchange market.

Mr. Greene contends that my "views and opinions on the 'meaning, interpretation and policy' of the 1992 ISDA Master Agreement are entitled to no weight whatsoever" because I was not involved in drafting the 1987 or 1992 ISDA Master Agreements or the User's Guides thereto. See Greene Rebuttal Report at ¶¶ 1-9. While it is true that I did not sit on the committees that drafted these documents, people (such as myself) can become expert in a particular area through training, education and experience. As set forth in my first report and discussed herein, I have extensive training, education and experience with regard to the derivative financial markets and the ISDA Master Agreement, including writing three books on foreign exchange, teaching courses on foreign derivatives at leading business schools in the country, twenty years of foreign trading experience at some of the leading banks in the world, and sitting on the board of directors of five hedge funds that invest in foreign exchange markets through the use of ISDA Master Agreements with a combined capital in excess of $20 billion.

### III.   PFIL VIEWS RETROACTIVE MARKET QUOTATIONS AS A REMEDY TO JPMORGAN'S BREACH

Mr. Greene contends that "PFIL's sole and exclusive claim for relief under its Complaint is predicated on the theory that the Reference Market-makers in this case were required to provide so-called retroactive quotations based on the historical prices in effect on the Early Termination Date, which was January 12, 1998." Greene Rebuttal Report ¶ 10. To the contrary, PFIL's claim is primarily based on the fact that JPMorgan did not value the Terminated

Transactions on January 12, 1998 or as soon as reasonably practicable thereafter.  See ISDA Master Agreement § 14 (market quotation definition).  As a result of its failure, JPMorgan should have remedied its breach by retroactively pricing the Terminated Transactions to January 12, 1998.  Thus, retroactive pricing is a part of PFIL's case to the extent it is used as a remedy to cure JPMorgan's initial failure to value the Terminated Transactions on January 12, 1998 or as soon as reasonably practicable thereafter.

Mr. Greene also contends that the drafters of the 1992 ISDA Master Agreement "consciously chose to subject the *Defaulting Party* to the risk that the contemporaneous prices in effect on the day and time as of which Reference Market-makers provide their quotations might be less favorable to it than the historical prices in effect on the Early Termination Date or any other historical prices."  Greene Rebuttal Report ¶ 12.  While it is true that the defaulting party bears the risk of market fluctuations that follow an Early Termination Date, that exposure only exists until it becomes reasonably practicable for the non-defaulting party to close out the Terminated Transactions.  Thus, in this case, PFIL bore the risk of market fluctuations between the Event of Default on January 12, 1998, at approximately 12:00 p.m. (*i.e.*, the point in time that the Default Event occurred) and late morning on January 13, 1998 (*i.e.*, the point in time when it was reasonably practicable for JPMorgan to have completed the close-out process).  However, PFIL did not bear the risk of market fluctuations beyond that point in time.

IV.   **PFIL'S THEORIES OF LIABILITY**

A.   **"Reasonably Possible" Has No Relevance to this Case**

Mr. Greene contends that "because Dr. DeRosa believes it was reasonably possible for JPMC to have requested and obtained quotations on all the Terminated Transactions 'no later than January 13, 1998,' JPMC is liable to PFIL for damages for failing to do so."  Greene

Rebuttal Report ¶ 15. I have never asserted that the phrase "reasonably possible" has any application in this case, and the phrase "reasonably possible" is not part of the ISDA Master Agreement. Rather, I have contended that JPMorgan had to value the Terminated Transactions on January 12, 1998 or as soon as "reasonably practicable" thereafter.

Moreover, contrary to Mr. Greene's assertion that I have not specified "either the time or place on January 13, 1998" that was reasonably practicable to value the Terminated Transactions, I have provided a basis to value the Terminated Transactions on January 13, 1998. Specifically, as stated in Exhibit B to my report dated February 10, 2006, it is my opinion that the Terminated Transactions should be valued based on the mid-point price on January 13, 1998. The mid-point price is simply the average of the highest and lowest prices in effect on January 13, 1998. I have also provided valuations based on other points in time and locations (*i.e.*, Tokyo) to give a complete picture of PFIL's potential damages during the week of January 12, 1998. See DeRosa Letter dated March 29, 2006 (containing supplemental data).

A degree of delay may be appropriate when the Termination Event occurs on a weekend, bank holiday, or as here, after the close of business in the Austral-Asian time zones. However, any delay that goes beyond what is reasonably practicable is not appropriate. In this case, JPMorgan had the entire evening in the Austral-Asian time zones on January 12, 1998, as well as the entire business days in London and New York on January 12, 1998, respectively (because of the differences in time zones), to prepare for the close-out. Given that amount of time, it was reasonably practicable for JPMorgan to have begun the close-out process when the markets opened in the Austral-Asian time zones on January 13, 1998. Moreover, given that traders execute scores of plain vanilla trades a day (like the trades at issue in this case), it was

reasonably practicable for JPMorgan to complete the close-out process by late morning on January 13, 1998.

