David C. Singer (DS 1358)
Seth B. Waxman (SW 7409)
DORSEY & WHITNEY LLP
250 Park Avenue
New York, New York 10177
(212) 415-9200

Attorneys for Plaintiff
Peregrine Fixed Income Limited (in liquidation)




**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------- X

Peregrine Fixed Income Limited (in liquidation),

Plaintiff,

-v-

JP Morgan Chase Bank (formerly known as The Chase Manhattan Bank and having merged with Morgan Guaranty Trust Company of New York),

Defendant.

---------------------------------------------------------- X

05 CV 4351 (RMB) (THK)

**AMENDED COMPLAINT**

Plaintiff Peregrine Fixed Income Limited (in liquidation), by its attorneys Dorsey & Whitney LLP, as and for its Complaint against the defendant JP Morgan Chase Bank, alleges:

1. Peregrine Fixed Income Limited ("PFIL") is a Hong Kong corporation with its principal place of business in Hong Kong. PFIL was engaged in business as a trader of fixed income financial products, including foreign exchange and interest rate swaps and other derivatives. PFIL was a wholly owed subsidiary of Peregrine Investment Holdings Limited ("PIHL").

2. Upon information and belief, JP Morgan Chase Bank ("JP Morgan") is a New York State Chartered Bank with its principal place of business at 270 Park Avenue, New York, New York. JP Morgan is engaged in general commercial and consumer banking and trading. JP Morgan was created by the merger of Morgan Guaranty Trust Company of New York ("MGT")

and The Chase Manhattan Bank. Prior to the merger, MGT engaged in the business of general commercial and consumer banking, and trading and trust businesses. The rights and liabilities of MGT were assumed by JP Morgan, including the liabilities of MGT to PFIL deriving from the ISDA Master Agreement.

**JURISDICTION AND VENUE**

3. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. The amount in controversy, exclusive of interest and costs, exceeds $75,000.

4. Personal jurisdiction over JP Morgan is premised on the fact that JP Morgan is located and does business within the State.

5. Venue is proper in this District, pursuant to 28 U.S.C. § 1391(a), where JP Morgan is located and a substantial part of this claim arose.

**NATURE OF CONTROVERSY**

6. On or about January 8, 1996, MGT and PFIL entered into an International Swap Dealers Association Master Agreement (the "ISDA Master Agreement") for the purpose of engaging in certain derivative transactions. Copies of the ISDA Master Agreement, the Schedule to the ISDA Master Agreement, and the Credit Support Annex to the Schedule to the ISDA Master Agreement are collectively attached hereto as Exhibit A. PIHL was listed as a "Credit Support Provider" pursuant to the Master Agreement Schedule Part 4(7). The ISDA Master Agreement was intended to govern the terms of individual currency swap transactions between the parties.

7. Between January 8, 1996 and November 7, 1997, PFIL and MGT entered into the following currency swap transactions (the "Subject Transactions"):

(a) Between January 8, 1996 and March 14, 1997, the parties entered into eight Thai Baht/United States Dollar cross-currency swap transactions;

(b) On July 18, 1997, the parties entered into one New Zealand Dollar/United States Dollar put option;

(c) Between July 25, 1997 and November 4, 1997, the parties entered into three Indonesian Rupiah/United States Dollar forward foreign exchange swap transactions;

(d) Between August 28, 1997 and November 6, 1997, the parties entered into eight Korean Won/United States Dollar non-deliverable forward foreign exchange swap transactions;

(e) Between October 22, 1997 and October 27, 1997, the parties entered into two Hong Kong Dollar/United States Dollar forward foreign exchange swap transactions;

(f) On November 7, 1997, the parties entered into two Japanese Yen/United States Dollar foreign exchange options (one put option and one call option); and

(g) Eleven failed transactions.

8. On January 12, 1998, the Board of Directors of PIHL resolved that PIHL should be placed into provisional liquidation and publicly announced that it was seeking the appointment of a provisional liquidator. On January 13, 1998, a petition for the winding-up of PIHL was presented to the Hong Kong court, and an order for the appointment of provisional liquidators in respect of PIHL was made that day.

9. The Board's actions caused an Event of Default under the ISDA Master Agreement as of January 12, 1998. The default resulted in an Automatic Early Termination of the ISDA Master Agreement.

10. The relevant provisions of the ISDA Master Agreement relating to the Event of Default and Early Termination are as follows:

**Events of Default and Termination Events**

(a) *Events of Default.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party

> or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:
>
> *    *    *
>
> (vii) *Bankruptcy.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:
>
> *    *    *
>
> (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets . . . .

ISDA Master Agreement § 5(a)(vii)(5) & (6).

> **Early Termination**
>
> (a) *Right to Terminate Following Event of Default.* If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8) . . . .

ISDA Master Agreement § 6(a).

11. Because the Schedule to the ISDA Master Agreement expressly states that "Automatic Early Termination" applies to PFIL, the Early Termination Date occurred immediately on January 12, 1998 upon the occurrence of the Event of Default. Master Agreement Schedule Part 1(6).

12. Because an Early Termination Date had occurred, no further payments were required to be made with respect to the Subject Transactions, and JP Morgan was obligated to determine what amount, if any, was due PFIL. Specifically, the ISDA Master Agreement states:

> Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

ISDA Master Agreement § 6(c)(ii).

13. Section 6(e) of the ISDA Master Agreement states that, in determining the amount payable, the parties had to select either the "Market Quotation" or "Loss" payment measure and had to select either the "First Method" or "Second Method" payment:

> If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method."

ISDA Master Agreement § 6(e).