However, given the arbitrariness of selecting one moment in time on the morning of January 13, 1998 over any other moment in time that morning to value the Terminated Transactions, it is my opinion that the most reasonable method for valuing the Terminated Transactions is to select the mid-point price on January 13, 1998. This method is most appropriate because it does not unduly favor one party over the other by selectively choosing the highest or lowest rate available for that day.

Finally, Mr. Greene states that the "1992 ISDA Master Agreement does not give the Defaulting Party the right to sit on the sidelines with a stopwatch and a whistle, calling fouls whenever the pace of requesting quotations is slower than it might like." Greene Rebuttal Report ¶ 21. I am informed that comparable counterparties that PFIL settled with as a result of Early Termination Event at issue in this case, only JPMorgan insisted on a valuation that was based on a date subsequent to January 13, 1998. See Simon Copley Deposition Transcript at 237-238 (hereinafter referred to as "Copley Dep. Tr. at ___"). Thus, the industry standard of reasonableness was to value the Terminated Transactions as of January 12, 1998 or January 13, 1998.

**B.   JPMorgan's Decision to Provide Market Variables Violated the ISDA Master Agreement**

Mr. Greene admits that JPMorgan provided certain variables to the Reference Market-makers at the time JPMorgan was seeking market quotations. See Greene Rebuttal Report ¶ 24. Mr. Greene attempts to justify this conduct by contending that JPMorgan "believed, reasonably and in good faith, that doing so would result in better (i.e., more advantageous) quotations for PFIL." Id. Mr. Greene also contends that PFIL's failure to offer proof that it suffered any losses

as a result of JPMorgan supplying certain variables to the Reference Market-makers undermines PFIL's claim for damages. See Greene Rebuttal Report ¶ 23. Both contentions are irrelevant.

The ISDA Master Agreement required JPMorgan to obtain market quotations from independent Reference Market-makers, so the market quotations most accurately reflected the true value of the Terminated Transactions. There is no provision in the ISDA Master Agreement permitting the Non-Defaulting Party to provide certain variables to influence the market quotations. Indeed, it is impossible to now determine whether better or different market quotations were available in the late morning on January 13, 1998 (or at any other point on January 13, 1998 for that matter). The ISDA Master Agreement calls upon independent entities to value the Terminated Transactions to avoid the exact argument that JPMorgan is making here; namely, that by influencing the process, JPMorgan achieved better pricing for PFIL.

Mr. Greene also incorrectly asserts that "PFIL has had 8 years to develop or obtain evidence that the Reference Market-makers in this case would have provided more favorable quotations to PFIL if JPMC had not provided spot reference prices to them." Greene Rebuttal Report ¶ 27. I am informed that not until discovery in this litigation was it confirmed that JPMorgan had provided market variables to the Reference Market-makers. Moreover, Mr. Greene's contention that PFIL has not "shown any evidence from the Reference Market-makers in this case that, but for JPMC's provision of spot prices, they would have provided more favorable quotations from PFIL's perspective" misses the point. See Greene Rebuttal Report ¶ 27. The only way to produce the evidence suggested by JPMorgan would be to recreate the exact market conditions that existed during the week of January 12, 1998, contact the same Reference Market-makers, and request market quotations without the influence of JPMorgan's input. Such an exercise cannot be done.

It is the independence of the Reference Market-makers that allows the market quotations to provide the most accurate valuations of the Terminated Transactions. Once that independence is compromised, the quotations provided by the Reference Market-makers do not provide an accurate assessment of the value of the Terminated Transactions.

### C.   JPMorgan's Decision to Request "Indications" Violated the ISDA Master Agreement

Mr. Greene admits that JPMorgan requested "indications" (*i.e.*, quotations on which the Reference Market-makers were not prepared to trade) from the Reference Market-makers. See Greene Rebuttal Report ¶ 30. By asking for indications, JPMorgan again improperly influenced the market quotations that were provided by the Reference Market-makers. The fact that PFIL has not provided proof that JPMorgan's conduct harmed PFIL is irrelevant.

I am also informed that not until discovery in this litigation was it confirmed that JPMorgan had requested "indications" as opposed to live quotes from the Reference Market-makers. Thus, PFIL has not had "8 years to develop or obtain evidence that the quotations given by Reference Market-makers in this case were less favorable to PFIL than they would have been if JPMC had not asked for indications." Greene Rebuttal Report ¶ 30. Nor could PFIL have developed such evidence even if it had known because it is impossible to now recreate the market conditions that were in place during the relevant time period.