14. The parties opted for the "Market Quotation" payment measure and the "Second Method" of payment. ISDA Master Agreement Schedule Part 1(7)(a) and (b). In defining "Market Quotation," the parties agreed to rely on Reference Market-makers to provide quotes that would put the parties in the same economic position had the Early Termination not occurred:

> "Market Quotation" means . . . an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party . . . or by such party . . . in consideration of an agreement between such party . . . and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the

> effect of preserving for such party the economic equivalent of any payment or delivery . . . by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have been required after that date.

ISDA Master Agreement § 14.

15. Reference Market-makers are defined by the ISDA Master Agreement as:

> [F]our leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

ISDA Master Agreement § 14.

16. Once selected, the Reference Market-makers were required to provide their quotations to the extent reasonably practicable as of the date the Early Termination took place:

> The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other . . . .

ISDA Master Agreement § 14. Thus, the Reference Market-makers were required to provide their quotations as of January 12, 1998.

17. Once the Market Quotations were obtained, the amount payable was the sum of all of the Market Quotations. ISDA Master Agreement §§ 6(e)(i)(3) and 14.

18. Thus, because the Reference Market-makers were able to provide their market quotations on January 12, 1998, the amount owed to PFIL was $71,226,529.

19. On or about January 15, 1998, JP Morgan notified PFIL that a Termination Event under the ISDA Master Agreement had occurred, but JP Morgan incorrectly determined that the Early Termination Date was January 13, 1998. Specifically, JP Morgan stated the following in a letter to PFIL:

> You are hereby notified that the Agreement is terminated pursuant to Section 6 of the Agreement as a consequence of an Event of Default under Section 5(a)(vii) of the Agreement with respect to [PFIL], and that the Early Termination Date in respect of the Agreement and all Transactions (as defined in the Agreement) outstanding thereunder is January 13, 1998.

A copy of the January 15, 1998 letter is attached hereto as Exhibit B.

20. On or about January 23, 1998, JP Morgan sent a letter to PFIL stating that it "has performed the calculations required to be performed by it pursuant to Section 6 of the Agreement" and concluded that it owed PFIL $57,524,016. A copy of the January 23, 1998 letter and accompanying calculations are attached hereto as Exhibit C.

21. JP Morgan's calculations were incorrectly based on Market Quotations from January 13, 1998, January 14, 1998 and January 15, 1998. JP Morgan's calculations were also incorrectly based on market quotations that were improperly influenced by the fact that JP Morgan (a) requested hypothetical market quotations (termed "indications") from Reference Market-makers as opposed to live quotes; and (b) supplied the exchange rates to the Reference Market-makers for inclusion in the calculation of the market quotations.

22. On or about January 26, 1998, JP Morgan paid to the provisional liquidators of PFIL the amount of $57,524,016, and the provisional liquidators accepted this amount as partial payment, without prejudice, reserving PFIL's right to seek the remaining amounts due.

23. On or about March 24, 1998, JP Morgan advised the provisional liquidators that JP Morgan had mistakenly overpaid the provisional liquidators $622,204. Accordingly, the

provisional liquidators returned this amount, reserving its right to seek the remaining amounts due. Thus, as of March 24, 1998, JP Morgan had paid to PFIL the amount of $56,901,812 pursuant to the ISDA Master Agreement.

24. The amount of $56,901,812 was incorrectly based on post-January 12, 1998 Market Quotations, and market quotations that were improperly influenced by JP Morgan. Had JP Morgan correctly calculated the amount due based on January 12, 1998 Market Quotations, PFIL was due a greater amount to be determined at trial.

25. Under the ISDA Master Agreement, including §§ 6(d)(ii) and 14, interest is owed on any principal amount that is due PFIL from JP Morgan.

26. The parties agreed that (a) New York law would govern the transactions; (b) the United States District Court for the Southern District of New York would have non-exclusive jurisdiction over this lawsuit; and (c) the parties waived their right to a jury trial. The relevant provisions are as follows:

> a) This Agreement will be governed by and construed in accordance with the law specified in the Schedule. ISDA Master Agreement Section 13(a). This Agreement will be governed by and construed in accordance with the laws of the State of New York without reference to choice of law doctrine. ISDA Master Agreement Schedule Part 4(1).
>
> b) With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably . . . submits to the . . . non-exclusive jurisdiction of the . . . United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York . . . . ISDA Master Agreement § 13(b)(i).
>
> c) Each party waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in respect of any suit, action or proceeding relating to this Agreement or any Credit Support Document. ISDA Master Agreement Schedule Part 5(7).

**CAUSE OF ACTION**
(Breach of Contract)

28. PFIL repeats and realleges the allegations contained in paragraphs 1 through 27.

29. PFIL and JP Morgan executed the ISDA Master Agreement on January 8, 1996.

30. PFIL duly performed all of its obligations under the ISDA Master Agreement.

31. JP Morgan breached the ISDA Master Agreement by incorrectly and wrongfully determining that the Early Termination Date was January 13, 1998, and incorrectly and wrongfully calculating the amounts due based on improperly influenced Market Quotations from January 13, 1998, January 14, 1998, and January 15, 1998.

32. As a direct result of JP Morgan's wrongful conduct, PFIL has been damaged in an amount to be determined at trial.

WHEREFORE, plaintiff demands judgment as follows:

(i) Awarding in favor of PFIL against JP Morgan a principal amount to be determined at trial, plus interest thereon;

(ii) Awarding costs and disbursements, including reasonable attorney's fees, incurred in connection with this the prosecution of the action; and

(iii) Granting such other relief as the Court deems just and proper.

Dated: March 15, 2007

**DORSEY & WHITNEY LLP**

By: /s/

David C. Singer (DS 1358)
Seth B. Waxman (SW 7409)
250 Park Avenue
New York, NY 10177
(212) 415-9200

Attorneys for Plaintiff
Peregrine Fixed Income Limited