### V.   JPMORGAN DID NOT VALUE THE TRANSACTIONS "ON" OR "AS SOON AS REASONABLY PRACTICABLE AFTER THE EARLY TERMINATION DATE"

Mr. Greene begins his critique of my opinion regarding the timing of the close-out process by focusing on the four steps that are involved in the close-out process. Those steps are:

1)   Determining that a termination event has occurred;

2)   Identifying all of the Terminated Transactions that are subject to the close-out;

3)    Obtaining market quotations for the Terminated Transactions; and

4)    Paying the amount due.

While Mr. Greene states that my "understanding of what the basic close-out process actually entails is profoundly mistaken," Greene Rebuttal Report ¶ 33, JPMorgan's chief lawyer on this matter, Don Thompson, expressly agreed that these are the four steps that must be completed in the close-out process. See Don Thompson Deposition Transcript at 103-105 (hereinafter referred to as "Thompson Dep. Tr. at ___").[1]

Mr. Greene next contends that it is my position that "once the Terminated Transactions have been identified, quotations must immediately be 'obtained.'" Greene Rebuttal Report ¶ 33. My problem with Mr. Greene's formulation is his use of the word "immediately." It is my opinion that once the Terminated Transactions have been identified, JPMorgan was required to obtain market quotations "on" or "as soon as reasonably practicable after the Early Termination Date." In doing so, it may have been reasonably practicable for JPMorgan to have taken certain steps that Mr. Greene discusses before actually obtaining the market quotations, including:

- Consulting among JPMorgan's lawyers in New York and Asia. See Greene Rebuttal Report ¶ 34;

- Determining when and how to hedge its trading books. See Id. ¶ 35;

- Coordinating its business people's efforts. See Id. ¶ 35; and

- Considering and discussing the order and timing of how and when quotations would be requested. See Id. ¶ 36.

---

[1]    Mr. Greene's attempt to minimize Mr. Thompson's testimony by focusing on the word "broadly" is a red herring. See Greene Rebuttal Report ¶ 39. I agree that these four steps are broad categories that each contain requirements of their own. However, the basic structure set forth by Mr. Thompson aptly describes the steps that must be taken in the close-out procedure.

Notwithstanding, it is my opinion that it was reasonably practicable for the steps ⋅⋅ to have been completed prior to the time the markets opened in the Austral-Asian time zones on January 13, 1998.

This is especially true given that JPMorgan, as well as the rest of the financial world, had notice of the financial problems and pending demise of PFIL's credit support provider, Peregrine Investment Holdings Limited ("PIHL"), in the weeks and months prior to the default. PIHL's financial problems were first widely discussed in major press outlets in late October and early November 1997. See South China Morning Post, *Investment Bank Says Reports of Demise Completely False* (October 27, 1997) (PIHL's management addressing concerns that it had suffered losses between US $300 million and US $1 billion).[2] Shortly thereafter, the Japan Bond Research Institute placed the ratings of PIHL under review with "negative implication." South China Morning Post, *Peregrine Rating Put Under Review* (November 1, 1997). Within days, PIHL management placed full page advertisements in major newspapers to address speculation that it may be in serious financial difficulties. See Asian Economic News, *Major H.K. Investment Bank Denies Rumor of Collapse* (November 3, 1997).

On November 18, 1997, an announcement was made that PIHL had reached a preliminary agreement for the Zurich Group to buy $200 million shares of PIHL. See New York Times, *Zurich Group to Buy a Big Piece of a Hong Kong Investment Bank* (November 18, 1997). Notwithstanding, the Japan Bond Research Institute maintained its negative outlook on the debt of PIHL. See South China Morning Post, *Business News* (November 19, 1997). Later that month, PIHL announced that it was firing 275 people, amounting to 14 percent of its world-wide

---

[2]   A summary of this article, as well as summaries of the other articles cited herein, are included in the Addendum to this report. Complete copies of the articles cited herein and other relevant articles are attached hereto as Exhibit A.

staff. <u>See</u> Chicago Tribune, *News* (November 28, 1997); <u>see</u> <u>also</u> New York Times, *Hong Kong Bank Lays Off 275 Workers World Wide* (December 1, 1997).

On December 5, 1997, Moody's Investors Services downgraded PIHL's credit rating to Prime-3. <u>See</u> Financial Times (UK), *Commercial Paper Downgraded* (December 5, 1997). On December 12, 1997, PIHL announced that it had incurred losses of more than HK $130 million during the period July 1997 to October 1997. <u>See</u> Chinese Press Digest, *Peregrine Investments: Losses Recorded for July to October* (December 12, 1997). Nonetheless, Peregrine pushed forward with negotiations with three potential shareholders, including First Chicago International Finance Corporation, which planned to take a US $25 million stake in PIHL. <u>See</u> South China Morning Post, *Peregrine to Continue Hunt for Investors* (December 16, 1997).

At the end of 1997, however, rumors began circulating that PIHL was going to be forced to incur nearly HK $100 million in losses due to a poor response to a rights issue relating to an Indonesian taxi business that PIHL underwrote, Steady Safe. <u>See</u> Chinese Press Digest, *Peregrine Investments: Indonesian Underwriting a Costly Exercise* (December 30, 1997). On January 7, 1998, PIHL officials declined to deny suggestions that the Indonesian company owed Peregrine most of its US $265 million accumulated debt. <u>See</u> South China Morning Post, *Jakarta Issue Delay Blow to Peregrine* (January 7, 1998). The same article noted that PIHL's stock had dropped 62% in the prior 12 months. <u>See</u> <u>id.</u>

On January 8, 1998, PIHL announced that it may have to revise the terms of the $200 million cash buyout by the Zurich Group. <u>See</u> Wall Street Journal, *Once Booming Peregrine Feels Pain of the Asian Currency Crisis* (January 8, 1998); <u>see</u> <u>also</u> New York Times, *International Business* (January 8, 1998). That same day, trading in PIHL shares was suspended

and PIHL's stocks fell 14 percent before trading was halted.  See South China Morning Post, *Peregrine Shares Hit as Zurich Talks go on; Peregrine Trading Suspended* (January 8, 1998).

On January 9, 1998, the Chicago Tribune announced that "Peregrine Investment Holdings, Ltd. was all but shuttered by regulators after a plan to sell almost a third of the Hong Kong investment bank collapsed, leaving its solvency in doubt. The Hong Kong Securities and Futures Commission suspended Peregrine's stock exchange membership and said it would restrict the company's business." Chicago Tribune, *Securities Commission Bars Peregrine from Hong Kong Exchange* (January 9, 1998); see also New York Times, *Peregrine Revising Deal with Zurich* (January 9, 1998).

On January 10, 1998, the Zurich Group declined to purchase PIHL's shares, "triggering crisis talks last night to find a new buyer . . . . In a bid to protect investors, [the Securities and Futures Commission] issued restriction notices on 10 companies under the Peregrine group banning them from conducting business and disposing of any assets. The futures exchange later restricted Peregrine's business to the liquidation of its positions while the stock exchange suspended Peregrine's Brokerage's membership pending further investigations into its financial situation . . . . Following the announcements, the Japan Bond Research Institute downgraded Peregrine's foreign currency and Hong Kong dollar long-term debt from BBB+ to BB-. Ratings for its foreign currency and Hong Kong dollar short-term debt were also downgraded from A2 to A3 . . . ." South China Morning Post, *Business News* (January 10, 1998); see also Times (UK), *Regulator Freezes Peregrine Assets* (January 10, 1998); New York Times, *Collapse of Equity Sale Leaves Peregrine Investments in Crisis* (January 10, 1998) ("Tom Grimmer, a Peregrine spokesman, denied rumors that Peregrine was closing, but said the company's shares, suspended form trading since Wednesday, would stay off the market indefinitely.").

12

On January 11, 1998, several leading publications announced that Peregrine was on the verge of collapse. See Los Angeles Times, *Business Section* (January 11, 1998) (". . . . Peregrine Investment Holdings Ltd. was fighting for its life Friday after reports that an Indonesian company linked to Suharto's oldest daughter owed it as much as $270 million . . . ."); Bloomberg News, *Is Peregrine Next on Block?* (January 11, 1998) ("Peregrine Investments Holdings Ltd. was all but shuttered by regulators Friday after a plan to sell almost a third of the Hong Kong investment bank collapsed, leaving its solvency in doubt."); Sunday Times (UK), *Big Investor Predicts Rout in Hong Kong, Peregrine Crisis Alarms Market* (January 11, 1998) ("Philip Tose, Peregrine's chairman, and his executives were engaged in frantic negotiations over the weekend to sign up a new investor during the several days' grace granted by regulators in which to find a new white knight. Meanwhile, its shares remain suspended.").

The documents produced and deposition testimony in this case also demonstrate that JPMorgan was fully aware in the week preceding the liquidation that the Peregrine conglomerate was in dire financial straits. See Magnus Dep. Tr. at 43-44, 64-65; Murray Dep. Tr. at 212-215, 230-232; JPMC 1096 (JPMorgan internal email dated January 9, 1998, stating that Peregrine has been added to JPMorgan's "crisis folder" and listing JPMorgan's exposure to Peregrine); JPMC 1093 (JPMorgan internal email dated January 9, 1998, discussing the need to monitor the ISDA Master Agreements and hold daily meetings given the financial crisis in Asia); JPMC 125 (JPMorgan internal email dated January 9, 1998, discussing JPMorgan's position in the event of a default by Peregrine); JPMC 124 (JPMorgan internal email dated January 9, 1998, ordering the stop of any payment to Peregrine on an Indonesian rupiah trade).

I understand that PIHL was placed into liquidation at approximately 12:00 p.m. (Hong Kong time) on January 12, 1998. See David Hague Deposition Transcript at 20, 30, 51-53, 56-

58 (hereinafter referred to as "Hague Dep. Tr. at __"). JPMorgan has stated that it was aware of the liquidation no later than early evening (Hong Kong time) on January 12, 1998. See Murray Dep. Tr. at 108-109, 190-191; Thompson Dep. Tr. at 148-49; Donna Reino Deposition Transcript at 31-32 (hereinafter referred to as "Reino Dep. Tr. at ___"). Thus, JPMorgan had the remainder of the evening and night in the Austral-Asian time zones on January 12, 1998, as well as the entire business days in London and New York on January 12, 1998, respectively, to discuss and complete the steps raised by Mr. Greene.

Moreover, by JPMorgan's own admission, all of the steps identified by Mr. Greene were completed no later than the afternoon of January 13, 1998. See Murray Dep. Tr. at 113, 119, 150-151. Thus, even assuming that JPMorgan required the morning and part of the afternoon on January 13, 1998 to complete these steps (a contention I find unreasonable), it is my opinion that JPMorgan should still have completed the close-out process by the close of business in the Austral-Asian time zones on January 13, 1998. Mr. Greene has not offered any explanation - - nor can he - - as to why JPMorgan did not complete the close-out process on January 13, 1998. Indeed, because of his lack of experience in the mechanics of obtaining market quotations, Mr. Greene is not qualified to opine on the reasonableness of the steps that JPMorgan's traders took in the afternoon of January 13, 1998.

In contrast, based on my extensive experience as a trader, it is my opinion that it was reasonably practicable for JPMorgan (arguably the largest participant in the foreign exchange market in the world) to obtain market quotations for 21 plain vanilla transactions prior to the close of the Austral-Asian markets on January 13, 1998.[3] Indeed, based on my understanding of

---

[3] As noted in my report dated February 10, 2006 at 23 n. 5, there were four more transactions that were subject to the close-out for a total of 25 transactions. However, four of the twenty five transactions had the same maturity date as at least one other transaction. Thus, the

the facts, JPMorgan has offered no non-speculative reason why the forwards, non-deliverable forwards, or swaps were not closed out on January 13, 1998.  See Murray Dep. Tr. 151-168. Moreover, it is my opinion that it was reasonably practicable for JPMorgan to have closed out the options transactions prior to the close of business in the Austral-Asian time zones on January 13, 1998.[4]

Mr. Greene next argues that it is reasonable for the process of requesting market quotations to take longer in situations where the people involved have little or no experience. See Greene Rebuttal Report ¶ 38.  Such an excuse cannot justify the type of delay that took place in this case, especially given JPMorgan's size and sophistication.  JPMorgan and PFIL executed the ISDA Master Agreement in January 1996.  For JPMorgan to claim that it did not understand its contractual obligations when the Early Termination Event occurred is a proposition that cannot survive in a modern, highly sophisticated business relationship.  Ignorance is not a defense to failing to comply with contractual obligations.

Mr. Greene highlights my contention "that it should have taken less than an hour for JPMC to have obtained quotations when markets opened in Singapore on January 13, 1998," Greene Rebuttal Report ¶ 40, although he does not dispute this assertion.  Indeed, based on his lack of experience as a trader, Mr. Greene does not have the expertise to offer an opinion on how long it should take a trader to obtain market quotations.  Instead, Mr. Greene offers a non-sequitur, namely, that JPMorgan learned of the default late in the day on January 12, 1998, which

trading managers were only required to obtain market quotations for 21 transactions because a single set of market quotations could be used to value transactions that had the same maturity date.

[4]   Despite Mr. Greene's attempt to minimize the testimony of Arthur Mangus, see Greene Rebuttal Report ¶ 37, Mr. Magnus did testify that JPMorgan had positively identified all of the Terminated Transactions long before January 14, 1998.  See Arthur Magnus Deposition Transcript at 65-66, 69-70, 89-90, 95-97, 103 (hereinafter referred to as "Magnus Dep. Tr. at ____").

would have required "JPMC to track the necessary people down at home or elsewhere, or to wake them in the dead of the night if necessary, to ensure that the quotations process could begin the first thing the next morning in Singapore on January 13, 1998." See Greene Rebuttal ¶ 40; see also id ¶ 41 (arguing that JPMorgan should not be required to "jump through hoops in order to request quotations as fast as possible").

In my report dated February 10, 1998, as well as this report, I have noted that JPMorgan claims to have first learned of the Event of Default late in the day on January 12, 1998.  Even so, it is my opinion that it was reasonably practicable for JPMorgan to complete the necessary steps to begin the close-out process when the markets opened in the Austral-Asian time zone on January 13, 1998.  As for Mr. Greene's contention that requiring the close-out to begin on the morning of January 13, 1998 would have involved waking people in the dead of the night, see Greene Rebuttal Report ¶ 40, I am not aware of any testimony to such effect in this case.  Mr. Murray testified that, as the trader in charge of the options desk, he was "on 24-hour duty." Murray Dep. Tr. at 132-133.  Even if it were true that certain traders or senior executives had to be inconvenienced to prepare for the close-out, it is my experience with large financial institutions such as JPMorgan that when tens of millions of dollars are at stake, the professionals involved make themselves available as necessary.

Once JPMorgan began the process of obtaining quotations on January 14, 1998, it took each of the trading managers respectively less than one hour to obtain the necessary quotes. Specifically, the time frame from the time that JPMorgan first sent its requests for market quotation to the time it received its last quote for a particular currency were as follows:

- Korean won:                 43 minutes

- New Zealand dollar:        29 minutes

16

- Indonesian rupiah:                  23 minutes

- Hong Kong dollar:                  15 minutes

- Japanese yen:                  8 minutes

<u>See</u> Reuters Market Quotations at JPMC 1051-1091.

Moreover, regarding the Thai baht, although JPMorgan contends that it took from the afternoon of January 14, 1998 to the morning of January 15, 1998 to obtain market quotations for the Thai baht transactions, such a length of time is unreasonable. JPMorgan had dedicated swap settlement and reset personnel who should have been composing the requisite request sheets once JPMorgan learned of the default. Preparation of the request sheets should have taken a matter of minutes and been faxed to the Reference Market-makers when the markets opened in the Austral-Asian time zones on January 13, 1998. Thus, although there was an added step to the Thai baht transactions (*i.e.,* the preparation of request sheets), JPMorgan nonetheless should have completed these transactions by late morning on January 13, 1998.

Mr. Greene next contends that the 1-2 hours that remained on January 13, 1998 after the order to commence the close-out process was given was not enough time to complete the close-out process on January 13, 1998. <u>See</u> Greene Rebuttal Report ¶ 42. In fact, Mr. Greene contends that such a requirement is "so arbitrary and unreasonable as to be preposterous on its face." <u>Id.</u> However, given that Mr. Greene has no experience obtaining market quotations or trading in the foreign exchange market, he does not have the expertise to offer an opinion regarding the tasks that can be accomplished by a trader in a highly sophisticated organization like JPMorgan in a 1-2 hour period.

In contrast, I have seen traders transact scores of trades in a matter of minutes, and I have done so myself. Here, the four trading managers had as few as two or at most seven trades to

17

close out.  Not only is it my experience that each of the four trading managers could have completed this task within an hour or two, each trading manager had his or her entire staff to assist with such trades.  Under these circumstances, it was reasonably practicable for JPMorgan to have completed the close-out process prior to the close of business in the Austral-Asian time zone on January 13, 1998.

Mr. Greene's next argument is tied to Mr. Murray's decision to wait to close out the New Zealand Dollar trade and Japanese Yen options trade (*i.e.*, a total of two trades) until January 14, 1998.  Mr. Greene contends that "the sworn testimony of Piers Murray and Arthur Magnus completely justifies the reasonableness of JPMC's decision not to pass responsibility for the close-out process from Singapore to JPMC's London or New York Offices."   Greene Rebuttal Report ¶ 44.  Mr. Greene goes on to say that he has "never heard anyone claim that requesting quotations in the most liquid markets could be unreasonable or abusive."  Id.  Finally, Mr. Greene contends that "JPMC proceeded cautiously and methodically to ensure precision and avoid errors due to miscommunication and/or lack of experience with these types of close-outs." Id.  While Mr. Greene, like anyone else, can read the depositions transcripts in this case, it is a different matter to say that Mr. Greene has the requisite experience as a trader in the foreign exchange market to offer an expert opinion on the reasonableness of Mr. Murray's decision.  He does not.

In contrast, having had extensive experience as a trader in the foreign exchange market, as well as having written books and taught courses on the subject, it is my opinion that the decision of Mr. Murray and the other trading managers to wait until January 14, 1998 to close out the Terminated Transactions was unreasonable.  First, with regard to Mr. Murray, who was responsible for the options book and only had to obtain one market quotation for the New

Zealand Dollar trade and one market quotation for the Japanese Yen trade, it is my opinion that those trades should have been closed out during the afternoon of January 13, 1998.

Mr. Murray had between 1 and 2 hours to obtain a market quotation for those two trades. In my experience, there is no reason that a trading manager in a major financial institution should not be able to obtain market quotations for two trades in that period of time. Indeed, Mr. Murray has acknowledged that the Japanese Yen was liquid throughout the world. See Murray Dep. Tr. at 126-27. Thus, Mr. Murray also could have obtained a market quotation for the Japanese Yen trade in the London or New York markets on January 13, 1998 even after the Austral-Asian markets closed. As such, Mr. Murray only needed to obtain a market quotation for one trade in the Austral-Asian time zone after he finished obtaining the market quotation for the one Indonesian Rupiah trade. It is entirely reasonable to expect a seasoned trader such as Mr. Murray to have completed such a task in the 1 or 2 hours that he had before the markets closed in the Austral-Asian time zone on January 13, 1998.

Moreover, even though Mr. Greene does not have the expertise to comment on the reasonableness of the delay in closing out the remaining trades (*i.e.*, two Hong Kong dollar forwards, six Korean won non-deliverable forwards, and seven Thai baht swaps), Mr. Greene does not even attempt to provide a basis for the delay for the remaining transactions. As I discussed in my report dated February 10, 2006 at 25, JPMorgan has offered no non-speculative reason for the delay in closing out the remaining transactions. Each of the three remaining trading managers had as few as two and at most seven trades to close out in the afternoon of January 13, 1998. Based on my experience as a trader, there is no reasonable basis for these trading managers to not have closed out their respective transactions in the hours that remained in the Austral-Asian time zones on January 13, 1998.

Finally, Mr. Greene fails to address the fact that JPMorgan would have proceeded in a much different fashion (*i.e.*, more expeditiously) had the situation been reversed and PFIL owed JPMorgan money, as evidenced by the following testimony of Mr. Piers Murray:

> Q:    With regards to forwards, when an event of default occurred, based on your knowledge of the forwards area, did their risk exposure change at that point in time?
>
> A:    The risk exposure would have been a function of the mark to market of that area at that point in time. And I'm not familiar - - I guess I can go back to the valuation memo of the actual in-the-moneyness of the transactions at that point in time. The extent of the in-the-moneyness would have been a guide as to the - - well, among other factors. **But the guide of the in-the-moneyness would have, um, would have been a factor in determining whether there was a need to manage that risk immediately or not.** If you were in a situation where a client owed you money versus owing money, you are effectively short an option that the position gets materially worse to you. When you have - - and therefore if that event occurs or if you know that an event of default is going to occur, you are likely to go out and protect yourself against that event by buying an option. Assuming that you have some idea of the time frame of default.
>
> Q:    Let me ask you. Doesn't it matter to J.P. Morgan whether they owe just a little bit of money to Peregrine or owe a whole lot of money to Peregrine in the context of being in the money or out of the money? Do you follow me?
>
> A:    It doesn't matter to J.P. Morgan whether it's - - it doesn't matter to J.P. Morgan from an absolute point of view whether it owes a little or a lot. If it owes a little, then it's an indication that given the volatility in the markets that little amount might turn into J.P. Morgan being owed money.
>
> Q:    Which is a situation which J.P. Morgan would want to avoid?
>
> A:    Which is a situation which J.P. Morgan would want to avoid, and in that case might buy some options to protect itself over a relatively short window that we might be concerned about. If you're very in the money, then there is an option embedded in that.

20

Q:     Do you know with regards to the forwards whether J.P. Morgan was in the money a little bit, middle of the range or really a lot in the money?

MR. FELDBERG:     Objection to the form of the question. You may answer.

A:     In the context of the valuation memo, we owed Peregrine around $57 million. So the payment was made to the extent of $57 million.   I would have called $57 million significantly in the money.

Q:     With regards to any of the four types of transactions at issue in this case - -

A:     I'm sorry, significant - - J.P. Morgan was significantly out of the money.

Q:     In other words, it owed.

A:     It owed, yes.

Murray Dep. Tr. at 212-215 (emphasis added):

(BY MR. WAXMAN) Q:   Let me just ask you.  Isn't it likely that on January 12, 1998, that the desk heads for these other types of transactions would have been very concerned about their books given that Peregrine had defaulted?  Isn't that fair to say?

A:     Well, on January 13th rather than January 12th.  Let's go with the morning of January 13th because that's when it was more - -

Q:     - - commonly known.

A:     Yes.  If you didn't know then at that point in time, then there was probably something wrong with you.  At that point in time the degree of concern would have been a function of the mark to market for the positions.  At a cursory glance, at a cursory glance, if your positions were deep in the money to the client, deep out of the money to you, you would have immediately had less concern than if the positions had been deep in the money for you.  And as I've said at least in terms of the options position, and certainly in the context of the directional risk that the client was taking in the local markets areas, the relationship was established so that we would owe the client

21

money. So that first cursory glance gave us an idea of the degree to which an immediate risk management response was required. Having ascertained that there was not an immediate risk management response required to protect our own books, then the important thing was to make sure that we obtained a -- that we began a fair process to determine the value of the transactions per the quotation method, whatever, per the closeout method, whatever that method might turn out to be. But again, at that point we had a piece of information that we didn't necessarily know how to act upon because this was the first time that we had come across the situation.

Murray Dep. Tr. at 230-232 (emphasis added).

Another JPMorgan 30(b)(6) witness, Donna Reino, testified similarly:

(BY MR. FELDBERG) Q: Ms. Reino, do you know of any reason why in a period when -- in mid-January 1998, when there began to be reports that Peregrine and its parent might be having financial difficulties, Morgan Guaranty did not either want any particular credit checks with respect to Peregrine and its parent, or hedge any particular transactions?

A:    I believe from reviewing the numbers, and just referencing back a comment that I made previously about what would Steve Thieke be interested in as the head of corporate risk management, the indication in these sorts of circumstances is are we owed or do we owe the customer, and when we owe the customer, there's no need, in our view -- they have credit risk to us in the sense that we're paying them. When we are owed, I think there's a greater concern, because we need to pay a bit more attention to that. Every report we've looked at, of the ones I've recognized, other than DR 11, shows us that we owe the client in a pretty substantial amount, so I do not think there was cause for that sort of alarm from senior management on the account, and from a counter-party credit perspective, unless there was something that Charles and Michael were concerned about, we wouldn't have done that.

\*            \*            \*

(BY MR. WAXMAN) Q:    Would it matter to J.P. Morgan if they owed PFIL just a little bit versus owing them a lot, or does it not matter?

22

> A:    From my perspective, if I am owed money, I am very concerned.  If I owe a dollar or I owe $68 million, I'm reasonably indifferent, because the - - this is the amount I owe the customer, so it's already taken into your account in P & L and so on and so forth.  So from a credit risk perspective, I don't - - I am indifferent to a dollar versus a big number.  I am not indifferent to "A client owes me $10" and a "Client who owes me $20 million."  I'm hugely concerned about the bigger number when they owe me.

Reino Dep. Tr. at 146-148 (emphasis added).

In sum, I disagree with Mr. Greene's opinion that it was reasonable for JPMorgan to have waited until 3:00 p.m. on January 13, 1998 to issue the order for the trading managers to begin the close-out process.  Based on my experience, it was reasonable for JPMorgan to have prepared in such a way by January 12, 1998 (in Asia, London, and New York) that the order to commence the close-out process was given when the Austral-Asian markets opened on January 13, 1998.  Moreover, given Mr. Greene's lack of experience as a trader, he is not qualified to offer an opinion on the reasonableness of the actions of the traders once the order to begin the close-out was given on the afternoon of January 13, 1998.  Further, it is my opinion that it was reasonable to have expected each of the four trading managers (with the assistance of their respective staffs if necessary) to have closed out the relatively small number of plain vanilla transactions that they were responsible for before the close of the Austral-Asian markets on January 13, 1998.

## VI.    OTHER ISSUES

Because the remainder of Mr. Greene's report simply restates many of the arguments raised in the first 25 pages of his report, I will not restate my responses to those arguments here. I will also reserve commenting on the issues Mr. Greene has with my damages calculation. As I understand it, JPMorgan is relying on Dr. John Hull for its damages calculation.  Thus, I will

23

06/01/2006 18:13 IFAX FAX_CENTER-NY@DORSEY.COM                    → Fax_Center-NY      ☑002/003
 06/01/2006 18:17 FAX 2038014342              DeROSA RESEARCH                            ☑002
06/01/2006 18:04 FAX  212 953 7201           DORSEY & WHITNEY THREE                      ☑003/003

address any issues relating to damages in my rebuttal report to Mr. Hull's Report, which I hereby

incorporate by reference.

Respectfully submitted,

David F. DeRosa, Ph.D